ACCEPTED
12-14-00336-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
4/23/2015 3:09:33 PM
CATHY LUSK
CLERK

NO. 12-14-00336-CV

_____

IN THE
TWELFTH COURT OF APPEALS
AT TYLER, TEXAS

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS

4/23/2015 3:09:33 PM

CATHY S. LUSK
Clerk

_____

FREDERICK DAWSON GRAHAM
VS.
DENA MARIE TURNER

FREDERICK DAWSON GRAHAM,
RESPONDENT/APPELLANT

DENA MARIE TURNER,
PETITIONER/APPELLEE

_____

Appealed from the County Court at Law of
Nacogdoches County, Texas

_____

**APPELLANT'S BRIEF**
_____

TOM RORIE
State Bar No. 17238000
210 North Street
Nacogdoches, TX 75961
(936) 559-1188
FAX (936) 559-0099

ATTORNEY FOR APPELLANT

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

In accordance with Rule 38.1(a) of the TEXAS RULES OF APPELLATE PROCEDURE, Appellant Frederick Dawson Graham provides the following list of all parties, and the names and addresses of all counsel:

Appellant:          Frederick Dawson Graham

Counsel:            Mr. Tom Rorie
                    210 North Street
                    Nacogdoches, TX 75961
                    (936) 559-1188
                    FAX (936) 559-0099
                    trorie@sbcglobal.net


Appellee:           Dena Marie Turner

Counsel:            Mr. Jarett T. LaRochelle
                    One Riverway, Suite 1700
                    Houston, TX 77055
                    (713) 907-8668
                    FAX (713) 840-6351
                    jarettlarochelle@yahoo.com

# TABLE OF CONTENTS

Page

Identity of Parties and Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Statement of the Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv

Points of Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xvii

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Point of Error No. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        The Trial Court Abused Its Discretion in Awarding Appellee An
        Ownership Interest in Appellant's Residence

    Point of Error No. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        The Trial Court Erred in Finding that the Parties were Tenants in
        Common in Appellant's Separate Property Residence Because
        the Evidence is Insufficient to Support that Holding

    Point of Error No. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        The Trial Court Erred by Divesting Appellant of One-Half of His
        Ownership in His Separate Property Residence and Awarding that
        Interest to Appellee

        Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        The Basis for the Trial Court's Ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        The Court Should Decline to Follow *Harrington and Aaron* . . . . . . . . . . . . . . . 4

        The Evidence is Not Sufficient to Support a Finding that the Parties
        were Tenants in Common . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Existence of Joint Tenancy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Looking for a Residence Together is Not Evidence of Ownership . . . . . . 9

Was there a Common Plan or Design in Acquiring the Residence? . . . . 10

Prior Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Appellant Made a Substantial Down Payment with Separate Funds . . . . 11

Appellant Paid off the Residence Quickly . . . . . . . . . . . . . . . . . . . . . . . . 12

The Subsequent Conduct of the Parties is Evidence of Intent . . . . . . . . . 13

The Trial Court had No Discretion to Divest Appellant of Any
Interest in His Separate Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Point of Error No. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

The Trial Court Abused Its Discretion in Failing to Find that the
Residence was Not Purchased with Appellant's Separate Property
Funds When the Evidence Conclusively Showed a Purchase with
His Separate Funds

Point of Error No. 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

The Trial Court Abused its Discretion when it Disregarded
Uncontradicted Evidence that Appellee Committed Fraud on
the Community Estate

Point of Error No. 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

The Trial Court Abused its Discretion in Disregarding Evidence
of Substantial Benefits Received By Appellee During the Marriage

Point of Error No. 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

The Trial Court Abused its Discretion in Finding that Appellant at
Fault in the Break-Up of the Marriage by Considering Evidence
that was Not Relevant in Time and Not Supported by the Evidence

Appellant "Assaulted" Appellee on Eight Occasions . . . . . . . . . . . . . . . 20

iv

     Appellant Held Appellee Captive Abroad . . . . . . . . . . . . . . . . . . . . . . . . 23

     Evidence of Conduct Before or After Marriage are Not
     Relevant as Fault in Marriage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Point of Error No. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    The Trial Court Abused its Discretion When it Ordered Appellant
    to Pay Spousal Support to Appellee Although He had No Ability to Pay

Point of Error No. 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    The Trial Court Abused its Discretion in Awarding a Disproportionate
    Part of the Tract Adjoining the Residence

Conclusion and Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# INDEX OF AUTHORITIES

Cases                                                                      Page

*Aaron v. Aaron*
2012 Tex.App. LEXIS 769 (Tex.App.-Houston [14th] 2012, no writ hist.) . . . . . . . . . . . . . . . . . 3

*Anchor Casualty Co. v. Bowers*
393 S.W.2d 168 (Tex.1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Bay Area Healthcare Group, Ltd. V. McShane*
239 S.W.3d 231 (Tex.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Butnaru v. Ford Motor Company*
84 S.W.3d 198 (Tex.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *18*

*Cameron v. Cameron*
641 S.W.2d 210 (Tex.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 14, 15

*Chavez v. Chavez*
269 S.W.3d 763 (Tex.App.-Dallas 2008) no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Davis v. Huey*
571 S.W.2d 859 (Tex.1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Eggemeyer v. Eggemeyer*
554 S.W.2d 137 (Tex.1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Griffin v. Birkman*
266 S.W.3d 189 (Tex.App.-Austin 2008, pet. ref'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

*Harrington v. Harrington*
742 S.W.2d 722 (Tex.App.-Houston [1st] 1987, no writ hist.) . . . . . . . . . . . . . . . . . . . . . . . . 3

*Hooks v. Bridgewater*
229 S.W. 1114 (Tex. 1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Allstate Insurance Company*
232 S.W.3d 340 (Tex.App-Tyler 2007, no writ hist.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*In re Bass*
113 S.W.3d 735 (Tex.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*In re Case*
28 S.W.3d 154 (Tex.App.-Texarkana 2000, no writ hist.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In the Interest of M.C.F.*
121 S.W.3d 891 (Tex.App.-Fort Worth 2003, pet. dism'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Jackson v. Smith*
703 S.W.2d 791 (Tex.App.-Dallas 1985, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Knight v. Knight*
301 S.W.3d 723 (Tex.App.-Houston [14th] 2009, no writ hist.) . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Landon v. Jean-Paul Budinger, Inc.*
724 S.W.2d 931 (Tex.App.-Austin 1987, no writ hist.) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

*Lozano v. Lozano*
2009 Tex.App. LEXIS 9620, 2009 WL 4882816 (Tex.App.-Corpus Christi 2009, no writ hist.)  7

*Mangum v. Turner*
255 S.W.3d 223 (Tex.App.-Waco 2009, pet. den.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*McKeehan v. McKeehan*
355 S.W.3d 282 (Tex.App.-Austin 2011, pet. den'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 28

*Mea v. Mea*
464 S.W.2d 201 (Tex.Civ.App.–Tyler 1971, no writ hist.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Powell v. Powell*
822 S.W.2d 181 (Tex.App.-Houston [1st] 1991, no writ hist.) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Puntarelli v. Peterson*
405 S.W.3d 131 (Tex.App.-Houston [1st] no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Schlueter v. Schlueter*
975 S.W.2d 584 (Tex.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Verhage v. Verhage*
2006 TexApp LEXIS 5735, 2006 WL 1791565 (TexApp-Tyler 2006, no neg. writ hist.)  . 8, 9, 14

*Walker v. Packer*
827 S.W.2d 833 (Tex.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Wilhoite v. Sims*
401 S.W.3d 752 (Tex.App.-Dallas 2013, no writ hist.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Zagorski v. Zagorski*
116 S.W.3d 309 (Tex.App.-Houston [14th] 2003, pet. den.) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15


Codes, Rules and Statutes                                                                                                    Page

TEXAS BUSINESS & COMMERCE CODE §26.01(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

TEXAS BUSINESS & COMMERCE CODE §26.01(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

TEXAS CONSTITUTION, Article 16, §15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

TEXAS PROPERTY CODE §5.072(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

TEXAS RULES OF EVIDENCE, Rule 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## STATEMENT OF THE NATURE OF THE CASE

Appellant and Appellee were married in 2007 and in 2012 Appellee filed for divorce. The issues in the divorce case all involved property. A hearing on a request by Appellee for temporary orders was held on March 24, 2014, and Appellant was ordered to pay temporary spousal support to Appellee in the amount of $2,000 per month.

Trial on the merits was conducted by the trial court on May 30, 2014; July 17, 2014; and July 18, 2014.

The court granted the divorce, divided various items of personal property, and held that the residence acquired by Appellant prior to the marriage was owned by the parties as tenants in common. The trial court ordered a disproportionate division of the proceeds of the sale of a lot adjoining the residence to Appellee, ordered Appellant to pay $8,000 in unpaid temporary spousal support, and awarded Appellee $10,000 in attorney's fees.

## STATEMENT OF FACTS

Appellant is a native of the United Kingdom who was trained as an accountant and worked for Texaco for 28 years. His specialty was in the field of accounting for the oil and gas industry. He held a number of very responsible positions. In that capacity he was also Texaco's representative to international organizations that developed and implemented software and accounting systems for that industry.

Appellant was married and has three daughters. He retired from Texaco when that company was taken over by Chevron and had both vested retirement benefits and received what he called a "redundancy," another term for severance pay. He received those benefits both in a lump sum and in periodic monthly installments of retirement benefits.

In 2001 Appellant was employed by Shell Oil Company in Houston, Texas and living in an apartment. Appellee was one of his neighbors. They met and began a romantic relationship. Eventually they moved in together into Appellee's apartment. Appellant began divorce proceedings to be divorced in the U.K. While the divorce proceeding was pending Appellant altered or forged some documents in order to mislead Appellee as to the status of his divorce.

Appellant explained at trial that in the UK one can be divorced either by separation, which is a longer process, or by alleging cruelty or adultery. Because of his concern about his family and in particular one daughter about whose mental health he had concerns, he wanted to seek a divorce by the less traumatic but slower divorce process. He modified the papers sent to him from the UK to represent that divorce was imminent when the process was actually slower.

Appellant left Shell and began to work as a international business consultant, taking jobs with oil and gas producers in Mexico, Asia, and other places where he would work for several months by

x

contract for an agreed contract amount. In 2006 he formed an LLC named Graham Global Consulting to which his income as a consultant was paid. Appellant and Appellee lived together at the time but Appellee was not shown as an owner of the company.

Appellee wanted to move to Nacogdoches, her home town. The parties looked at residences in Nacogdoches to consider purchase. In 2006 Appellant purchased a residence in Nacogdoches. He paid the initial down payment and closing costs with funds sent to him by wire transfer from the UK in the amount of $85,000. The residence was conveyed to Appellant alone as grantee and he alone signed the note and deed of trust in order to secure a loan for payment of the balance. Appellant paid off the balance in monthly installment payments of several thousand dollars sent to him by wire transfer, and in less than two years had paid off the entire balance owed.

Appellee claimed at trial that the parties had purchased the residence together with the agreement that both would own it, and that Appellant had orally agreed to convey an interest in the home to her. Appellant denied any such agreement.

The parties were married on January 31, 2007. At the time of marriage Appellee had no property of any value. She had defaulted in payment of student loan debt and Appellant showed at trial that he had paid $63,000 of her student loan debt during their relationship.

In 2008 a lot adjoining the residence lot became available for purchase. Appellant purchased it in his name only and again solely signed a promissory note and deed of trust in order to secure a loan. He paid several thousand dollars down. The parties made several payments on the lot, but eventually they defaulted. Shortly before trial Appellant borrowed approximately $15,000 from his sister and brother in law to pay off the balance owed on the lot to avoid foreclosure.

During the marriage Appellee seldom worked and earned little income.  The parties lived on income earned by Appellant in his consulting business.  Appellant also had some income from his retirement benefits earned prior to marriage and some funds he received from his father's estate after the father's death.

Appellant experienced numerous health issues.   He had four strokes, two heart attacks, and epileptic seizures.  Both his physical health and mental capacity declined.  He suffered from residual effects on his mental functioning, slurring of words at times, problems maintaining his balance or equilibrium, and memory problems.  He has not worked since 2010.  On several occasions he had funds wire-transferred from the UK to pay living expenses and by the time the parties had separated he had expended all his funds. At the time of trial his only income was his Texaco retirement check from which he netted $1,856 per month.

The parties had a tumultuous relationship, with numerous arguments and disputes.  By the end of 2011 they were discussing divorce.  At this time Appellee was aware of Appellant's health issues.  She testified at trial that she took him to see several medical specialists.  She told Appellant at that time she it was her turn to take care of him.   However, the parties continued to bicker and argue.   In April of 2012 Appellant accompanied Appellee to Houston to help do repairs to the home of an aunt of Appellee.  The parties again argued and Appellant decided to leave to drive back to Nacogdoches.   They wrestled over the car keys which Appellee refused to give to Appellant. Appellee claimed at trial that on this occasion Appellant assaulted her.  Appellant drove home and when he arrived at his residence he discovered Appellee's father removing personal property from the residence.

The parties again discussed divorce and Appellant prepared a written document as evidence of their agreement to divide their property. He secured $20,000 from the UK to pay to her as part of a settlement. Appellee accepted the money but later denied she was bound by any agreement because Appellant had "breached" that agreement because he had not executed all the documents necessary for divorce before he left for a trip to the UK.

According to Appellee's divorce petition, the parties separated July 1, 2012. A few weeks later Appellant traveled to the UK to see his family members and attend the wedding of a daughter.

While Appellant was in the UK Appellee discovered that while he was there he had visited some porn sites on line and she discovered the papers regarding his divorce from his previous spouse that he had altered or forged.

Much of the trial was consumed with Appellee's evidence, presented in numerous three-ring binders indexed and tabbed, itemizing all the wrongs that Appellant had done her, including numerous counts of fraud, allegations that Appellant had committed adultery, numerous allegations of assault or emotional distress, allegations that Appellant had visited porn sites while in the UK, and evidence of the substantial income she could have earned in her occupation had she not married Appellant. She testified at great length that her services to Appellant in connection with his consulting business were critical to his ability to perform his job, to the extent that she should be considered a partner in his business.

Appellant's response was that Appellee had no experience in accounting, much less the specialized area in his expertise, that she never provided any services to a client, that she never worked in a client's workplace, that he had clerical and secretarial support from his clients in the work place, and that he had never charged nor collected any compensation for any services by

Appellee. He further showed that while she may have proof-read reports to clients, she lacked the knowledge and expertise to write any such reports.

In March of 2014 Appellee set a hearing on a request for temporary orders, including a request for temporary spousal support. Appellant appeared *pro se*, telling the court that his attorney had withdrawn due to his inability to pay, he had just returned from the UK where he had suffered another stroke, and that he could not pay spousal support. The trial court ordered him to pay to Appellee temporary spousal support of $2,000 per month. He has not done so. The trial court ordered him on final hearing to pay that support for four months, or $8,000.

In a hearing held after the trial on the merits Appellant showed the trial court that he had borrowed money to pay off the note on the lot which adjoined the residence and the trial court modified its ruling to allow payment of that debt out of the proceeds of any sale before the parties divided the remaining proceeds.

## SUMMARY OF THE ARGUMENT

The trial court abused its discretion by judicially finding and declaring that Appellant and Appellee are tenants in common as to the residence purchased by Appellant prior to their marriage. The purported oral agreement for the conveyance of an interest in real property is not enforceable because of the Statute of Frauds, found in TEXAS BUSINESS & COMMERCE CODE 26.01.

If an oral agreement for the conveyance of an interest in real property is permitted under *Harrington v. Harrington*, 742 S.W.2d 722 (Tex.App.–Houston [1st] 1987, no writ hist.) and *Aaron v Aaron*, 2012 Tex.App. LEXIS 769 (Tex.App.–Houston [14th] 2012, no writ hist.), the evidence heard by the trial court is insufficient to support an oral agreement in this case.

To grant an interest to Appellee in Appellant's residence is to divest him of an interest in his separate property, which is an abuse of discretion.

Any finding by the trial court that Appellant's residence was not purchased with his separate funds is unsupported by the evidence, as Appellant conclusively established that his funds earned or acquired prior to marriage was the source of the down payment and mortgage payments.

The trial court abused its discretion in failing and refusing to consider in its division of the community property of the parties acts by Appellee which constitute fraud on the community estate and involve an amount of money that is significant in relation to the total community estate.

The trial court abused its discretion in failing and refusing to consider in its division of the community property of the parties financial benefits Appellee received, including Appellant's payment of her student loans incurred prior to the marriage, when the amount involved was significant in relation to the total community estate.

The trial court abused its discretion by considering evidence of alleged wrongful acts by Appellant both prior to the marriage and after the parties had separated and agreed to divorce because such evidence was not relevant to the issue of the breakup of the marriage.

The trial court abused its discretion by ordering Appellant to pay temporary spousal support to Appellee when the evidence showed that the amount ordered was in excess of his income, he was disabled and unable to work, and he had no resources with which to pay support.

The trial court abused its discretion in awarding to Appellee a disproportionate ownership interest in a lot adjoining Appellant's residence acquired during the marriage when the evidence showed that Appellant provided the down payment and incurred debt to pay off the mortgage note when foreclosure was threatened.

**POINTS OF ERROR**

POINT OF ERROR NO. 1: THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING APPELLEE AN OWNERSHIP INTEREST IN APPELLANT'S RESIDENCE.

POINT OF ERROR NO. 2: THE TRIAL COURT ERRED IN FINDING THAT THE PARTIES WERE TENANTS IN COMMON IN APPELLANT'S SEPARATE PROPERTY RESIDENCE BECAUSE THE EVIDENCE IS INSUFFICIENT TO SUPPORT THAT HOLDING.

POINT OF ERROR NO. 3: THE TRIAL COURT ERRED BY DIVESTING APPELLANT OF ONE-HALF OF HIS OWNERSHIP INTEREST IN HIS SEPARATE PROPERTY RESIDENCE AND AWARDING THAT INTEREST TO APPELLEE.

POINT OF ERROR NO. 4: THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO FIND THAT THE RESIDENCE WAS NOT PURCHASED WITH APPELLANT'S SEPARATE PROPERTY FUNDS WHEN THE EVIDENCE CONCLUSIVELY SHOWED A PURCHASE WITH HIS SEPARATE FUNDS.

POINT OF ERROR NO. 5: THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DISREGARDED UNCONTRADICTED EVIDENCE THAT APPELLEE COMMITTED FRAUD ON THE COMMUNITY ESTATE.

POINT OF ERROR NO. 6: THE TRIAL COURT ABUSED ITS DISCRETION BY DISREGARDING EVIDENCE OF SUBSTANTIAL BENEFITS RECEIVED BY APPELLEE DURING THE MARRIAGE.

POINT OF ERROR NO. 7: THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING APPELLANT AT FAULT IN THE BREAKUP OF THE MARRIAGE BY CONSIDERING EVIDENCE THAT WAS NOT RELEVANT IN TIME AND NOT SUPPORTED BY THE EVIDENCE.

POINT OF ERROR NO. 8:  THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ORDERED APPELLANT TO PAY SPOUSAL SUPPORT TO APPELLEE ALTHOUGH HE HAD NO ABILITY TO PAY.

POINT OF ERROR NO. 9:  THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING A DISPROPORTIONATE PART OF THE TRACT ADJOINING THE RESIDENCE.

## ARGUMENTS AND AUTHORITIES

Appellant shows the court that the trial court in this divorce case abused its discretion and committed errors as a matter of law that in reasonable likelihood caused or contributed to an unjust or improper decision. Those errors are grouped by subject matter and argument is combined in order to avoid duplication. All issues involve either the division of marital property or temporary spousal support.

POINT OF ERROR NO. 1:

THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING APPELLEE AN OWNERSHIP INTEREST IN APPELLANT'S RESIDENCE.

POINT OF ERROR NO. 2:

THE TRIAL COURT ERRED IN FINDING THAT THE PARTIES WERE TENANTS IN COMMON IN APPELLANT'S SEPARATE PROPERTY RESIDENCE BECAUSE THE EVIDENCE IS INSUFFICIENT TO SUPPORT THAT HOLDING.

POINT OF ERROR NO. 3:

THE TRIAL COURT ERRED BY DIVESTING APPELLANT OF ONE-HALF OF HIS OWNERSHIP INTEREST IN HIS SEPARATE PROPERTY RESIDENCE AND AWARDING THAT INTEREST TO APPELLEE.

THE STANDARD OF REVIEW

The standard of review in a family law case is clear: whether the trial court abused its discretion. "Abuse of discretion" occurs if a trial court makes a decision that is so arbitrary or unreasonable that it amounts to a clear error. *In re Bass*, 113 S.W.3d 735 (Tex.2003). As long as the trial court does not abuse its discretion it may divide the marital property in such a way as it deems right. *Mea v. Mea*, 464 S.W.2d 201 (Tex.Civ.App.–Tyler 1971, no writ hist.). Despite that

1

broad discretion there must exist some reasonable basis for an unequal division of the property of the parties. *Knight v. Knight*, 301 S.W.3d 723 (Tex.App.–Houston [14th] 2009, no writ hist.).

A trial court abuses its discretion if it makes a finding without sufficient facts on which to rationally base its ruling. *Griffin v. Birkman*, 266 S.W.3d 189 (Tex.App.–Austin 2008, pet. ref'd). While a trial court has discretion to weigh evidence that supports its decision, if the evidence is legally insufficient to support that decision the court abuses its discretion. *In the Interest of M.C.F.*, 121 S.W.3d 891 (Tex.App.–Fort Worth 2003, pet. dism'd).

When a trial court fails to analyze or apply law correctly it may abuse its discretion. There is no discretion in either determining what the law is or in applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833 (Tex.1992); *In re Allstate Insurance Company*, 232 S.W.3d 340 (Tex.App.–Tyler 2007, no writ hist.). Even evidentiary rulings may abuse a trial court's discretion if they violate the Rules of Evidence. *Landon v. Jean-Paul Budinger, Inc.*, 724 S.W.2d 931 (Tex.App.–Austin 1987, no writ hist.).

## THE BASIS FOR THE TRIAL COURT'S RULING

From comments made during the trial and the multitude of findings by the trial court against the interest of Appellant the trial judge's disapproval of Appellant's conduct is obvious. However, the court recognized that there was little community property and what is acquired prior to marriage cannot be community property (RR Vol. 2, p.80.) The evidence showed that Appellee already had almost all of it. She had all the operating motor vehicles the parties had acquired; had received $20,000 from Appellant, which he secured to carry out an agreement between them in contemplation of divorce (Ex. D-46, D-44); and she had emptied Appellant's business bank account by taking

2

$9,400 without his consent, leaving that account overdrawn (Ex. D-44). The parties had already divided their personal property with a few exceptions.

The only property of any significant monetary value remaining was Appellant's residence, purchased by him prior to marriage. Under the facts and law the trial court was limited in what it could do regarding that residence. The evidence was clear that the residence had been purchased prior to marriage and that all the closing documents showed Appellant as the sole owner (Ex. R-11, R-12, R-13). The substantial down payment made at closing of the purchase came from funds acquired by Appellant prior to marriage. Appellant was able to trace all the payments made on the mortgage note to their sources, his retirement benefits earned prior to marriage and his inheritance from his father.

There was no evidence of an enhancement in value of the residence by use of community funds, so Appellant neither sought nor did the trial court award any reimbursement to the community estate from Appellant's separate estate.

Under these circumstances, if the trial court wanted to award property to Appellee only one option remained: find a way to give Appellee an interest in Appellant's residence. So the trial judge adopted a theory advanced by Appellee, that the parties jointly acquired Appellant's residence as "tenants in common." The trial court then awarded Appellee an undivided one-half interest in Appellant's residence and ordered it sold.

That theory has been adopted in only two cases of which Appellant is aware. In *Harrington v. Harrington*, 742 S.W.2d 722 (Tex.App.–Houston [1st] 1987, no writ hist.), the court affirmed a finding by the trial court that the parties were "tenants in common" in a residence acquired solely in the husband's name two years prior to marriage solely in his name. In 2012 the 14th Court of

Appeals followed *Harrington* as precedent in *Aaron v. Aaron*, 2012 Tex.App. LEXIS 769 (Tex.App.–Houston [14th] 2012, no writ hist.). There the court found that the parties had an oral agreement to jointly own a residence purchased in the name of the husband solely as a matter of convenience.

The Findings of Fact signed by the trial judge are puzzling. For example, Findings 27 and 28 purportedly state that the funds used to purchase Appellant's residence were not his separate funds. Yet the trial court did not find that the residence was community property, and the actual judgment declares Appellee to be a tenant in common, not an owner as community property. Finding 27 also finds that neither the down payment nor the monthly payments were made with funds from Appellant's money market account. And Finding 24 finds (incorrectly) that the down payment was made with Appellant's business income, not separate funds. Yet the purchase of the residence and the payment of the down payment occurred prior to marriage, and there is no evidence that Appellee ever contributed any monies of hers to the purchase. All monies used to purchase the residence were earned or acquired by Appellant prior to the marriage: by definition those funds must have been his separate property.

Since the Final Decree of Divorce signed by the trial judge adjudicates that the parties are tenants in common in the residence, Appellant focuses on that issue.

## THE COURT SHOULD DECLINE TO FOLLOW
## *HARRINGTON* AND *AARON*

It is public policy that any agreement to convey an interest in real property must be in writing. TEX. BUS. & COMM. CODE § 26.01(b)(4). This means that when any performance of an agreement requires a transfer of property in land, that agreement must be in writing. *Mangum v. Turner*, 255

4

S.W.3d 223 (Tex.App.–Waco 2009, pet. den.). Traditionally this rule has been referred to as the "Statute of Frauds" and dates back to the earliest Texas jurisprudence. Even if the parties only agree to a future conveyance of an interest in real property a written contract is nonetheless required. TEX.PROP.CODE § 5.072(a).

In the very limited instances in which Texas courts have allowed exceptions to the "Statute of Frauds," specific evidence and performance by the vendee is required. The most common exception is that based on *Hooks v. Bridgewater*, 229 S.W. 1114, 1116 (Tex.1921), which allows a party to enforce an oral agreement provided that he can show (1) payment of consideration, in either money or services, (2) possession by the vendee, which must be exclusive, and (3) the making by the vendee of valuable and permanent improvements to the property. This case does not show evidence that meets the *Hooks v. Bridgewater* standard. There is no evidence that Appellee paid any consideration for an interest in Appellant's residence, that her possession was exclusive, or that she made any valuable and permanent improvements to the property (and if any improvements were made they were funded by Appellant's income).

Given the public policy of Texas against oral agreements to convey real property, is there anything about the facts in this case that justified the trial court ignoring that public policy? Appellant will show that given the facts in this case, and in all cases involving oral promises between persons in intimate relationships, there is even <u>less</u> reason to ignore that public policy and enforce such promises.

It is the policy of the State of Texas that promises between spouses or those who reside together without marriage should only be enforceable if they are in writing. TEX. BUS. & COMM. CODE §26.01(b)(3). Texas recognizes that promises made in an intimate relationship may be less

reliable than arms-length transactions because of the nature of the relationship. The requirement of written agreements avoids elevating "pillow talk" to enforceable agreements.

Oral agreements between parties engaged in an intimate relationship are less likely to be confirmed by any written evidence or documentation. In arms-length transactions it is common to find communications between the parties, whether mailed correspondence as in the past or communications sent by email, or telecopier today. Those communications are available to a court as evidence that can either confirm or deny the existence of an oral agreement. When promises are made in intimate relationships written documentation is much less likely to be found because any communications are likely private.

In cases to enforce oral promises made by those in intimate relationship it is much less likely that any third party witnesses will be aware of the communications between the parties and available to testify. In arm's length transactions it is much more likely that some third party, whether a realtor, real estate appraiser, loan officer at a potential lender, or property surveyor may have some knowledge of any oral agreement between the parties. Those engaged in intimate relationships are likely to discuss issues privately and without any witnesses.

Another reason to refuse to enforce oral agreements between persons in intimate relationships is that they almost always require reliance on testimony by an interested party. Testimony by an interested witness always requires a different level of scrutiny than other types. It has been recognized that in some instances the testimony of an interested witness may amount to no evidence at all. The exception to the interested witness rule is that evidence by an interested witness may be considered if it is not contradicted by any other witness or circumstances and is "direct and positive" and free of any contradiction, inaccuracy , or other conflicting circumstances. *Anchor Casualty Co.*

*v. Bowers*, 393 S.W.2d 168 (Tex.1965); *Lozano v. Lozano*, 2009 Tex.App. LEXIS 9620, 2009 WL 4882816 (Tex.App.–Corpus Christi 2009, no writ hist.).   Such testimony may be quite difficult to find in cases involving persons in intimate relationships.

Finally, a reason to refuse to enforce oral agreements to convey real property between those in intimate relationships is that the language used in those relationships may differ from that which would be usual and customary in an arms-length transaction.  For example, if two persons who do not co-habit and do not have an intimate relationship make mention of "our land" or "our property" the language used has some legal significance, i.e. that each of them owns an interest in the property. On the other hand, if two people in an intimate relationship speak of "our home" that word has several possible meanings other than joint ownership.   It means where they live.   Parties can have a "home" in an apartment, in a rent house, in a mobile home in a mobile home park.   Thus the words "our house" or "our home" may not be as reliable an indicator of ownership as in other circumstances.

With the increased frequency of co-habitation by unmarried persons it is likely that more cases of this nature will arise.   The adoption of a theory of "tenancy in common" by those contemplating marriage threatens to become the exception that consumes the rule.

*Harrington* and *Aaron* are not based on the TEXAS FAMILY CODE or any other statutory provision adopted by the State of Texas. The theory of "tenancy in common" ignores the public policy of the state against enforceability of oral agreements for conveyances of land, strong presumption that ownership of property should be governed by its characterization as either community or separate under the Texas Constitution and the TEXAS FAMILY CODE, and the policy that agreements between spouses must be written.   Those cases offer no reason why the courts

7

should uphold one rule prohibiting oral agreements in most cases but adopt a different rule for those who cohabit.

This court has recognized that rulings regarding ownership of real property of spouses must not disregard the distinction between separate and community property. *Verhage v. Verhage*, 2006 Tex.App.LEXIS 5735, 2006 WL 1791565 (Tex.App.–Tyler 2006, no neg. writ hist.). To adopt a theory that a spouse or potential spouse can acquire an interest in the separate property of the other party by some oral agreement threatens to upend the accepted rules of characterization of property, to simply allow a party to make an "end run" around accepted law.

Other than the *Harrington* and *Aaron,* Texas courts have declined to adopt a theory that persons in intimate relationships, or those who marry, may become tenants in common based on alleged oral promises. This court should likewise decline to adopt the reasoning of *Harrington* and *Aaron* and find that the trial judge abused his discretion in enforcing an alleged oral agreement between the parties to convey an interest in Appellant's residence to Appellee.

## THE EVIDENCE IS NOT SUFFICIENT TO SUPPORT A A FINDING THAT THE PARTIES WERE TENANTS IN COMMON

Even if the court declines to reject the reasoning of *Harrington* and *Aaron* the purported oral agreement in question in this suit should not be enforced as there are substantial differences in the facts between those cases and this one. The evidence in this case is insufficient to support the trial court's ruling. Evidence that is so slight that any inference would be in effect a guess is no evidence at all. *McKeehan v. McKeehan*, 355 S.W.3d 282, 295 (Tex.App.-Austin 2011, pet. den'd).

8

Existence of Joint Tenancy Is a Question of Law:

It is well established that a trial court hearing a divorce case has substantial discretion in dividing a marital estate. But the trial court does not have the same discretion on a question of law. For example, although the court has discretion to decide what evidence it gives weight to, whether the agreement between the parties is governed by the Statute of Frauds is a question of law. *Wilhoite v. Sims*, 401 S.W.3d 752 (Tex.App.–Dallas 2013, no writ hist.). The trial court has no discretion at all to award to one spouse an interest in the separate property of the other. *Cameron v. Cameron*, 641 S.W.2d 210 (Tex.1982); *Powell v. Powell*, 822 S.W.2d 181 (Tex.App.–Houston [1st] 1991, no writ hist.); *In re Case*, 28 S.W.3d 154 (Tex.App.–Texarkana 2000, no writ hist.); *Verhage v. Verhage*, 2006 Tex.App.LEXIS 5735, 2006 WL 1791565 (Tex.App.–Tyler 2006, no neg. writ hist.).

Looking for a Residence Together is Not Evidence of Ownership:

Appellee testified that she and Appellant looked for a residence together. In *Harrington* the court noted the testimony of the wife that the parties referred to the residence as "our home." This leads to a simple question. How else would the parties who are co-habiting in a residence refer to it? Joint occupancy is not the same as joint ownership. So how legally significant is the use of the term "our house" or "our home?" At the time Appellant purchased his residence the parties had co-habited for several years and intended to continue to do so. Appellant expected that Appellee would reside with him in any residence he acquired, whether rented or owned. Doubtless he would have consulted with Appellee before acquiring any residence in which he expected both of them to reside, whether community or separate. It would be unusual indeed for one party to unilaterally make a decision to choose a residence for both of them without consulting with the other party.

Appellant's testimony as to the circumstances under which the parties looked for a residence in Nacogdoches is consistent with this narrative (RR Vol. 3, pp. 79-80).

To illustrate this point, assume that the parents of one of the parties offered to purchase a house for their son or daughter in expectation of marriage, as a gift to their child. The betrothed couple then search for a house together in which they will begin their married life. They go to the closing of the conveyance together. Does their joint search convert the separate property acquired by gift into jointly owned property? The answer is clearly no.

To further illustrate the point, assume one party owns a separate property business which he or she either owned prior to marriage or acquired by gift or inheritance. The other party works there. She or he refers to the business as "our business." Does that language convert the ownership from separate to community?

That the parties jointly searched for a residence acceptable to both is not an indicia of ownership, but a recognition that one member of a couple is likely to consider the wishes of the other in selecting a place for them to reside. Therefore, that evidence is of little import.

Was There a Common Plan or Design in Acquiring the Residence?

One factor mentioned in both *Harrington* and *Aaron* is evidence of a common plan or design to divide or allocate the expenses of the purchase of the residence and their living expenses. In *Harrington* the appellee testified that "she spent much of her separate property income on the house and on living expenses of the children."

In *Aaron* the appellee testified that she paid the closing costs for the purchase of the residence, that she paid the mortgage payments for the first six months after they acquired the

residence, and that when the appellant began to make the mortgage payments she paid for their food and utilities, a contribution that was equal to the monthly mortgage payment.

The contrast between those cases and this case could not be more clear. The evidence showed that:

●Appellant paid the entire down payment and all closing costs with his separate funds received by him by wire transfer from his accounts;

● Appellant paid, with his separate funds, <u>all</u> the mortgage payments after the purchase and fully paid the balance due on the note made to purchase the residence;

● Appellant paid <u>all</u> the living expenses of the parties, while Appellee paid none except with his income (RR Vol. 3, p. 47).

Appellee used any income she earned during their relationship for her own purposes and not as part of a common plan: Appellant paid all their living expenses. (RR Vol. 3, p. 47)   There is no evidence that Appellee contributed, either directly or indirectly, to the purchase of the residence.

<u>Prior Conduct</u>:

In *Harrington* the court noted that the parties had lived together "for about three years in residences leased in both their names."   In this case, there is no such indication of a prior joint residence.  In fact, when asked whose residence the parties lived in prior to their marriage Appellee insisted it was <u>her</u> residence (RR Vol. 2, p. 82).

<u>Appellant Made a Substantial Down Payment with Separate Funds</u>:

In *Aaron* the court noted that the wife was not able to "contribute" as much toward the down payment as the husband, clearly implying that there was a joint effort to accumulate funds in order to purchase the residence.  In this case it is clear that all the funds used to purchase the residence

11

were acquired or earned before the parties even knew each other, as a result of Appellant's long term employment with Texaco.

The size of the initial payment made by Appellant is significant evidence of his intent to purchase the home as his own (Ex. R-17; also see p. 20 of Exhibit P-4 showing instructions to wire transfer the funds and Ex. R-14 which shows the amount required for the closing).    If Appellant's intent was to acquire a jointly owned residence why commit such a large portion of his separate funds to the down payment instead of paying for the residence during the marriage?

Appellant Paid Off the Residence Quickly:

If one assumes that the parties intended their relationship to last and it was agreed, as Appellee argues, to jointly own the residence, why would Appellant agree to such a short note term and such large monthly payments?  He paid off the residence in less than two years after he purchased it with separate funds he had accumulated prior to the relationship of the parties (Ex. R-19).  If the parties' intent was to jointly own the residence why not utilize a more common 15 to 25 year mortgage to be repaid by the earnings of the parties during their marriage?

The short payment schedule for payment of the mortgage on the residence is some evidence of Appellant's intent to primarily rely upon his separate property funds to pay for the residence instead of community income he earned during their marriage.  This shows an intent to treat the residence as his alone.  Appellant provided the court with an itemized statement tracing all the funds used to make the monthly house payments to their source (Ex. R-19).  Likewise, Respondent traced all the income earned during the marriage and how it was disposed of, what funds he had on hand at the time of the marriage, and showed that none of his post-marriage income was sent to the UK

and could have been the source of the funds used to make the payments on the residence (Ex. R19a-25).

The Subsequent Conduct of the Parties is Evidence of Intent:

Appellee testified that Appellant told her that the residence would be theirs and that he would convey record title to her. Yet in 2008 Appellant purchased an adjoining lot in his name only (Ex. R-26, R-27, R-29, and R-33). Appellee was aware of this purchase.

If Appellee had an agreement that the residence would be conveyed to her and jointly owned, why did she not object to Appellant also acquiring title to the second tract in his name alone after their marriage? At the time of the second purchase she was aware that he had never conveyed any ownership interest in the residence to her although she says he had promised to do so. Her silence is evidence that contradicts her claim.

Appellee testified that "[i]t was joint ownership of everything, because we built the business together from 2003 forward." (RR Vol. 2, p. 109). In 2006, the same year as when Appellant purchased the residence, he created an LLC named Global Energy Consulting (RR Vol. 2, 84-85) which showed Appellant as the only owner. So there again, even though she claimed they were "joint owners" Appellee knew she was not shown as an owner of the LLC.

For the reasons outlined above, the evidence is simply insufficient as a matter of law to support a finding that the parties agreed to purchase Appellant's residence and own it jointly, and the trial court abused its discretion in awarding a one-half interest in that residence to Appellee.

13

## THE TRIAL COURT HAD NO DISCRETION TO DIVEST
## APPELLANT OF ANY INTEREST IN HIS SEPARATE PROPERTY

The Texas Supreme Court directly addressed an award to one spouse of an interest in the separate property of the other in *Cameron v. Cameron*, 641 S.W.2d 210 (Tex.1982). The court explained the distinction between community and separate property this way:

> Community property owes its existence to the legal fact of marriage, and when the parties to that compact determine their relationship should end, property acquired during the marriage is and should be divided among them in a just and right manner. By way of contrast separate property, in the community property setting, owes its existence to wholly extramarital factors, things unrelated to the marriage. In relation to that property, the parties are, in essence, strangers; they are separate. Any property that arises independently of marriage as a means of "equitably" balancing the spouse's positions on divorce cannot be justified.

An award of an interest in Appellant's separate property residence to Appellee is actually an attempt to characterize his separate property as some other form of property so that the trial court can "equitably balance" the positions of the parties, exactly what the Texas Supreme Court said is not permissible.

As this court said, in *Verhage v. Verhage*, 2006 Tex.App. LEXIS 5735, 2006 WL 1791565 (Tex.App.–Tyler 2006, no neg. writ hist.).

> Any judicial divestiture of separate property would essentially disregard the constitutionally mandated distinction between the separate and community property of spouses. . . . . Moreover, allowing a trial court to divest separate property from one spouse and award it to the other spouse as part of the latter's separate estate would impermissibly enlarge the exclusive constitutional definition of separate property.

If the trial court mis-characterized Appellant's separate property as either community property of the parties or as the separate property of his spouse, that error is reversible error, because

the effect would be to divest the spouse of his separate property. Tex.Const., art. 16, § 15; *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex.1977); *Cameron v. Cameron*.

This court should find that the trial court abused its discretion in divesting Appellant of his separate property and awarding Appellee an interest in it. The court should reverse and render judgment that Appellant's residence remains his sole and separate property, not subject to sale by the order of the trial court, and that Appellee has no ownership interest therein.

POINT OF ERROR NO. 4:

THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO FIND THAT THE RESIDENCE WAS NOT PURCHASED WITH APPELLANT'S SEPARATE PROPERTY FUNDS WHEN THE EVIDENCE CONCLUSIVELY SHOWED A PURCHASE WITH HIS SEPARATE FUNDS.

As Appellant noted above, some confusion exists as to the effect of the trial court's finding of fact that his separate property funds were neither used to pay the down payment on the residence nor the mortgage note payments, when the court then did not find the property to be community property. The purchase was made prior to the marriage of the parties with Appellant's funds, so how could the funds used be anything other than separate property? Appellant is not aware of any authority that a spouse has a claim to income earned by the other spouse prior to marriage.

Appellant is also confused by the findings by the trial court because, if in fact community funds were used to improve or pay down debt against the residence the remedy or relief would be a right of contribution, not a transfer of ownership. Characterization of property is determined at the property's inception of title. *Chavez v. Chavez*, 269 S.W.3d 763, 767 (Tex.App.–Dallas 2008, no pet.); *Zagorski v. Zagorski*, 116 S.W.3d 309, 317 (Tex.App.–Houston [14th] 2003, pet.den.)

15

Confusion also arises from the court's finding because the actual evidence is at such odds with Findings of Fact 24, 25, 27, and 28. Appellant reviews the evidence regarding the purchase of the residence to explain the events and to make clear that the findings of fact by the trial court do not add up to the result.

Appellant's residence was purchased on August 25, 2006 (Ex. R-11). Appellant was required to pay at the closing $83,934.95 (Ex. R-11, R-17). Appellant wire-transferred his funds for the down payment three days prior, on August 22, 2006, in the amount of $85,000 (Ex. R-18). The parties were not married until January 31, 2007.

Appellant showed the source of each payment made. He showed that the funds used for payments were sent to him by wire transfer from the United Kingdom and he traced each payment made to those funds. In support of his claim that his separate funds were used to make the payments on the residence he offered the testimony of an officer of his bank that he sent no monies abroad to the UK except for some specific funds used for a specific purpose (RR Vol. 3, p. 9-12). The purpose of that testimony was to establish that no funds had been transferred by Appellant to the UK after the marriage of the parties; therefore, any funds that came into the US to Appellant must be his separate funds because they had to be in the UK prior to the marriage of the parties.

Appellee's testimony, that the payments made on the residence were actually funded by community income, is so weak as to be laughable. She claimed the source of the down payment was income earned by Appellant as a payment for his services through his business and those funds, coupled with a little of this and a little of that, somehow added up to the amount used to fund the purchase of the residence. Appellee failed to show how the parties could pay their living expenses with Appellant's income, pay income taxes on it, and yet have 100% of it available as a down

16

payment on the residence. And no explanation was given as to how Appellant's income prior to marriage became community funds.

If the trial court relied on Appellant's testimony to support her claim that she should be an owner of Appellant's house it clearly abused its discretion. The trial court's findings of fact, if it even relied upon them, are at such odds with the credible evidence that it is raises the question if the trial judge even read them. A trial court abuses its discretion if it relied on facts that are so unreliable or weak to form a sufficient basis for a rational decision. *Griffin v. Birkman*, p. 197. A trial court that makes a decision which is not based on sufficient facts to make a decision either way abuses its discretion. *Landon v. Jean-Paul Budinger, Inc.*, p.938.

POINT OF ERROR NO. 5:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DISREGARDED UNCONTRADICTED EVIDENCE THAT APPELLEE COMMITTED FRAUD ON THE COMMUNITY ESTATE.

Appellant offered evidence that during his marriage to Appellee she had used community funds to improve the residences of both her mother and her aunt (Ex. R-37; R-38a-38i) as well as payment of other expenses of her family members. He corroborated that testimony with checks and other records that showed the expenditures (Ex. R- 38a-38i). Appellant testified that these expenditures were made without his knowledge and consent, and only discovered by him at a later date (RR Vol. 3, p. 107-111; Ex. R-37; Ex. R-38A-38H; Ex. R-39-39E). Appellee never denied making those expenditures and never claimed that Appellant was either aware of or had consented to her expenditures.

The use of community funds by a spouse to improve the property of a relative, without the knowledge and consent of the other spouse, is what has been termed "fraud on the community."

17

*Schlueter v. Schlueter*, 975 S.W.2d 584 (Tex.1998). Fraud on the community occurs when one spouse breaches his fiduciary duty to the other by disposing of community property without the consent of the other. *Puntarelli v. Peterson*, 405 S.W.3d 131, 137-138 (Tex.App.–Houston [1ˢᵗ] no pet.). Once a spouse produces evidence of such a transfer the burden shifts to the other spouse to rebut the presumption of constructive fraud. *Jackson v. Smith,* 703 S.W.2d 791, 795-796 (Tex.App.–Dallas 1985, no writ). Once Appellant produced evidence of use of community funds for the use and benefit of Appellee's relatives the burden shifted to her to rebut the presumption that her expenditures were fraudulent.

Appellee was never required by the trial court to provide any explanation for her use of community funds to enhance the value of her relative's residences. In fact, the court simply ignored this evidence. And Appellee never offered any evidence to rebut the presumption of fraud.

Appellant concedes that the trial court had discretion to hear this evidence and to consider it in making a fair and equitable division of the estates of the parties. But can the trial court simply ignore it? Appellant also acknowledges that if the amount involved is minimal in relation to the overall estate being divided by the court that the court may be justified in ignoring it. But in this case the amount involved was equal to or greater than the value of the community property the court was dividing.

A trial court has discretion to base its decision on conflicting evidence. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex.1978). And a trial court has discretion to decide an issue if there is some evidence of a "substantive and probative character" to support a decision. *Butnaru v. Ford Motor Company,* 84 S.W.3d 198, 211 (Tex.2002). But if there is no evidence that the use of funds by a spouse was for the benefit of the community estate and made with the consent of the spouse it is an

18

abuse of discretion for a trial court to ignore that evidence, especially when the amount involved is as great at the community estate being divided.

Appellant requests that the trial court remand the division of the community estate of the parties with directions to the trial court to consider the fraud on the community estate committed by Appellee in its division of the community estate.

POINT OF ERROR NO. 6:

THE TRIAL COURT ABUSED ITS DISCRETION BY DISREGARDING EVIDENCE OF SUBSTANTIAL BENEFITS RECEIVED BY APPELLEE DURING THE MARRIAGE.

The testimony at trial showed that Appellant had by the time she met Appellant defaulted in repayment of her student loans[1]. Appellant provided evidence of payments of her student loans with his income of $63,000 (Ex. R-41). While Appellee questioned the amount paid, she did not question that Appellant had in fact paid her pre-existing student loan debt (RR Vol. 3, p. 178). The trial judge makes no mention of the payment of Appellee's student loan debt in his findings or fact and there is no indication that these payments were even considered. While a trial judge has discretion to weigh evidence in making a just and right division of the parties to a divorce action, he has no discretion to simply ignore evidence. While the court has discretion to ignore transactions involving minimal amounts of money or amounts that are small in relation to the total estate of the parties, the amounts that Appellant paid toward Appellee's student loan debt is approximately two times the value of the community estate the court divided. To ignore such evidence and facts is an abuse of discretion.

---

[1] Appellee's inability to pay her pre-existing student loan debt is puzzling in view of her testimony of her exceptional ability and the lucrative career she gave up to be married to Appellant.

19

POINT OF ERROR NO. 7:

THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING APPELLANT AT FAULT IN THE BREAKUP OF THE MARRIAGE BY CONSIDERING EVIDENCE THAT WAS NOT RELEVANT IN TIME AND NOT SUPPORTED BY THE EVIDENCE

The trial court found that Appellant was at "fault" in the breakup of the marriage (FF 32). If that finding had no effect on the rulings of the trial court Appellant would not address it; however, since it appears that this finding was the foundation for the trial court's decision to award Appellee an interest in Appellant's residence, Appellant must address it.

Appellant and Appellee had at times a rocky relationship, without any doubt. However, Appellee's testimony is characterized by gross exaggerations and dramatization of events that the actual testimony frequently does not support.

Appellee alleged that several events occurred supporting her claim that Appellant's conduct was the reason for the dissolution of the marriage of the parties. In her typical fashion, those events are documented at great length ("127 counts of fraud"). However, an examination of the actual evidence shows that she often testified more about her "conclusions" or "feeling" than about the actual facts of the event. An example is her testimony that they had a dispute over money while driving in a car one day, which she characterized as "financial terrorism." (RR Vol. 1, p. 47). Appellant raises this issue because that the evidence in the record does not actually support the findings of the trial court on several of these points, and the trial court has no discretion to ignore the actual evidence.

Appellant "Assaulted" Appellee On Eight Occasions:

Finding of Fact No. 6 by the trial court finds that Appellant assaulted Appellee on eight different occasions. There are two major problems with this finding.

20

First, there is a complete lack of corroboration of any of these claims. There is no evidence that Appellee ever reported to any law enforcement officer that she had been assaulted. There is no evidence that she ever sought medical treatment. There is no photographic evidence that she was assaulted. No witness testified as to seeing any assault or sign of assault. And it is almost a certainty that anyone as verbose as Appellee would have told someone had she been assaulted; yet no family member, friend, or neighbor was called to confirm that Appellee had made a contemporaneous report of an assault.

Second, there is a marked disparity between the actual testimony and what Appellee referred to as an "assault." The first instance of "assault" referred to by Appellee relates to events while the parties were traveling through Malaysia and Thailand (RR Vol. 1, p. 47). Appellee says that "there was a violent explosive that he has lunging and I went flying." Yet there is no actual evidence that Appellant ever even touched Appellee.

The next instance which Appellee testified about concerned an event at home (RR Vol.1, p. 50). Appellee said that they had an argument. Even though she and her brother were having an argument about their mother's care and they were "crosswise" by the time of trial it was Appellant who was solely responsible for their dispute. She went upstairs and he followed her, he was "screaming" and "she slid down the wall." Nowhere is there any evidence that Appellant ever touched Appellee, much less assaulted her.

In the next event that Appellee related, a trip to Hot Springs, Arkansas, an argument between the parties occurred (RR Vol. 1, p. 54). Appellee says there was no reason for Appellant to be upset about anything. Appellant testified that he became upset when Appellee said to her friends that she wished she was not with him, which humiliated him in front of her friends (RR Vol. 3, pp. 139-140).

21

Appellant was upset but there is no evidence that he touched anyone, much less assaulted Appellee. He went to bed, got up early the next morning, and drove home.

Next Appellee testified about an incident in which she claimed Appellant became angry over a power cord (RR Vol. 1, p. 56). She said he "got into a Rugby stance" and she was "fearful." However, there is no evidence that Appellant ever touched her.

According to Appellee there was another instance at the residence in which Appellant flew into a "rage" (RR Vol. 1, p. 60). She further said "he yelled at me and came at me. He didn't hit me, but he came close. I raised my fist and I backed up." She says that Appellant then ran around the house destroying personal property, one of many occasions on which she claimed he destroyed personal property. If in fact Appellant had destroyed the personal property of the parties as many times as Appellee claimed in her testimony there would have been no property for the court to divide.

The most telling incident is one that Appellee related at her aunt's home in Houston (RR Vol. 1, p. 69.). The parties had gone to the aunt's home to make repairs. Appellee yelled at Appellant. She said that Appellant grabbed her, threw her up against the wall, and choked her. Appellant's testimony was that he did not assault her but was trying to get his car keys which she refused to give to him so he could return home (RR Vol. 3, p. 143). Appellee herself admitted that they were in a tussle over the car keys, her refusing to give them to him. What is most interesting about these events is that when Appellant returned to his home in Nacogdoches he found Appellee's father parked at the house removing his personal property. (RR Vol. 3, pp. 51-53).

Appellee admitted that she told her father to go the residence and gather up property from the house (RR Vol. 2, p. 104-105). The argument over the car keys was not because Appellant was being unreasonable but because Appellee wanted to detain him as long as possible in Houston while

22

her father cleaned out the house (RR Vol. 3, p. 143). It is also instructional that when law enforcement was called it was not for the purpose of charging Appellant with a crime but rather to ascertain if he was safely driving to his residence in Nacogdoches (RR Vol. 1, p. 69-71). And, Appellant, the man who had assaulted her, called her when he reached home to tell her he had arrived safely (RR Vol. 1, p. 71).

Of the eight instances of "assault" there is actual testimony of any touching by Appellant of Appellee on only one occasion, at Appellee's aunt's home, and the testimony there is conflicting and supports the conclusion that a disagreement arose when Appellee attempted to detain Appellant in Houston for a sufficient period to allow her father to clean out his residence of his personal property. When the events of that day are understood in context it is more likely that no assault actually occurred but instead a "tussle" over the car keys happened.

On another occasion Appellee testified that "[h]e assaulted me." (RR Vol. 1, p. 121). She says not that he hit her, or knocked her down, but instead "I broke down. I completely just fell out to the point of not being able to physically get up." Again, while Appellee characterizes as an "assault" lacks any evidence of any touching by Appellant.

Appellant Held Appellee Captive Abroad:

Appellee testified that Appellant had essentially held her captive for a period of five months on a trip to Malaysia and Thailand (RR Vol. 1, p. 47). Again, there is no evidence that Appellee reported that event to any authorities nor made any attempt to "escape." There was no contact made reporting her status to local United States Diplomatic authorities. There is no evidence of how Appellant could have imprisoned Appellee in a hotel room and kept her there while he worked at the offices of the company for which he was contracted to provide consulting services. When Appellee

23

returned to the United States she sought no protection, from law enforcement or anyone else. She returned to her residence with Appellant, the man who she claimed held her captive abroad for five months.

Evidence of Conduct Before or After Marriage Not Relevant As Fault in Marriage:

The evidence showed that prior to the marriage of the parties Appellant altered or modified some documents relating to his divorce from his previous spouse in the United Kingdom and showed those to Appellee. Appellant admitted to such conduct. (RR Vol. 3, p. 24-27). He explained at trial that in the UK there are different ways of seeking a divorce, the shorter procedures requiring proof of either cruelty or adultery, and that he chose the more lengthy option of separation in consideration of his family.

Appellee testified that she discovered Appellant's forgery of divorce documents in September of 2012 after the parties had separated and after he had left the country to return to the UK for a family visit. Appellant objected to all this evidence on the basis of relevance. Evidence of conduct prior to the marriage is not relevant to the issue of fault in the breakup of the marriage, particularly when it is not discovered until the parties have already separated and filed for divorce.

Appellee had already decided to divorce Appellant the previous December. She said she remained with him only to care for him, and intended to stay no longer than one year.

She filed a petition for divorce herself on September 21, 2012. She contended that she was not bound by any agreement with Appellant to accept $20,000 and items of personal property because he had "breached" their agreement. The way he had done so? By not executing all the documents in full satisfaction of her claim to the community assets needed to finalize the divorce by the time he left to travel to the UK in July of 2012.

24

The evidence conclusively showed that Appellant's action regarding his divorce papers occurred prior to the marriage and that Appellee did not discover his action until months after the parties had separated and filed for divorce. Therefore, that conduct could not have been a material factor causing the divorce.

Likewise, Appellant testified that learning that Appellant had visited pornographic web sites while he was in the UK was relevant to the issue of "fault" in the marriage. Again, this conduct occurred after the parties agreed to divorce, the parties had already separated, and Appellant left for the UK.

Appellant objected to all this testimony when offered on the grounds of relevance, i.e., that what occurred before the marriage and after the marriage over could not be relevant to the issue of fault in the breakup or dissolution of that marriage. Evidence must be both relevant and material. *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231 (Tex.2007).

Appellant concedes that a trial court has discretion to hear and weigh the evidence and reach conclusions based on it, that any evidentiary rulings by the trial court are committed to its discretion, and that reversal is justified only when the error probably caused the rendition of an improper judgment. *Bay Area Healthcare Group, Ltd. v. McShane,* p. 234). But relevance has limits. Under Rule 401, TEXAS RULES OF EVIDENCE, the court is to determine the purpose of offering the evidence and whether there exists some logical or direct connection between the evidence offered and what the offering party seeks to prove. What is the scope of admissible evidence to prove fault in the breakup of the marriage?

First, the event must have happened during the marriage. Evidence of some act by Appellant before the parties married cannot, by definition, constitute fault during the marriage.

25

Second, the event must have happened prior to the decision of the parties to "break up." Once the decision to terminate the marriage has been made, no act afterwards can be considered a cause of the decision to divorce.

The trial court found "fault" by Appellee and awarded both an interest in his separate property and a disproportionate part of the community property to Appellee; therefore, it cannot be said that this evidence was harmless or that it was not a cause of the trial court's division of the marital estate. Consideration of evidence which is not legally relevant is a breach of discretion.

POINT OF ERROR NO. 8:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ORDERED APPELLANT TO PAY SPOUSAL SUPPORT TO APPELLEE ALTHOUGH HE HAD NO ABILITY TO PAY

A trial court has substantial, but not unlimited, discretion to order one party in a divorce proceeding to pay spousal support to the other. In this case the order of the court for payment of temporary spousal support was an abuse of discretion. The ability to pay support was not based on any actual evidence of ability, but upon mere suspicion or surmise.

At the time the trial court ordered Appellant to pay $2,000 monthly in temporary support Appellant was over 60 years of age and had suffered four mini-strokes (including one shortly before the hearing on temporary orders), and epileptic seizures, and two heart attacks. His physical condition prevented him from working and his last income was over two years before in 2010. While at one time his services as an accountant in the oil and gas industry were in demand, companies in that industry had completed their adoption of the accounting system he had helped develop so there was less demand for his services (RR Vol. 4, p. 40). In fact, he had experienced a stroke about a week before he returned for the temporary orders hearing (RR Vol. 3, p.138).

Appellant's only source of income was his retirement benefits in the amount of $1,856 per month. <u>That amount is less than he was ordered to pay Appellee as temporary support</u>. His living expenses were $1,574. (RR Vol. 3, p. 72-73; Ex. R-9, R-10, R5-8).

Appellee herself, perhaps without meaning to do so, confirmed the decline in Appellant's health and his inability to support even himself. In her testimony about the events that occurred at her aunt's house in Houston she mentioned that she did not want Appellant on a ladder and that she thought it unsafe for him to drive himself home to Nacogdoches (RR Vol. 1, p. 70). She also acknowledged not long before she filed her petition for divorce that rather than expect Appellant to take care of <u>her</u>, she expected that his needs required her to take care of <u>him</u> (RR, Vol. 2, p. 120-121). In the course of her testimony about their conversation at the time she emphasized that "I went all over the State of Texas for months running him to cardiologists and neurologists and post stroke specialists, biochemical specialists, speech therapists." Yet this is the person she contends shall be supporting her.

Appellee herself is both younger and in substantially better health than Appellant. And if her testimony is to be believed she is capable of making literally hundreds of thousands of dollars from her occupation.

The only basis on which the trial court could have found an ability by Appellant to pay temporary spousal support is if it was believed that Appellant owned or controlled substantial funds in the United Kingdom. Appellee testified that he did, but her testimony was not based on any actual knowledge, but only on suspicion or surmise. If there was evidence that Appellant had funds in the UK available to him and there was a dispute over whether they were available for payment of support the trial court had discretion to decide who to believe. But when the only evidence is that "he has

27

money in the UK" without identifying those funds, that testimony amounts to nothing more than surmise or suspicion. Evidence of that nature is no evidence at all. *McKeehan v McKeehan,*, 365 S.W.3d 282, 295 (Tex.App.–Austin 2011, pet. den'd). The only actual evidence of Appellant's ownership of any assets in the UK was his divorce decree from his previous spouse, which awarded all his assets in the UK to her. Even if the trial court simply concludes "I do not believe Appellant when he says he has no money in the UK" that does not prove that he does have money. It does no more than raise a suspicion. A suspicion is no evidence at all.

The only asset in the US which could possibly serve as collateral for a loan by Appellant to pay spousal support was his residence, but Appellee had filed a *lis pendens* as to that property which precluded any access to funds (RR Vol. 3, p.135; Ex. R-54, R-55). Thus he showed he had no capacity to borrow funds for that purpose.

Thus, the trial court abused its discretion in ordering Appellant to pay temporary spousal support to Appellee in an amount in excess of his monthly income and without reliable evidence that he had any other source of income or property to pay that support.

POINT OF ERROR NO. 9:

THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING A DISPROPORTIONATE PART OF THE TRACT ADJOINING THE RESIDENCE

The trial court awarded a disproportionate part of the lot adjoining Appellant's residence to the parties, 60% to Appellee and 40% to Appellant. Under the circumstances that disproportionate award is an abuse of discretion.

The adjoining lot was purchased for $54,000. Appellant paid at closing $10,681.07 in addition to $500 he had already deposited as earnest money (Ex. R-30). After he became unable to

28

work and his business income ended, he fell behind in making payments, risking foreclosure. The balance due to avoid foreclosure was $15, 229.64 (Ex. R-29, R-30). Appellant secured a loan from his sister and brother-in-law to pay off the lot, avoid foreclosure, and retain it (Ex. R-31).

Thus the trial court has awarded a disproportionate part of the lot to Appellee despite the fact that the purchase was only possible by the use of Appellant's separate property at the time of purchase and his borrowing money to pay it off and avoid foreclosure. It was an abuse of discretion for the trial court to award to Appellee a greater interest in property she would never have had except for Appellant's expenditure of his separate funds and which she would have lost except for Appellant's action in borrowing money to preserve it.

## CONCLUSION AND PRAYER FOR RELIEF

Appellant, Frederick Graham requests that the court reverse the Final Decree of Divorce signed by the presiding judge of the Nacogdoches County Court at Law on September 3, 2014.

Appellant further requests that the court render judgment that Appellee has no ownership interest in his residence located at 3704 Raguet Street in the City of Nacogdoches, Texas.

Appellant further requests that the court remand the other issues regarding the division of the community property and spousal support of the parties to the Nacogdoches County Court at Law with instructions to (a) consider the evidence with regard to expenditures made by Appellee with community funds, (b) financial benefits received by Appellee during the marriage, including but not limited to payment of Appellee's student loan debt, (c) the disproportionate division of the tract or parcel of land adjoining Appellant's residence, and (d) the award to Appellee of temporary spousal support by order of that court on March 31, 2014.

Appellant further requests that he be awarded all costs of this appeal, that all costs be taxed against Appellee, and that he have such other relief as he may show himself entitled to receive.

Respectfully submitted,

*Tom Rorie*

Tom Rorie
State Bar No. 17238000
210 North Street
Nacogdoches, TX 75961
(936) 559-1188
FAX (936) 559-0099
**ATTORNEY FOR APPELLANT**

## CERTIFICATE OF COMPLIANCE

Pursuant to TEXAS RULE OF APPELLATE PROCEDURE 9.4(i)(3), I hereby certify that this brief contains 9,141 words (excluding any caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix). This is a computer-generated document created in WordPerfect, using 12-point typeface for all text. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

*Tom Rorie*

Tom Rorie

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document has been served on counsel for Appellants this 23rd day of April, 2015, by e-file notice, to-wit:

Mr. Jarett T. LaRochelle
Attorney at Law
One Riverway, Suite 1700
Houston, TX 77055
jarettlarochelle@yahoo.com

*Tom Rorie*

Tom Rorie

NO. 12-14-00336-CV

_____

IN THE
TWELFTH COURT OF APPEALS
AT TYLER, TEXAS

_____


FREDERICK DAWSON GRAHAM
VS.
DENA MARIE TURNER

FREDERICK DAWSON GRAHAM,
RESPONDENT/APPELLANT

DENA MARIE TURNER,
PETITIONER/APPELLEE

_____


Appealed from the County Court at Law of
Nacogdoches County, Texas

_____

**APPENDIX TO APPELLANT'S BRIEF**
_____


TOM RORIE
State Bar No. 17238000
210 North Street
Nacogdoches, TX 75961
(936) 559-1188
FAX (936) 559-0099

ATTORNEY FOR APPELLANT


**ORAL ARGUMENT REQUESTED**

## APPENDIX

No.     Document

1.     TEXAS BUSINESS & COMMERCE CODE §26.01

2.     TEXAS PROPERTY CODE §5.072(a)

3.     TEXAS RULES OF EVIDENCE, Rule 401

4.     TEXAS CONSTITUTION , Article 16, §15

5.     Original Petition for Divorce

6.     Temporary Orders

7.     Final Decree of Divorce

8.     Findings of Fact and Conclusions of Law

9.     Respondent's Exhibit 52 - UK Decree of Divorce

10.    Respondent's Exhibit 11 - Warranty Deed with Vendor's Lien for Raguet House

11.    Respondent's Exhibit 17 - Cashier's Check for Raguet House Purchase

12.    Respondent's Exhibit 18 - Wire Transfer to Fund Raguet House Purchase

13.    Page 20 of Petitioner's Exhibit 4 - Email regarding Money Transfer

14.    Respondent's Exhibit 14 - Settlement Charges on Raguet House Purchase

15.    Respondent's Exhibit 19 - Schedule Showing House Payments

16.    Respondent's Exhibit 19a - Bank Statement Showing Pre-Marriage Balance

17.    Respondent's Exhibit 20 - Schedule Showing Transfers From Savings

18.    Respondent's Exhibit 21 - House Payment Transaction History

19.    Respondent's Exhibit 22 - Savings Account Summary 2006-2008

20.    Respondent's Exhibit 23 - Savings Account Summary 2007-2008

21.    Respondent's Exhibit 24 - Savings Account Spreadsheet

22.    Respondent's Exhibit 33 - Warranty Deed with Vendor's Lien for Back Lot

23.    Respondent's Exhibit 26 - Real Estate Lien Note to Back Lot

24.    Respondent's Exhibit 27 - Deed of Trust to Back Lot

25.    Respondent's Exhibit 29 - Receipt of Payoff Amount for Back Lot

26.    Respondent's Exhibit 37 - Loans & Taxes Summary on Appellee's Mother's Home

27.    Respondent's Exhibit 38a-38i - Checks for Repairs to Appellee's Family's Homes

28.    Respondent's Exhibit 39-39e - Tax Receipts for Appellee's Mother's House

29.     Respondent's Exhibit 41 - Schedule of Appellee's Student Loan Payments

30.     Respondent's Exhibit 9 - Spreadsheet of Income and Living Expenses

31.     Respondent's Exhibit 10 - Incoming Pension Wire Transfer

32.     Respondent's Exhibit 5 - Pension Letter from Chevron (2/26/14)

33.     Respondent's Exhibit 6 - Pension Letter from Chevron (7/30/13)

34.     Respondent's Exhibit 7 - Screen Shot of Pension Amount

35.     Respondent's Exhibit 8 - Monthly Payslip

36.     Respondent's Exhibit 54 - Notice of Lis Pendens on Raguet House

37.     Respondent's Exhibit 55 - Notice of Lis Pendens on Back Lot

38.     Respondent's Exhibit 31 - Loan Agreement with Robert & Kathleen McCatty

NO. C1228635

IN THE MATTER OF
THE MARRIAGE OF

DENA MARIE TURNER
AND
FREDERICK DAWSON GRAHAM

§
§
§
§
§
§

IN THE DISTRICT COURT

420th JUDICIAL DISTRICT

NACOGDOCHES COUNTY, TEXAS

## ORIGINAL PETITION FOR DIVORCE

1.    *Discovery Level*

Discovery in this case is intended to be conducted under level 2 of rule 190 of the Texas Rules of Civil Procedure.

2.    *Parties*

This suit is brought by Dena Marie Turner, Petitioner.

Frederick Dawson Graham is Respondent.

3.    *Domicile*

Petitioner has been a domiciliary of Texas for the preceding six-month period and a resident of this county for the preceding ninety-day period.

4.    *Service*

Process should be served on Respondent.

5.    *Protective Order Statement*

No protective order under title 4 of the Texas Family Code is in effect, and no application for a protective order is pending with regard to the parties to this suit.

6.    *Dates of Marriage and Separation*

The parties were married on or about 2007 and ceased to live together as husband and wife on or about July 1, 2012.

7.    *Grounds for Divorce*

The marriage has become insupportable because of discord or conflict of personalities between Petitioner and Respondent that destroys the legitimate ends of the marriage relationship and prevents any reasonable expectation of reconciliation.

8.    *Children of the Marriage*

There is no child born or adopted of this marriage, and none is expected.

9.    *Division of Community Property*

Petitioner requests the Court to divide the estate of Petitioner and Respondent in a manner that the Court deems just and right, as provided by law.

Petitioner should be awarded a disproportionate share of the parties' estate for the following reasons, including but not limited to:

a.    fault in the breakup of the marriage; and

b.     benefits the innocent spouse may have derived from the continuation of the marriage.

10.     *Reimbursement*

Petitioner requests the Court to reimburse Petitioner's separate estate for funds or assets expended by Petitioner's separate estate for the benefit of the community. Those expenditures resulted in a direct benefit to the community estate. Petitioner's separate estate has not been adequately compensated for or benefitted from the expenditure of those funds or assets, and a failure by the Court to allow reimbursement to Petitioner's separate estate will result in an unjust enrichment of the community estate at the expense of Petitioner's separate estate.

Petitioner requests the Court to reimburse Petitioner's separate estate for funds or assets expended by Petitioner's separate estate for the benefit of Respondent's separate estate. Those expenditures resulted in a direct benefit to Respondent's separate estate. Petitioner's separate estate has not been adequately compensated for or benefited from the expenditure of those funds or assets, and a failure by the Court to allow reimbursement to Petitioner's separate estate will result in an unjust enrichment of Respondent's separate estate at the expense of Petitioner's separate estate.

11.     *Attorney's Fees, Expenses, Costs, and Interest*

It was necessary for Petitioner to secure the services of Jeremy S. Willis, a licensed attorney, to prepare and prosecute this suit. To effect an equitable division of the estate of the parties and as a part of the division, judgment for attorney's fees, expenses, and costs through trial and appeal should be granted against Respondent and in favor of Petitioner for the use and benefit of Petitioner's attorney; or, in the alternative, Petitioner requests that reasonable attorney's fees, expenses, and costs through trial and appeal be taxed as costs and be ordered paid directly to Petitioner's attorney, who may enforce the order in the attorney's own name. Petitioner requests postjudgment interest as allowed by law.

12.     *Prayer*

Petitioner prays that citation and notice issue as required by law and that the Court grant a divorce and all other relief requested in this petition.

Petitioner prays for attorney's fees, expenses, and costs as requested above.

Petitioner prays for general relief.

Respectfully submitted,

JEREMY S. WILLIS
209 Hughes Street
Nacogdoches, TX 75961
Tel: (936) 569-7944
Fax: (936) 569-0323

By:_____
Jeremy S. Willis
State Bar No. 24030785
Attorney for Petitioner

| IN THE MATTER OF | § | IN THE COUNTY COURT AT LAW |
| THE MARRIAGE OF | § | |
| | § | |
| DENA MARIE TURNER | § | |
| AND | § | |
| FREDERICK DAWSON GRAHAM | § | NACOGDOCHES COUNTY, TEXAS |

## TEMPORARY ORDERS

On the date set forth below the Court heard Petitioner's motion for temporary orders.

*Appearances*

Petitioner, Dena Marie Turner, appeared in person and through attorney of record, Jarett T. LaRochelle, and announced ready.

Respondent, Frederick Dawson Graham, appeared in person and announced ready.

*Jurisdiction*

The Court, after examining the record and hearing the evidence and argument of counsel, finds that all necessary prerequisites of the law have been legally satisfied and that the Court has jurisdiction of this case and of all the parties.

*Property and Parties*

The Court finds that the following orders respecting the property and parties are necessary and equitable.

IT IS ORDERED that Frederick Dawson Graham pay to Dena Marie Turner as temporary spousal support $2,000.00 per month, with the first payment being due and payable on April 1, 2014, and a like payment being due and payable on the first (1st) day of each month thereafter until further order of this Court.

IT IS ORDERED that Petitioner have the exclusive and private use and possession of the following property while this case is pending: Petitioner's computer, camera and other tools,

equipment and supplies as used for Petitioner's business purposes.

IT IS ORDERED that Respondent shall maintain Petitioner as insured beneficiary on his health insurance policy.

*Temporary Injunction*

The temporary injunction granted below shall be effective immediately and shall be binding on Respondent; on his agents, servants, employees, and attorneys; and on those persons in active concert or participation with him who receive actual notice of this order by personal service or otherwise. The requirement of a bond is waived.

IT IS ORDERED that Respondent is enjoined from:

1.      Communicating with the other party in person, by telephone, or in writing in vulgar, profane, obscene, or indecent language or in a coarse or offensive manner.

2.      Threatening the other party in person, by telephone, or in writing to take unlawful action against any person.

3.      Placing one or more telephone calls, anonymously, at any unreasonable hour, in an offensive and repetitious manner, or without a legitimate purpose of communication.

4.      Causing bodily injury to the other party.

5.      Threatening the other party with imminent bodily injury.

6.      Destroying, removing, concealing, encumbering, transferring, or otherwise harming or reducing the value of the property of one or both of the parties.

7.      Falsifying any writing or record relating to the property of either party.

8.      Misrepresenting or refusing to disclose to the other party or to the Court, on proper request, the existence, amount, or location of any property of one or both of the parties.

9.      Damaging or destroying the tangible property of one or both of the parties,

including any document that represents or embodies anything of value.

10. Tampering with the tangible property of one or both of the parties, including any document that represents or embodies anything of value, and causing pecuniary loss to the other party.

11. Selling, transferring, assigning, mortgaging, encumbering, or in any other manner alienating any of the property of Petitioner or Respondent, whether personalty or realty, and whether separate or community, except as specifically authorized by this order.

12. Incurring any indebtedness, other than legal expenses in connection with this suit, except as specifically authorized by this order.

13. Making withdrawals from any checking or savings account in any financial institution for any purpose, except as specifically authorized by this order.

14. Spending any sum of cash in the possession or subject to the control of Respondent for any purpose, except as specifically authorized by this order.

15. Withdrawing or borrowing in any manner for any purpose from any retirement, profit-sharing, pension, death, or other employee benefit plan or employee savings plan or from any individual retirement account or Keogh account, except as specifically authorized by this order.

16. Entering any safe-deposit box in the name of or subject to the control of Petitioner or Respondent, whether individually or jointly with others.

17. Withdrawing or borrowing in any manner all or any part of the cash surrender value of life insurance policies on the life of Petitioner or Respondent, except as specifically authorized by this order.

18. Changing or in any manner altering the beneficiary designation on any life

insurance on the life of Petitioner or Respondent.

19.     Canceling, altering, failing to renew or pay premiums, or in any manner affecting the present level of coverage of any life, casualty, automobile, or health insurance policies insuring the parties' property or persons.

20.     Opening or diverting mail addressed to the other party.

21.     Signing or endorsing the other party's name on any negotiable instrument, check, or draft, such as tax refunds, insurance payments, and dividends, or attempting to negotiate any negotiable instrument payable to the parties or the other party without the personal signature of the other party.

22.     Taking any action to terminate or limit credit or charge cards in the name of the parties or the other party, except as specifically authorized in this order.

23.     Discontinuing or reducing the withholding for federal income taxes on wages or salary while this case is pending.

24.     Destroying, disposing of, or altering any financial records of the parties, including but not limited to records from financial institutions (including canceled checks and deposit slips), all records of credit purchases or cash advances, tax returns, and financial statements.

25.     Destroying, disposing of, or altering any e-mail or other electronic data relevant to the subject matters of this case, whether stored on a hard drive or on a diskette or other electronic storage device.

IT IS ORDERED that Respondent is further enjoined from:

1.     Terminating or in any manner affecting the service of water, electricity, gas, telephone, cable television, or other contractual services, such as security, pest control, landscaping, or yard maintenance, at 3704 Raguet Street, Nacogdoches, Texas 75965 or in any

manner attempting to withdraw any deposits for service in connection with those services.

2.  Excluding Petitioner from the use and enjoyment of the residence located at 3704 Raguet Street, Nacogdoches, Texas 75965.

3.  Entering, operating, or exercising control over the 1999 Mercedes 430 E, WDBJF70H0XA847072 and 1992 Chevrolet Suburban, 1GNEC16K3PJ325569 in the possession of Petitioner.

4.  Exercising possession or control of any of this property: Petitioner's computer, camera and other tools, equipment and supplies as used for Petitioner's business purposes.

IT IS ORDERED that Respondent is specifically authorized:

To make expenditures and incur indebtedness for reasonable and necessary living expenses for food, clothing, shelter, transportation, and medical care.

To make expenditures and incur indebtedness for reasonable attorney's fees and expenses in connection with this suit.

To engage in acts reasonable and necessary to conduct Respondent's usual business and occupation.

*Duration*

These Temporary Orders shall continue in force until the signing of the Final Decree of Divorce or until further order of this Court.

SIGNED on ___*March 3, 2014*___.

_____
JUDGE PRESIDING

CAUSE NO. <u>C1228635</u>

| | | |
|---|---|---|
| IN THE MATTER OF<br>THE MARRIAGE OF | §<br>§<br>§ | IN THE COUNTY COURT AT LAW |
| DENA MARIE TURNER<br>AND<br>FREDERICK DAWSON GRAHAM | §<br>§<br>§ | NACOGDOCHES COUNTY, TEXAS |

## FINAL DECREE OF DIVORCE

On the 30th day of May, 2014, and 17th and 18th days of July, 2014, the Court heard this case.

*Appearances*

Petitioner, Dena Marie Turner, appeared in person and through attorney of record, Jarett T. LaRochelle, and announced ready for trial.

Respondent, Frederick Dawson Graham, appeared in person and through attorney of record, Tom Rorie, and announced ready for trial.

*Record*

The record of testimony was duly reported by the court reporter for the County Court at Law.

*Jurisdiction and Domicile*

The Court finds that the pleadings of Petitioner are in due form and contain all the allegations, information, and prerequisites required by law. The Court, after receiving evidence, finds that it has jurisdiction of this case and of all the parties and that at least sixty days have elapsed since the date the suit was filed.

The Court further finds that, at the time this suit was filed, Petitioner had been a domiciliary of Texas for the preceding six-month period and a resident of the county in which this suit was filed for the preceding ninety-day period. All persons entitled to citation were

properly cited.

*Jury*

A jury was waived, and questions of fact and of law were submitted to the Court.

*Divorce*

IT IS ORDERED AND DECREED that Dena Marie Turner, Petitioner, is granted a divorce from Frederick Dawson Graham, Respondent, and the marriage between them is dissolved on the ground of cruelty.

*Child of the Marriage*

The Court finds that there is no child of the marriage of Petitioner and Respondent and that none is expected.

*Division of Marital Estate*

The Court finds that the following is a just and right division of the parties' marital estate, having due regard for the rights of each party.

Property Jointly Owned

IT IS ORDERED AND DECREED that the wife, Dena Marie Turner, and the husband, Frederick Dawson Graham, are awarded the following to be jointly owned, as tenants in common:

J-1.    The following real property, including but not limited to any escrow funds, prepaid insurance, utility deposits, keys, house plans, home security access and code, garage door opener, warranties and service contracts, and title and closing documents:

Legal Description:

All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas and being **Lot No. 1** of the Replat of Lot 25-

C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of Plat Records, Nacogdoches County, Texas.

Being more commonly known as 3704 Raguet Street, Nacogdoches, Texas 75965

J-2. The following real property, including but not limited to any escrow funds, prepaid insurance, utility deposits, keys, house plans, home security access and code, garage door opener, warranties and service contracts, and title and closing documents:

Legal Description (back lot):

All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas and being **Lot No. 2** of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of Plat Records, Nacogdoches County, Texas.

Being more commonly known as Parker Street, Lot 2 of 25C

Property to Husband

IT IS ORDERED AND DECREED that the husband, Frederick Dawson Graham, is awarded the following as his sole and separate property, and the wife is divested of all right, title, interest, and claim in and to that property:

H-1. The furniture, furnishings, fixtures, goods, art objects, collectibles, appliances, and equipment in the husband's possession.

H-2. All individual retirement accounts, simplified employee pensions, annuities, and variable annuity life insurance benefits in the husband's name.

H-3. The 1992 Mercedes 400E motor vehicle, vehicle identification number WDBEA34E9NB765399, together with all prepaid insurance, keys, and title documents.

Property to Wife

IT IS ORDERED AND DECREED that the wife, Dena Marie Turner, is awarded the following as her sole and separate property, and the husband is divested of all right, title, interest, and claim in and to that property:

W-1. The furniture, furnishings, fixtures, goods, art objects, collectibles, appliances, and equipment in the wife's possession.

W-2. The 1999 Mercedes 430E motor vehicle, vehicle identification number WDBJF70H0XA847072, together with all prepaid insurance, keys, and title documents.

W-3. The 1993 Chevrolet Suburban motor vehicle, vehicle identification number 1GNEC16K3PJ325569, together with all prepaid insurance, keys, and title documents.

Division of Debt

Debts to Husband

IT IS ORDERED AND DECREED that the husband, Frederick Dawson Graham, shall pay, as a part of the division of the estate of the parties, and shall indemnify and hold the wife and her property harmless from any failure to so discharge, these items:

H-1. All debts, charges, liabilities, and other obligations incurred by the husband unless express provision is made in this decree to the contrary.

H-2. All encumbrances, ad valorem taxes, liens, assessments, or other charges due or to become due on the real and personal property identified in this decree unless express provision is made in this decree to the contrary.

Debts to Wife

IT IS ORDERED AND DECREED that the wife, Dena Marie Turner, shall pay, as a part of the division of the estate of the parties, and shall indemnify and hold the husband and his

property harmless from any failure to so discharge, these items:

W-1. All debts, charges, liabilities, and other obligations incurred by the wife from and after July 1, 2012, unless express provision is made in this decree to the contrary.

Notice

IT IS ORDERED AND DECREED that each party shall send to the other party, within three days of its receipt, a copy of any correspondence from a creditor or taxing authority concerning any potential liability of the other party.

**Provisions Dealing with Sale of Residence**

IT IS FURTHER ORDERED AND DECREED that the following property and all improvements located thereon:

Legal Description:

All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas and being **Lot No. 1** of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of Plat Records, Nacogdoches County, Texas.

Being more commonly known as 3704 Raguet Street, Nacogdoches, Texas 75965

and

Legal Description (back lot):

All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas and being **Lot No. 2** of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of Plat Records, Nacogdoches County, Texas.

Being more commonly known as Parker Street, Lot 2 of 25C

shall be sold under the following terms and conditions:

1.      The parties shall list the property with a duly licensed real estate broker having sales experience in the area where the property is located, provided further that the real estate broker shall be an active member in the Multiple Listing Service with the Texas Board of Realtors.

2.      The property shall be sold for a price that is mutually agreeable to Petitioner and Respondent.

3.      Respondent shall continue to make all payments of principal, interest, taxes, and insurance on the property during the pendency of the sale, and Respondent shall have the exclusive right to enjoy the use and possession of the premises until closing. All maintenance and repairs necessary to keep the property in its present condition shall be paid by Respondent.

4.      The net sales proceeds (defined as the gross sales price less cost of sale and full payment of any mortgage indebtedness or liens on the property) shall be distributed as follows:

With respect to the sale of:

> All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas and being **Lot No. 1** of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of Plat Records, Nacogdoches County, Texas.
>
> Being more commonly known as 3704 Raguet Street, Nacogdoches, Texas 75965;

fifty percent (50%) to the wife, Dena Marie Turner, and

fifty percent (50%) to the husband, Frederick Dawson Graham; and

with respect to the sale of:

All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas and being **Lot No. 2** of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of Plat Records, Nacogdoches County, Texas.

Being more commonly known as Parker Street, Lot 2 of 25C

Net sales proceeds from this **Lot No. 2** shall be applied first to the repayment of the $15,000 indebtedness owed by Frederick Dawson Graham to Robert McCatty and Kathleen McCatty, and the remaining net sales proceeds from this **Lot No. 2** shall be divided as follows:

sixty percent (60%) to the wife, Dena Marie Turner, and

forty percent (40%) to the husband, Frederick Dawson Graham.

Judgment to Satisfy Temporary Orders entered March 31, 2014

For the purpose of a just and right division of property made in this decree, IT IS FURTHER ORDERED AND DECREED that Petitioner, Dena Marie Turner, is awarded judgment of eight thousand dollars ($8,000.00) against Respondent, Frederick Dawson Graham, payable in accordance with the terms of the closing documents ordered in this decree to be executed, with interest at five percent per year compounded annually from the date of judgment, for which let execution issue.

Attorney's Fees

The Court finds that Dena Marie Turner has incurred $10,000.00 as reasonable attorney's fees, expenses, and costs, which were necessary as support for Dena Marie Turner. IT IS ORDERED that good cause exists to award Jarett T. LaRochelle a judgment in the amount of $10,000.00 for attorney's fees, expenses, and costs, with interest at five percent per year

compounded annually from the date this Final Decree of Divorce is signed until paid. The judgment, for which let execution issue, is awarded against Frederick Dawson Graham, and Frederick Dawson Graham is ORDERED to pay the fees, expenses, costs, and interest to Jarett T. LaRochelle at One Riverway, Suite 1700, Houston, Texas 77056 by cash, cashier's check, or money order on or before September 30, 2014. Jarett T. LaRochelle may enforce this judgment for fees, expenses, and costs in the attorney's own name by any means available for the enforcement of a judgment for debt.

### Treatment/Allocation of Community Income for Year of Divorce

IT IS ORDERED AND DECREED that, for the calendar year 2014, each party shall file an individual income tax return in accordance with the Internal Revenue Code.

IT IS ORDERED AND DECREED that for calendar year 2014, each party shall indemnify and hold the other party and his or her property harmless from any tax liability associated with the reporting party's individual tax return for that year unless the parties have agreed to allocate their tax liability in a manner different from that reflected on their returns.

IT IS ORDERED AND DECREED that each party shall furnish such information to the other party as is requested to prepare federal income tax returns for 2014 within thirty days of receipt of a written request for the information, and in no event shall the available information be exchanged later than March 1, 2015. As requested information becomes available after that date, it shall be provided within ten days of receipt.

IT IS ORDERED AND DECREED that all payments made to the other party in accordance with the allocation provisions for payment of federal income taxes contained in this Final Decree of Divorce are not deemed income to the party receiving those payments but are part of the property division and necessary for a just and right division of the parties' estate.

*Transfer and Delivery of Property*

Direction to Deliver Property

Frederick Dawson Graham is ORDERED to deliver to Dena Marie Turner on or before September 30, 2014, the following items:

1.    Disney lithographs and other paraphernalia and any other items of personal property acquired by Dena Marie Turner before marriage.

Dena Marie Turner is ORDERED to deliver to Frederick Dawson Graham on or before September 30, 2014, the following items:

1.    car battery, one generator, rugby shirts, family portraits, tools, rugs, camera, candy jar, and any other items of personal property acquired by Frederick Dawson Graham before marriage.

*Court Costs*

IT IS ORDERED AND DECREED that Petitioner, Dena Marie Turner, is awarded a judgment against Respondent, Frederick Dawson Graham, for costs of court incurred in the course of this lawsuit, with interest at five percent per year compounded annually from the date the judgment is signed until paid, for which let execution issue.

*Resolution of Temporary Orders*

IT IS ORDERED AND DECREED that Petitioner and Respondent are discharged from all further liabilities and obligations imposed by the temporary order of this Court rendered on the date set forth below.

*Discharge from Discovery Retention Requirement*

IT IS ORDERED AND DECREED that the parties and their respective attorneys are discharged from the requirement of keeping and storing the documents produced in this case in

accordance with rule 191.4(d) of the Texas Rules of Civil Procedure.

*Clarifying Orders*

Without affecting the finality of this Final Decree of Divorce, this Court expressly reserves the right to make orders necessary to clarify and enforce this decree.

*Relief Not Granted*

IT IS ORDERED AND DECREED that all relief requested in this case and not expressly granted is denied. This is a final judgment, for which let execution and all writs and processes necessary to enforce this judgment issue. This judgment finally disposes of all claims and all parties and is appealable.

*Date of Judgment*

This divorce judicially PRONOUNCED AND RENDERED in court at 101 W. Main Street, Room 240, Nacogdoches, Nacogdoches County, Texas, on July 30, 2014, and further noted on the court's docket sheet on the same date, but signed on ___September 3, 2014___

_____
JUDGE PRESIDING

APPROVED AS TO FORM ONLY:

/s/ Jarett T. LaRochelle
Jarett T. LaRochelle
Attorney for Petitioner
State Bar No. 24041296
One Riverway, Suite 1700
Houston, Texas 77056
Tel: (713) 622-3766
Fax: (713) 840-6351

jarettlarochelle@yahoo.com


APPROVED AS TO FORM ONLY:


By:_____

Tom Rorie
Attorney for Respondent
State Bar No. 17238000
210 North Street
Nacogdoches, Texas 75961
Tel: (936) 559-1188
Fax: (936) 559-0099
trorie@sbcglobal.net

CAUSE NO. <u>C1228635</u>

| | | |
|---|---|---|
| IN THE MATTER OF | § | IN THE COUNTY COURT AT LAW: 35 |
| THE MARRIAGE OF | § | |
| | § |  |
| DENA MARIE TURNER | § | |
| AND | § | DISTRICT CLERK |
| FREDERICK DAWSON GRAHAM | § | NACOGDOCHES COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1.    The pleadings of Petitioner are in due form and contain all the allegations, information, and prerequisites required by law.

2.    The Court has jurisdiction of this case and of all the parties and that at least sixty days have elapsed since the date the suit was filed.

3.    At the time this suit was filed, Petitioner had been a domiciliary of Texas for the preceding six-month period and a resident of the county in which this suit was filed for the preceding ninety-day period.

4.    All persons entitled to citation were properly cited.

5.    The parties were married on or about 2007 and ceased to live together as husband and wife on or about July 1, 2012.

6.    The marriage has become insupportable because of discord or conflict of personalities between Petitioner Dena Marie Turner and Respondent Frederick Dawson Graham that destroys the legitimate ends of the marriage relationship and prevents any reasonable expectation of reconciliation. Specifically, Respondent is guilty of cruel treatment toward Petitioner, including but not limited to acts of assault and/or battery on or about April 20, 2012, in February of 2012, in December of 2011, in October of 2011, in August of 2011, on or about July 4, 2010, in June of

2010, in August of 2009, and in June of 2008. Respondent is at fault in the breakup of the marriage.

7. Petitioner and Respondent lived together and were looking to purchase a residence together many years prior to their date of marriage.

8. Petitioner ceased working on her own independent career to enter into a business partnership and service Respondent's career for which time was billed at a higher rate.

9. By written correspondence, Respondent acknowledging Petitioner's business services consistently from 2004 through 2011. Examples of Respondent's acknowledgment of Petitioner's business services are found in Petitioner's Exhibit 1, email(s) dated May 25, 2004; July 13, 2004; July 16, 2004; August 2, 2004; August 13, 2004; June 23, 2005; May 2, 2006; April 27, 2006; May 3, 2006; May 4, 2006; July 12, 2006; July 13, 2006; October 18, 2006; April 4, 2007; November 14, 2008; and January 14, 2011.

10. The real property at issue in this matter is as follows:

All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas and being **Lot No. 1** of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of Plat Records, Nacogdoches County, Texas, being more commonly known as 3704 Raguet Street, Nacogdoches, Texas 75965; (hereinafter the "House") and

All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas and being **Lot No. 2** of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of Plat Records, Nacogdoches County, Texas, being more commonly known as Parker Street, Lot 2 of 25C (hereinafter the "Back Lot") (the "House" and "Back Lot" being hereinafter referred to as the

"Raguet Street residence").

11. Petitioner and Respondent collaborated together to find and decide upon the purchase of the Raguet Street residence in Nacogdoches. Prior to the purchase of the Raguet Street residence, Petitioner and Respondent had previously attempted to purchase another, more expensive, residence in Nacogdoches. Petitioner was the only connection with or inspiration to reside in Nacogdoches. Respondent had no independent connection with or incentive to reside in Nacogdoches.

12. The purchase of the House was prior to the date of marriage of the parties.

13. The purchase of the Back Lot was after the date of marriage of the parties.

14. The Petitioner testified and Respondent conceded that title to the Raguet Street residence was exclusively held in the name of Respondent because Petitioner's credit score would have resulted in a higher mortgage interest rate. By correspondence to Petitioner, Respondent acknowledged the savings received from their method of financing the Raguet Street residence in Petitioner's Exhibit 1; email dated August 17, 2006.

15. Petitioner testified that she never anticipated Respondent would make claim to the House or the Raguet Street residence as his separate property.

16. Respondent had promised Petitioner to add Petitioner's name to title to the Raguet Street residence.

17. Petitioner served as the coordinator and "general contractor" for extensive repairs and remodeling to the Raguet Street residence. Petitioner would not have performed all of the contracting and remodeling efforts at the Raguet Street residence but for the understanding in reliance upon Respondent's representations that it was "their" home.

18. Respondent represented to Petitioner that he intended the home to be jointly owned, used,

and enjoyed by emails dated May 25, 2004; July 6, 2004; July 16, 2004; July 30, 2004; August 25, 2004; September 2, 2004; July 13, 2006; August 3, 2006; September 26, 2006; December 18, 2006; and October 14, 2008, all included in Petitioner's Exhibit 1.

19. There is no evidence of intent for the Petitioner to have no ownership interest in the House.

20. Respondent admitted on the stand to fabricating, falsifying, and/or fraudulently executing documents with the intention that Respondent rely upon the truthfulness of the information contained in such documents.

21. Respondent admitted on the stand to lying to Petitioner.

22. Respondent made an admission against his interests via telephone voice recording Petitioner that Respondent hid assets from Petitioner in the United Kingdom.

23. Respondent's testimony and evidence were found to not be credible.

24. The initial down payment on the Raguet Street residence purchase was provided from business revenue generated by the combined efforts of Petitioner and Respondent.

25. The payments in reduction of principal on the mortgage secured by the Raguet Street residence were made from business revenue generated by the combined efforts of Petitioner and Respondent.

26. Any and all inheritance or other separate property funds belonging to Respondent were deposited into a money market account and comingled with other funds used to pay living expenses.

27. Neither the initial down payment nor the regular monthly payments on the mortgage secured by the Raguet Street residence were funded from Respondent's money market account.

28. Petitioner's exhibit(s) 4, 10, 11, and 12, evidence the business revenue used to fund the

initial down payment and regular monthly payments on the mortgage secured by the Raguet Street residence.

29. In full and final payment of the mortgage due and owing on the "Back Lot", Respondent borrowed $15,000 from Robert McCatty and Kathleen McCatty.

30. On March 31, 2014, Temporary Orders were entered in this matter ordering Respondent to make monthly payments of temporary spousal support to Petitioner in the amount of Two Thousand and no/100 Dollars ($2,000.00), on the first (1st) day of each month beginning April 1, 2014, and thereafter until further order of this Court.

31. Respondent altogether failed to make any payment of temporary spousal support to Petitioner, in violation of the Temporary Orders entered March 31, 2014.

32. Due to Respondent's fault in the breakup of the marriage, Petitioner is entitled to a disproportionate division of the parties' marital estate.

33. Respondent has the use and enjoyment of his prior marital residence with his prior wife, Bridgett Graham, in the United Kingdom.

34. Respondent is awarded the personal property in his possession as well as his car battery, one generator, his rugby shirts, family portraits, tools, rugs, camera, candy jar, and any other property he acquired before marriage as well as anything related to his business, retirement, or property located in the United Kingdom.

35. Petitioner is awarded the personal property in her possession other than the items specifically awarded to Respondent, including any Disney items in the possession of Respondent and any other property she acquired before marriage.

36. Respondent is awarded the 1992 Mercedes 400E motor vehicle, VIN: WDBEA34E9NB765399, already in Respondent's possession.

37. Petitioner is awarded the 1999 Mercedes 430E motor vehicle, VIN: WDBJF70H0XA847072, and the 1993 Chevrolet Suburban motor vehicle, VIN: 1GNEC16K3PJ325569, already in Petitioner's possession.

38. Respondent is obligated to pay and indemnify Petitioner against all debts, charges, liabilities and other obligations incurred by Respondent, including all encumbrances, ad valorem taxes, liens, assessments, or other charges due or to become due on the real and personal property of the parties' martial estate.

39. Petitioner is obligated to pay and indemnify Respondent against all debts, charges, liabilities and other obligations incurred by Petitioner from and after July 1, 2012.

40. To effectuate the division of the parties' marital estate, the Raguet Street residence should be listed with a duly licensed real estate broker, sold for a price mutually agreeable to Petitioner and Respondent, and the net sale proceeds distributed as follows:

With respect to the sale of:

> All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas and being **Lot No. 1** of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of Plat Records, Nacogdoches County, Texas.
>
> Being more commonly known as 3704 Raguet Street, Nacogdoches, Texas 75965;

fifty percent (50%) to the wife, Dena Marie Turner, and

fifty percent (50%) to the husband, Frederick Dawson Graham; and

with respect to the sale of:

> All that certain lot or parcel of land in the City of Nacogdoches,

Nacogdoches County, Texas and being **Lot No. 2** of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of Plat Records, Nacogdoches County, Texas.

Being more commonly known as Parker Street, Lot 2 of 25C

Net sales proceeds from this **Lot No. 2** shall be applied first to the repayment of the $15,000 indebtedness owed by Frederick Dawson Graham to Robert McCatty and Kathleen McCatty, and the remaining net sales proceeds from this **Lot No. 2** shall be divided as follows:

sixty percent (60%) to the wife, Dena Marie Turner, and

forty percent (40%) to the husband, Frederick Dawson Graham.

41. Petitioner has incurred reasonable and necessary attorney's fees in excess of $10,000.00.

42. Petitioner is entitled to recover her reasonable and necessary attorney's fees from Respondent.


## CONCLUSIONS OF LAW

1. Although title to the House was acquired prior to marriage of the parties and recorded exclusively in Respondent's name, the House is jointly owned by Petitioner and Respondent, as tenants in common. *Aaron v. Aaron*, 2012 Tex.App. LEXIS 769 (Tex.App.—Houston [14th Dist.] January 31, 2012) (mem. Opinion) (Cause No. 14-10-00765-CV) and *Harrington v. Harrington*, 742 S.W.2d 722 (Tex.App.—Houston [1st Dist.] 1987).

2. The evidence clearly demonstrates that there was never any indication of intent for the Petitioner to have no ownership interest in the House.

3. The parties both benefitted from securing a mortgage and taking title solely in the Respondent's name, as a result of Petitioner's credit.

4. Respondent is guilty of cruel treatment and fault in the breakup of the marriage.

5. Respondent's testimony and evidence are not credible.

6. Petitioner is entitled to an award of Eight Thousand and no/100 Dollars ($8,000.00) against Respondent for Respondent's failure to comply with the Temporary Orders entered March 31, 2014.

7. To effectuate the division of the parties' marital estate, the Raguet Street residence should be listed with a duly licensed real estate broker, sold for a price mutually agreeable to Petitioner and Respondent, and the net sale proceeds distributed as follows:

With respect to the sale of:

> All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas and being **Lot No. 1** of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of Plat Records, Nacogdoches County, Texas.
>
> Being more commonly known as 3704 Raguet Street, Nacogdoches, Texas 75965;

fifty percent (50%) to the Petitioner, Dena Marie Turner, and

fifty percent (50%) to the Respondent, Frederick Dawson Graham; and

with respect to the sale of:

> All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas and being **Lot No. 2** of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of Plat Records, Nacogdoches County, Texas.
>
> Being more commonly known as Parker Street, Lot 2 of 25C

Net sales proceeds from this **Lot No. 2** shall be applied first to the repayment of the $15,000 indebtedness owed by Frederick Dawson Graham to Robert McCatty and Kathleen McCatty, and the remaining net sales proceeds from this **Lot No. 2** shall be divided as follows:

sixty percent (60%) to the Petitioner, Dena Marie Turner, and

forty percent (40%) to the Respondent, Frederick Dawson Graham.

8.     Good cause exists to award Jarett T. LaRochelle judgment against Respondent in the amount of $10,000.00 as reasonable and necessary attorney's fees incurred by Petitioner.

9.     The marriage relationship has become insupportable and there is no reasonable expectation of reconciliation. All of the grounds necessary to grant a divorce have been established. The parties are divorced. The property division is just and right. The separate property findings are supported by the evidence.

If any finding of fact as listed herein shall be a conclusion of law then such finding of fact shall be deemed to be a conclusion of law. If any conclusion of law as listed herein shall be a finding of fact then such conclusion of law shall be deemed to be a finding of fact.

SIGNED this 9th day of October, 2014.

_____
JUDGE PRESIDING

## IN THE Slough County Court



BETWEEN    Frederick Dawson Graham    Petitioner

AND    Brigid Graham    Respondent

Referring to the decree made in this cause on the 1st August 2005, whereby it was decreed that the marriage solemnised on the 28th September 1974

at THE CHURCH OF THE HOLY FAMILY, TRELAWNEY AVENUE, LANGLEY, SLOUGH IN THE DISTRICT OF SLOUGH IN THE COUNTY OF BERKSHIRE

between Frederick Dawson Graham the Petitioner

and Brigid Graham the Respondent

be dissolved unless sufficient cause be shown to the Court within six weeks from the making thereof why the said decree should not be made absolute, and no such cause having been shown, it is hereby certified that the said decree was on the 20th December 2006, made final and absolute and that the said marriage was thereby dissolved.

Dated: 20th December 2006

Notes:

1.    Divorce affects inheritance under a will

Where a will has already been made by either party to the marriage then, by virtue of section 18A of the Wills Act 1837:

(a) any provisions of the will appointing the former spouse executor or trustee or conferring a power of appointment on the former spouse shall take effect as if the former spouse had died on the date on which the marriage is dissolved unless a contrary intention appears in the will;

(b) any property which, or an interest in which, is devised or bequeathed to the former spouse shall pass as if the former spouse had died on the date on which the marriage is dissolved unless a contrary intention appears in the will.

2.    Divorce affects the appointment of a guardian

Unless a contrary intention is shown in the instrument of appointment, any appointment under section5(3) or 5(4) of the Children Act 1989 by one spouse of his or her former spouse as guardian is, by virtue of section 6 of that Act, deemed to have been revoked at the date of the dissolution of the marriage.

The court office at Slough County Court, The Law Courts, Windsor Road, Slough, Berkshire, SL1 2HE is open from 10:00am and 4:00pm on Mondays to Fridays. Tel 01753 690300 Please address all communications to the Court Manager quoting the number at the top right hand corner of this form.

Printed by HMCS

D37 Decree of Absolute (Divorce)

RESPONDENT'S
EXHIBIT 52



# SEPARATION AGREEMENT

THIS SEPARATION AGREEMENT (the "agreement") Dated this 2nd August 2005

**BETWEEN :**

Frederick Dawson Graham
of Slough
Buckinghamshire, England
(the "Husband")

OF THE FIRST PART

-and-
Brigid Graham
of Slough
Buckinghamshire, England
(the "Wife")

OF THE SECOND PART

**BACKGROUND :**

A.    The Husband and Wife (individually the "Party" and collectively the "Parties") were lawfully married on September 28th, 1974, in Langley County of Berkshire, England. Due to certain differences that have developed between the Husband and the Wife, they agree to live separate and apart from each other, and conditions in this Agreement.

B.    The Husband and Wife have made complete, fair and accurate disclosure to each other on all Financial matters reflected in this Agreement.

C.    The terms of this Agreement are intended to settle the matters addressed and may be Incorporated into a final decree of divorce, except to the extent that specific matters are amended or addressed in a subsequent separation agreement.

D.    The Husband and Wife have each voluntarily entered into this Agreement and have not been forced by anyone to sign this Agreement, and both the Husband and the Wife confirm that they are in sound mental health.

**IN CONSIDERATION OF** the mutual promises and covenants contained in this Agreement, and other valuable considerations, the receipt and sufficiency of which consideration is hereby



acknowledged, the Parties agree as follows:

### LIVING SEPARATE AND APART

1. The husband and Wife have lived separate and apart since January 1, 2002 and will continue to live separate and apart as fully and completely as though they had never been married. Neither Party will attend the other's home or work without invitation or approval.

### INTERFERENCE

2. Each Party will be free from interference, authority or control of the other Party as fully as through each were single and unmarried. Each Party may engage in employment, business or profession, and reside where he or she my chose, free from any interference, restriction, authority, or control of the other Party. Each Party agrees not to interfere, bother, harass, intimidate or otherwise restrict the other Party or their family or friends at their respective residences, places of employment or any other place.

### SUCCESSION RIGHTS

3. Upon the death of the Wife, the Husband waives, releases, discharges, quite claims and renounces every and all rights, whether at common law in equity, or by statute to share in the estate of the Wife.

4. Upon the death of the Husband, the Wife waives, releases, discharges, quite claims and renounces every and all rights, whether at common law. In equity, or by statute, to share in the estate of the Husband.

### CHILDREN

5. There are 3 children of the marriage, namely :

| Name: | Date of Birth |
|---|---|
| Erin Graham | August 29, 1980 |
| Siobhan Graham | February 17, 1983 |
| Rebecca Graham | November 26, 1985 |

6. The Husband and Wife agree that sole legal custody is in the best interests of the children. The Husband and Wife agree that the Wife is granted sole legal custody, and has the primary right to make decisions regarding matters of their health, education and welfare In the children's best interest. The parent who has not been granted sole legal custody may make emergency decisions affecting the health or safety of the children when the children are in physical care and control of that Party. The Husband and Wife agree that the grant of sole legal custody to one Party does not deprive the other Party of access to information regarding the children.

7. The Parties agree that the Wife will be the primary care giver for their minor or dependent Children.

The Husband and Wife agree that the Husband will have the following visitation schedule with the children

N/A Frederick has decided to remain in America.

### Child Support

9. The husband will pay child support in the amount of £GBP monthly to the Wife. Child support payments will commence on the 16th August 2005 and will be paid on the 16th day of each and every month.

10. The Husband will pay total of £GBP monthly to the Wife for the children uninsured health care costs, and for other extraordinary expenses, such as: Subject to mutual agreement to be in the best interest of each individual child.

   Child support payment for these expenses will commence on August 16 2005 and will be paid on the 16th day of each and every month.

11. The Wife will maintain health insurance, including medical and dental coverage, for the benefit of Erin Graham, Siobhan Graham and Rebecca Graham.

12. Child support payments, contributions to uninsured health care costs, child care costs and extraordinary expenses and the maintenance of health insurance will continue for each child so long as the child is:

   a. Under the age of majority, unmarried and financially dependent on the parents:

   b. Over the age of majority, unmarried and financially dependent on the parents due to illness or disability; or

   C Over the age of majority, unmarried and attending an accredited post secondary education institution as a full-time student and is dependent on the parents for support. These child support benefits will continue until the child has completed his or her first post-secondary degree or diploma or until the end of the calendar year in which the child reaches the age of 21 years, which ever come first. The Husband will not be required to pay a tuition amount greater than the tuition rate for a reasonable comparable program at the supported university or college nearest the residence of the child at the time of entrance.

### SPOUSAL MAINTENANCE

13. Neither Party Claims entitlement to Spousal maintenance. Both Parties waive any claim to spousal maintenance now and in the future, regardless of any change in circumstances experienced by either Party.



## MARITAL HOME

**14.** The address of the marital home is: 34, Azalea Way, George Green, Slough, Bucks, SL3 6RN.

**15.** The Husband will transfer his interest in the marital home to the Wife free of all circumstances.

**16.** The expenses relating to the marital home, including but not limited to mortgage payments, utility bills. property taxes and repair costs, will be paid by the Husband.

## INCOME

**17.** Total annual employment income for the Husband is £GBP. The Husband has no other source of income.

**18.** Total annual employment income for the Wife is £GBP. The Wife has no other source of income.

## DIVISION OF PROPERTY

**19.** The Parties acknowledge that they have agreed upon a division of all property, owned or possessed by them as marital property or separate property. The Husband and Wife are in possession of all those properties to which he or she is respectively entitled. Accordingly, neither makes any claim to any property or properties in the possession of the other, except as stated in Schedule A to this agreement.

## DEBTS

**20** The Parties agree that any indebtedness secured against, or attributable to, any item of property that either Party is receiving under this Agreement will be the sole responsibility of the Party receiving the particular property. This section does not apply to any debts or mortgage relating to the marital home.

**21.** Neither Party will incur any further debt or liability on the other Parties credit. Any debt accumulated after this date of this agreement is the debt of the individual Party, regardless if the debt was incurred as a result of joint credit.

## ADDITIONAL CLAUSES

**22.** All UK assets will remain in the sole property of Brigid Graham.

## GENERAL PROVISION

**23.** The Husband and Wife will promptly sign and give to the other all documents necessary to effect to the terms of this agreement.

This Agreement contains the entire agreement between the Husband and Wife about their relationship with each other. Except as provided elsewhere in this Agreement, this Agreement replaces any earlier written or oral agreement between the Parties.

25. Should any portion of this Agreement be held by a court of law to be invalid, unenforceable, or void, such holding will not have the effect of invalidating or voiding the remainder of this Agreement, and the Parties agree that the portion so held to be invalid, unenforceable, or void, will be deemed amended, reduced in scope, or otherwise stricken only to the extent required for purposes of validity and enforcement in the jurisdiction of such a holding.

26. The Husband and Wife may only amend this Agreement in writing after both Parties have obtained legal advice on the changes.

27. In the event that a dispute arises regarding this Agreement, the Parties will try to resolve the matter through negotiation or mediation, prior to initiation a court action.

28. Notwithstanding that the Parties acknowledge and agree that their circumstances at the execution of this Agreement may change for any reason, including but without limiting the generality of the foregoing, the passage of years, it is nonetheless their intention to be bound strictly by the terms of this Agreement at all times.

29. The parties agree to provide and execute such further documentation as may be reasonably required in the future in order to continue to give full force and effect to the terms of this Agreement.

30. Headings are inserted for the convince of the Parties only and are not to be considered when interpreting this agreement.

31. This Agreement and the terms and conditions contained in this Agreement apply to and are binding upon the Parties, their respective heirs, executors, administrators, and assigns.

32. The terms of this Agreement will remain in effect unless:

   a. The Parties terminate this Agreement in writing signed by both Parties, or
   b. If the Parties resume marital relations for a period of 90 days or more.

33. The laws of England will govern the interpretation of this Agreement and the status, ownership, and division of property between the Parties wherever either or both of them may from time to time reside.



IN WITNESS WHEREOD the Parties have duly affixed their signatures on this 2 day of August. 2005

Signed by the Husband
In the presence of:

_____
WITNESS

_____
Frederick Dawson Graham

Signed by the Wife
In the presence of:

_____
WITNESS

_____
Brigid  Graham

# Schedule A

The Wife will be entitled to the following properties free of any claim by the Husband

| item | Description | Estimated value |
|------|-------------|-----------------|
| 1 | All UK bank accounts including savings | Xxxx GBP |
| 2 | Pension contribution from Texaco / Chevron to be shared when you requested and when pension is executed. | Xxxx GBP |
| 3 | Rover Car | Xxxx GBP |
| 4 | Texaco / Chevron redundancy payment when executed | Xxxx GBP |
| 5 | Sale proceeds from any Texaco / Chevron Shares remaining following voluntary retirement from Texaco | Xxxx GBP |

 **HM Courts & Tribunals Service**

TO: BRIGID GRAHAM

    34, AZALEA WAY,

    GEORGE GREEN,

    SLOUGH,

    BERKSHIRE,

    SL3 6RN

From: **HM COURTS & TRIBUNALS SERVICE**

**The Family Court at Slough,**

The Law Courts,

Windsor Road,

Berkshire,

SL1 2HE

DX 98030 SLOUGH 3

www.hmcourts-service.gov.uk

Your Ref: smm/sm/bb/17825/2

Date: 25th April 2014

Dear Brigid Graham,

Case Number: SL04D01140

Graham vs Graham

Following your email dated 17th April 2014, the fee paid for a copy of your Decree Absolute. Please find copies of your Decree Absolute and the Settlement Agreement filed by your solicitor enclosed.

Yours faithfully

Rochelle Sampy
Family Section

erin graham
13/04/2014

To: Frederick Graham, Boy Rider, Spegs 2



This is what we have received from the court x

Sent from my iPhone

Begin forwarded message:

**From:** Erin Graham <erin.graham@bbc.co.uk>
**Date:** 11 April 2014 11:02:53 BST
**To:** "erniegr@hotmail.com" <erniegr@hotmail.com>
**Subject: FW: Divorce documentation**

**From:** Slough County, Enquiries [mailto:Enquiries@slough.countycourt.gsi.gov.uk]
**Sent:** 11 April 2014 07:41
**To:** Erin Graham
**Subject:** RE: Divorce documentation

The file is currently in storage, once the file is received I will notify you of the Court fee. The file can take a number of weeks to be received.

*Kerenza Broughton*
Mrs K Broughton
Slough County Court
Tel 01753 690300

I am not authorised to bind my Department contractually, or to make representations or other statements which may bind the Department in any way via electronic means.

**HM Courts & Tribunals Service**

HM COURTS & TRIBUNALS SERVICE
The Family Court at Slough
The Law Court
Windsor Road
Slough
Berkshire
SL1 2HE

DX 98030 SLOUGH 3

T 01753 690300
F 01753 575990
**Minicom** VII 0191 4781476
(Helpline for the deaf and hard of hearing)

www.hmcourts-service.gov.uk

Our ref:

Your ref: smm/sm/bb/17825/2

BRIGID GRAHAM
34 AZALIA WAY
GEORGE GREEN
SLOUGH
BERKSHIRE
SL3 6RN

25th April 2014

Dear Brigid Graham

Case number: SL04D01140
Graham vs. Graham

Following your email dated the 17th of April 2014, the fee for a copy of your Decree Absolute increased to £10 as a result of changes to the courts system on the 22nd of April 2014.

Yours faithfully

Rochelle Sampy
Family Section
Extension:



95120

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## WARRANTY DEED WITH VENDOR'S LIEN

**Date:** August 25, 2006

**Grantor:** STEVEN LUTZ and wife, SHANNON LUTZ

**Grantor's Mailing Address** (including county):

P.O. 600973
Dallas, TX
Dallas County

**Grantee:** FREDERICK DAWSON GRAHAM

**Grantee's Mailing Address** (including county):

3704 Raguet
Nacogdoches, Texas 75965
Nacogdoches County

**Consideration:**

TEN AND NO/100 DOLLARS ($10.00) and other valuable consideration, and a note of even date that is in the principal amount of NINETY FIVE THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($95,500.00) and is executed by Grantee, payable to the order of FIRST BANK & TRUST EAST TEXAS. The note is secured by a vendor's lien retained in favor of FIRST BANK & TRUST EAST TEXAS in this deed and by a deed of trust of even date from Grantee to JOE C. DENMAN, Trustee.

**Property** (including improvements):

All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas, and being Lot No. 1 of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of the Plat Records, Nacogdoches County, Texas.

**Exceptions to and Reservations from Conveyance and Warranty:**

Easements, rights-of-way, and prescriptive rights, whether of record or not; all presently recorded restrictions, reservations, covenants, conditions, zoning ordinances, oil and gas leases, rights of development, mineral severances, and other instruments, other than liens and conveyances, that affect the property; rights of adjoining owners in any walls and fences situated on a common boundary; any discrepancies, conflicts, or shortages in area or boundary lines; any encroachments or overlapping of improvements; any conditions that would be revealed by a physical inspection and survey of the property.

Ad valorem taxes for the year 2006 have been prorated between Grantor and Grantee, and Grantee assumes payment of taxes for the year 2006 and subsequent years.

Grantor, for the consideration and subject to the reservations from and exceptions to conveyance and warranty, grants, sells, and conveys to Grantee the property, together with all and

G:\Home-Karla\Mr-Holds\August\Graham-deed.wpd


PONDENT'S
IIBIT 11

singular the rights and appurtenances thereto in any wise belonging, to have and hold it to Grantee, Grantee's heirs, executors, administrators, successors, or assigns forever. Grantor hereby binds Grantor and Grantor's heirs, executors, administrators, and successors to warrant and forever defend all and singular the property to Grantee and Grantee's heirs, executors, administrators, successors, and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the reservations from and exceptions to warranty.

The vendor's lien against and superior title to the property are retained until each note described is fully paid according to its terms, at which time this deed shall become absolute.

When the context requires, singular nouns and pronouns include the plural.

FIRST BANK & TRUST EAST TEXAS, at the instance and request of the Grantee herein, having advanced and paid in cash to the Grantor herein that portion of the purchase price of the herein described property as is evidenced by the hereinabove described note of $95,500.00, the vendor's lien together with superior title to said property is herein retained for the benefit of FIRST BANK & TRUST EAST TEXAS, and the same are hereby TRANSFERRED and ASSIGNED unto the said bank.

_____
STEVEN LUTZ

_____
SHANNON LUTZ

THE STATE OF TEXAS      §

COUNTY OF NACOGDOCHES      §

This instrument was acknowledged before me on the _25_ day of August, 2006, by Steven Lutz and wife, Shannon Lutz.



THAD FLOYD
Notary Public
STATE OF TEXAS
My Comm. Exp. 10/22/2008

_____
NOTARY PUBLIC, STATE OF TEXAS

Filed for Record in:
Nacogdoches County
On: Sep 01,2006 at 12:36P
As a
Recording
Document Number:     95120
Amount               20.00
Receipt Number - 52630
By,
Carol Wilson, County Clerk

G:Home:Kim:Mhand:McAugustsGrahamdeed.wpd

**NOTICE TO CUSTOMER**
THE PURCHASE OF AN INDEMNITY BOND WILL BE
REQUIRED BEFORE AN OFFICIAL CHECK OF THIS
BANK WILL BE REPLACED OR REFUNDED IN THE
EVENT IT IS LOST, MISPLACED OR STOLEN.

Purchaser's Receipt-Retain For Your Records



First Bank
& Trust EAST TEXAS
104 N. TEMPLE DR.
DIBOLL, TEXAS 75941

319598

98-2808/1131

Purchased By

FREDERICK GRAHAM

DATE ___AUGUST 25, 2006___

Payable To   STRIPLING, PEDERSEN & FLOYD, TRUSTEE

$   83,934.95

8 3 9 3 4 - 95 cts                                    Dollars

**CASHIER'S CHECK**

For _____ Memorandum

⑈319598⑈ ⑆1131228041⑆ ⑈001007157⑈

RESPONDENT'S
EXHIBIT 17



**Basic Business Checking statement**
August 1, 2006 to August 31, 2006

## Basic Business Checking: 1881121667

### ATM/Debit Card transactions this statement period (continued)

| Date | Amount ($) | Activity | Bank reference number |
|---|---|---|---|
| Aug 14 | -6.48 | VISA Target 00018069 Glendale CO | 9488344539 |
| Aug 15 | -1.50 | Puli ATM Usage Fee - W/D Fm DDA | 8489000889 |
| Aug 15 | -2.00 | Other Bank ATM Fee | 8489000990 |
| Aug 15 | -260.00 | W/D At 555 17th St., Suite 150 Denver CO | 8489000988 |
| Aug 16 | -200.00 | VISA Exempla Physician Netwr 303-403-3810 CO *Medical* | 9488890584 |
| Aug 16 | -100.00 | VISA 0056 Wild Oats10000560 Denver CO *Meals* | 9488890580 |
| Aug 16 | -10.00 | VISA Ampco Parking Broadway Denver CO | 9488890582 |
| Aug 21 | -40.46 | VISA K&g Petrole51610042505 Castle Rock CO | 9488665711 |
| Aug 21 | -55.00 | VISA Fedex Shp 08/15/06 Ab# 857-354157505 TN *Office Supplies* | 9488665713 |
| Aug 22 | -27.00 | VISA The Loop Manitou Spgs CO | 9488015324 |
| Aug 24 | -1.50 | Puli ATM Usage Fee - W/D Fm DDA | 8489000886 |
| Aug 24 | -2.00 | Other Bank ATM Fee | 8489000887 |
| Aug 24 | -300.00 | W/D At 555 17th St., Suite 150 Denver CO | 8489000885 |
| Aug 24 | -10.00 | VISA Ampco Parking Broadway Denver CO | 9488429110 |
| Aug 28 | -1.50 | Puli ATM Usage Fee - W/D Fm DDA | 8489000859 |
| Aug 28 | -1.50 | Puli ATM Usage Fee - W/D Fm DDA | 8489000862 |
| Aug 28 | -1.50 | Puli ATM Usage Fee - W/D Fm DDA | 8489000788 |
| Aug 28 | -2.00 | Other Bank ATM Fee | 8489000860 |
| Aug 28 | -2.00 | Other Bank ATM Fee | 8489000863 |
| Aug 28 | -2.00 | Other Bank ATM Fee | 8489000789 |
| Aug 28 | -500.00 | W/D At Bcs 2400 N. St 2 Nacogdoches TX | 8489000858 |
| Aug 28 | -400.00 | W/D At 4822 North Street Nacogdoches TX | 8489000861 |
| Aug 28 | -300.00 | W/D At Bcs 2400 N. St 2 Nacogdoches TX | 8489000787 |
| Aug 28 | -100.00 | VISA Clear Springs Restaura Nacogdoches TX *Entertaining* | 9488700677 |
| Aug 30 | -21.63 | VISA Lowe's #1772 Nacogdoches TX | 9488113843 |
| Aug 31 | -720.00 | VISA Dia Parking 2 3033424046 CO | 9488821260 |
| Aug 31 | -90.00 | VISA Dia Parking 2 3033424046 CO | 9488821262 |
| Aug 31 | -27.44 | VISA Rudy's 8 Nacogdoches TX | 9488821264 |

Total ATM/Debit Card Withdrawals: -$5,417.00
Total number of ATM/Debit Card Withdrawals: 48

### Electronic withdrawals this statement period

| Date | Amount ($) | Activity | Reference numbers Customer | Bank |
|---|---|---|---|---|
| Aug 09 | -6,330.31 | VISA Payment Erick D. Graham | | 9488140498 |
| Aug 22 | -85,000.00 | Wire # 004066 Bnf Fred Graham Fed # 000136 | | 9485000849 |

Total Electronic Withdrawals: -$91,330.31
Total number of Electronic Withdrawals: 2

 **Lowest daily balance**

Your lowest daily balance this statement period was $2,650.94
on **August 28, 2006.**

RESPONDENT'S
EXHIBIT 18

**From:** Graham, Fred
**To:** D D Allen (ddallen@comerica.com)
**Subject:** FW: Transfers
**Date:** Tuesday, August 22, 2006 10:36:28 AM

Dawn Can you please change the amount of the transfer from $84,000 to 85,000
Thank you

-----Original Message-----
**From:** Graham, Fred
**Sent:** Monday, August 21, 2006 4:14 PM
**To:** D D Allen (ddallen@comerica.com)
**Subject:** Transfers

Dawn can you please arrange for the transfer From my company account xxxxx1667 $84,000 to the following account First Bank & Trust East Texas, 1009 N University Drive, Nacogdoches TX 75961, Routing number 113122804 Account Number 501037589.

Thank you

L.                          SETTLEMENT CHARGES

| 700. TOTAL SALES/BROKER'S COMMISSION | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| BASED ON PRICE $185,000.00 @ 5 % = $9,250.00 | | |
| DIVISION OF COMMISSION (LINE 700) AS FOLLOWS: | | |
| 701 $4,625.00 to LaDonna Simpson | | |
| 702 $4,625.00 to Charles Pool Real Estate | | |
| 703 $0.00 to | | |
| 704 $0.00 to | | |
| 705 Commission paid at settlement | | |
| 706 | | $9,250.00 |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN:** | | |
| 801 Loan origination fee % | | |
| 802 Loan discount % | | |
| 803 Appraisal fee to Ed Pool | | |
| 804 Credit report to | $125.00 | |
| 805 Lender's inspection fee | | |
| 806 Mortgage insurance application fee to | | |
| 807 Assumption fee | | |
| 808 FBTET fbo Stormwater Research | | |
| | $11.00 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE:** | | |
| 901 Interest from to @ /day | | |
| 902 Mortgage insurance premium for mos to | | |
| 903 Hazard insurance premium for 1.00 yrs to Joe Max Green | $2,059.00 POC) | |
| 904 Flood insurance premium for yrs to | | |
| 905 | | |
| **1000. RESERVES DEPOSITED WITH LENDER:** | | |
| 1001 Hazard insurance months @ per month | | |
| 1002 Mortgage insurance months @ per month | | |
| 1003 City property taxes months @ per month | | |
| 1004 County property taxes months @ per month | | |
| 1005 Annual assessments months @ per month | | |
| 1006 insurance months @ per month | | |
| 1007 months @ per month | | |
| 1008 months @ per month | | |
| 1009 Aggregate Accounting Escrow Adjustment | | |
| **1100. TITLE CHARGES:** | | |
| 1101 Settlement or closing fee to | | |
| 1102 Abstract or title search to | | |
| 1103 Title examination to Stripling Pedersen Floyd LLP (34%) | | |
| 1104 Title insurance binder to | | |
| 1105 Document preparation to Stripling Pedersen & Floyd LLP | $200.00 | $110.00 |
| 1106 Notary fees to | | |
| 1107 Attorney's fees to | | |
| (includes above items Numbers ) | | |
| 1108 Title insurance to Nacogdoches Abstract & Title Co., Inc. | $100.00 | $1,340.00 |
| (includes above items Numbers ) | | |
| 1109 Lender's coverage $100.00 ( $95,500.00 ) | | |
| 1110 Owner's coverage $1,340.00 ( $185,000.00 ) | | |
| 1111 Tax Cert. | | $10.00 |
| 1112 Guaranty Fee | $1.00 | $1.00 |
| 1113 | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES:** | | |
| 1201 Recording fees Deed $20.00 Mortgage $28.00 Releases | $48.00 | |
| 1202 City/county tax/stamps Deed Mortgage | | |
| 1203 State tax/stamps Deed Mortgage Other | | |
| 1204 | | |
| 1205 | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES:** | | |
| 1301 Survey to | | |
| 1302 Inspection to | | |
| 1303 Escrow Fee | $100.00 | $100.00 |
| 1304 Old Republic Home Protection | | $320.00 |
| 1305 FedEx Fee | | $20.00 |
| 1306 | | |
| 1307 | | |
| **1400. TOTAL SETTLEMENT CHARGES** | $585.00 | $11,151.00 |

have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower _Frederick Dawson Graham_ Frederick Dawson Graham     Date 25 August 06
Seller or Agent _Steven Lutz_ Steven Lutz     Date 8/25/06

Borrower _____ Date _____
Seller or Agent _Shannon Lutz_ Shannon Lutz     Date 8/25/06

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Date _____ Settlement Agent _Thad Floyd_ Thad Floyd     Date 8/25/06

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

RESPONDENT'S
EXHIBIT 14

# A. Settlement Statement

U.S. Department of Housing
and Urban Development

OMB No. 2502-0265

**Type of Loan**

1. ☐ FHA  2. ☐ FmHA  3. ☒ Conv. Unins

4. ☐ VA  5. ☐ Conv. Ins

| File Number | Loan Number | Mortgage Insurance Case Number |
|---|---|---|
| Graham, Frederick Dawson | | |

**C. NOTE:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "p.o.c" were paid outside of closing, they are shown here for informational purposes and are not included in the totals.

**D. NAME AND ADDRESS OF BORROWER:** Frederick Dawson Graham
3704 Raguet, Nacogdoches, TX 75965

**E. NAME AND ADDRESS OF SELLER:** Steven Lutz
Nacogdoches, TX

Shannon Lutz
Nacogdoches, TX

**F. NAME AND ADDRESS OF LENDER:** First Bank & Trust East Texas
1009 N. University Dr., Nacogdoches, TX 75961

**G. PROPERTY LOCATION:** 3704 Raguet
Nacogdoches, TX 75965

**H. SETTLEMENT AGENT:** Stripling Pedersen Floyd LLP
**PLACE OF SETTLEMENT:** 118 E. Hospital St. Ste 400, Nacogdoches, TX 75961
**TIN:** 751624274

**I. SETTLEMENT DATE:** 08/25/2006  **RESCISSION DATE**

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract Sales Price | $185,000.00 | 401. Contract Sales Price | $185,000.00 |
| 102. Personal Property | | 402. Personal property | |
| 103. Settlements charges to borrower. | | 403. | |
| (from line 1400) | $585.00 | | |
| | | 404. | |
| | | 405. | |
| ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | | ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE | |
| 106. City/town taxes         to | | 406. City/town Taxes         to | |
| 107. County Taxes         to | | 407. County Taxes         to | |
| 108. Assessments         to | | 408. Assessments         to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER:** | $185,585.00 | **420. GROSS AMOUNT DUE TO SELLER** | $185,000.00 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201. Deposit or earnest money | $2,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | $95,500.00 | 502. Settlement charges to seller (line 1400) | $11,151.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan   USAA Fed. Savings | $130,200.81 |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. Option Fee | $100.00 | 506. Option Fee | $100.00 |
| 207. Credit for repairs | $2,000.00 | 507. Credit for repairs | $2,000.00 |
| 208. | | 508. | |
| 209. | | 509. | |
| ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | | ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | |
| 210. City/town taxes         to | | 510. City/town taxes         to | |
| 211. County taxes  01/01/2006 to 08/25/2006 | $2,050.05 | 511. County taxes  01/01/2006 to 08/25/2006 | $2,050.05 |
| 212. Assessments         to | | 512. Assessments         to | |
| | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER:** | $101,650.05 | **520. TOTAL REDUCTIONS IN AMOUNT DUE TO SELLER** | $145,501.86 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER** | |
| 301. Gross amount due from borrower (line 120) | $185,585.00 | 601. Gross amount due to seller (line 420) | $185,000.00 |
| 302. Less amount paid by/for borrower (line 220) | $101,650.05 | 602. Less reductions in amt. due seller (line 520) | $145,501.86 |
| 303. CASH (☒ FROM) (☐ TO) BORROWER: | $83,934.95 | 603. CASH (☐ FROM) (☒ TO) SELLER: | $39,498.14 |

**HUD-1 (3-86) - RESPA, HB 4305.2**

## A. Settlement Statement

U.S. Department of Housing and Urban Development

OMB No. 2502-0265



| Type of Loan | | | | | |
|---|---|---|---|---|---|
| 1. ☐ FHA  2. ☐ FmHA  3. ☒ Conv. Unins | File Number *Graham, Frederick Dawson* | Loan Number | Mortgage Insurance Case Number | | |
| 4. ☐ VA  5. ☐ Conv. Ins. | | | | | |

**C. NOTE:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "p.o.c." were paid outside of closing; they are shown here for informational purposes and are not included in the totals.

**D. NAME AND ADDRESS OF BORROWER:** *Frederick Dawson Graham*
*3704 Raguet, Nacogdoches, TX 75965*

**E. NAME AND ADDRESS OF SELLER:** *Steven Lutz* *Nacogdoches, TX*    *Shannon Lutz* *Nacogdoches, TX*

**F. NAME AND ADDRESS OF LENDER:** *First Bank & Trust East Texas*
*1009 N. University Dr., Nacogdoches, TX 75961*

**G. PROPERTY LOCATION:** *3704 Raguet*
*Nacogdoches, TX 75965*

**H. SETTLEMENT AGENT:** *Stripling Pedersen Floyd LLP*
**PLACE OF SETTLEMENT:** *118 E. Hospital St. Ste 400, Nacogdoches, TX 75961*
**TIN:** *751624274*

**I. SETTLEMENT DATE:** *08/25/2006*    **RESCISSION DATE:**

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract Sales Price | $185,000.00 | 401. Contract Sales Price | $185,000.00 |
| 102. Personal Property | | 402. Personal property | |
| 103. Settlement charges to borrower. | | 403. | |
| (from line 1400) | $585.00 | | |
| | | 404. | |
| | | 405. | |
| ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE | | ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE | |
| 106. City/town taxes to | | 406. City/town Taxes to | |
| 107. County Taxes to | | 407. County Taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER:** | $185,585.00 | **420. GROSS AMOUNT DUE TO SELLER** | $185,000.00 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201. Deposit or earnest money | $2,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | $95,500.00 | 502. Settlement charges to seller (line 1400) | $11,151.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan   *USAA Fed. Savings* | $130,200.81 |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. *Option Fee* | $100.00 | 506. *Option Fee* | $100.00 |
| 207. *Credit for repairs* | $2,000.00 | 507. *Credit for repairs* | $2,000.00 |
| 208. | | 508. | |
| 209. | | 509. | |
| ADJUSTMENTS FOR ITEMS UNPAID BY SELLER | | ADJUSTMENTS FOR ITEMS UNPAID BY SELLER | |
| 210. City/town taxes to | | 510. City/town taxes to | |
| 211. County taxes *01/01/2006* to *08/25/2006* | $2,050.05 | 511. County taxes *01/01/2006* to *08/25/2006* | $2,050.05 |
| 212. Assessments to | | 512. Assessments to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | $101,650.05 | **520. TOTAL REDUCTIONS IN AMOUNT DUE TO SELLER** | $145,501.86 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER** | | **600. CASH AT SETTLEMENT TO/FROM SELLER** | |
| 301. Gross amount due from borrower (line 120) | $185,585.00 | 601. Gross amount due to seller (line 420) | $185,000.00 |
| 302. Less amount paid by/for borrower (line 220) | $101,650.05 | 602. Less reductions in amt. due seller (line 520) | $145,501.86 |
| **303. CASH** (☒FROM) (☐TO) **BORROWER** | $83,934.95 | **603. CASH** (☐FROM) (☒TO) **SELLER** | $39,498.14 |

**HUD-1 (3-86) - RESPA, HB 4305.2**

# SETTLEMENT CHARGES

| 700. TOTAL SALES/BROKER'S COMMISSION | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLERS FUNDS AT SETTLEMENT |
|---|---|---|---|---|
| BASED ON PRICE $185,000.00 @ 5 % = $9,250.00 | | | | |
| DIVISION OF COMMISSION (LINE 700) AS FOLLOWS: | | | | |
| 701 $4,625.00 to LaDonna Simpson | | | | |
| 702 $4,625.00 to Charles Pool Real Estate | | | | |
| 703 $0.00 to | | | | |
| 704 $0.00 to | | | | |
| 705 Commission paid at settlement | | | | $9,250.00 |
| 706 | | | | |
| 800. ITEMS PAYABLE IN CONNECTION WITH LOAN: | | | | |
| 801 Loan origination fee % | | | | |
| 802 Loan discount % | | | | |
| 803 Appraisal fee to Ed Pool | | | $125.00 | |
| 804 Credit report to | | | | |
| 805 Lender's inspection fee | | | | |
| 806 Mortgage insurance application fee to | | | | |
| 807 Assumption fee | | | | |
| 808 FBTET fbo Stormwater Research | | | $11.00 | |
| 900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE: | | | | |
| 901 Interest from to @ / day | | | | |
| 902 Mortgage insurance premium for mos. to | | | | |
| 903 Hazard insurance premium for 1.00 yrs to Joe Max Green | $2,059.00 P.O.C. | | | |
| 904 Flood insurance premium for yrs to | | | | |
| 905 | | | | |
| 1000. RESERVES DEPOSITED WITH LENDER: | | | | |
| 1001 Hazard insurance months @ per month | | | | |
| 1002 Mortgage insurance months @ per month | | | | |
| 1003 City property taxes months @ per month | | | | |
| 1004 County property taxes months @ per month | | | | |
| 1005 Annual assessments months @ per month | | | | |
| 1006 Flood insurance months @ per month | | | | |
| 1007 months @ per month | | | | |
| 1008 months @ per month | | | | |
| 1009 Aggregate Accounting Escrow Adjustment | | | | |
| 1100. TITLE CHARGES: | | | | |
| 1101 Settlement or closing fee to | | | | |
| 1102 Abstract or title search to | | | | |
| 1103 Title examination to Stripling Pedersen Floyd LLP (34%) | | | | |
| 1104 Title insurance binder to | | | | |
| 1105 Document preparation to Stripling Pedersen & Floyd LLP | | | $200.00 | $110.00 |
| 1106 Notary fees to | | | | |
| 1107 Attorney's fees to | | | | |
| (includes above items Numbers: ) | | | | |
| 1108 Title insurance to Nacogdoches Abstract & Title Co., Inc. | | | $100.00 | $1,340.00 |
| (includes above items Numbers ) | | | | |
| 1109 Lender's coverage $100.00 ( $95,500.00 ) | | | | |
| 1110 Owner's coverage $1,340.00 ( $185,000.00 ) | | | | |
| 1111 Tax Cert. | | | | $10.00 |
| 1112 Guaranty Fee | | | $1.00 | $1.00 |
| 1113 | | | | |
| 1200. GOVERNMENT RECORDING AND TRANSFER CHARGES: | | | | |
| 1201 Recording fees Deed $20.00 Mortgage $28.00 Release | | | $48.00 | |
| 1202 City/county tax/stamps Deed Mortgage | | | | |
| 1203 State tax/stamps Deed Mortgage Other | | | | |
| 1204 | | | | |
| 1205 | | | | |
| 1300. ADDITIONAL SETTLEMENT CHARGES: | | | | |
| 1301 Survey to | | | | |
| 1302 Pest inspection to SPF Escrow Fee | | | $100.00 | $100.00 |
| 1304 Old Republic Home Protection | | | | $320.00 |
| 1305 FedEx Fee | | | | $20.00 |
| 1306 | | | | |
| 1307 | | | | |
| 1400. TOTAL SETTLEMENT CHARGES | | | $585.00 | $11,151.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement

Borrower: _Frederick Dawson Graham_ Date: 25 August
Frederick Dawson Graham

Seller or Agent: _Steven Lutz_ Date: 8/25/06

Borrower: _____ Date: _____
Seller or Agent: _Shannon Lutz_ Date: 8/25/06

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Date: _____ Settlement Agent: _Thad Floyd_ Date: 8/25/06

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

FB 2.30 PM House note payments and income source

| House loan payments | number of Payments | Date | Loan payment bank statement Comerica a/c 7001142970 | Income source Bank statements Comerica a/c 7001142996 | Other sources | |
|---|---|---|---|---|---|---|
| Pre Marriage before 31st January 2007 | | | | | | |
| FB &T LOAN PMY 120005014750000 | 1 | 2 Oct 06 | (4,877.62) | | 16,374.93 | opening balance |
| | | | | | 8,000.00 | deposit |
| FB &T LOAM PMY 103006 120005014750000 | 2 | 31-Oct 06 | (4,877.62) | | 7,128.58 | opening balance |
| | | | | | 3,000.00 | deposit |
| FB &T LOAN PMY 113006 120005014750000 | 3 | 1 Dec-06 | (4,877.62) | 6,000.00 | | |
| FB &T LOANPMY 122906 120005014750000 | 4 | 2 Jan-07 | (4,877.62) | 3,000.00 | 7,385.85 | |
| according to FB&T records | 5 | 30-Jan-07 | (4,877.62) | | | |
| | | 30-Jan-07 | | | 5,000.00 | deposit |
| **per mnarriage 31st January 2007** | | | **(24,388.10)** | **9,000.00** | | |
| **Post marriage Transaction** | | | | | | |
| FB &T LOANPMY 022807 120005014750000 | 6 | 1-Mar-07 | (4,877.62) | 6,000.00 | | |
| TRANSFER FROM AC 00000700137890 | 7 | 3-Apr-07 | (4,877.62) | 6,000.00 | | |
| WEB TRANSFER FROM AC 7001142988 | 8 | 1-May-07 | (4,877.62) | | 20,000.00 | deposit 20th April |
| FB &T LOANPMY 043007 120005014750000 | 9 | 1 Jun-07 | (4,877.62) | | 5,000.00 | deposit 21st June1 |
| FB &T LOANPMY 043007 120005014750000 | 10 | 7-Jul-07 | (4,877.62) | | 6000.00 | deposit 29th June |
| FB &T LOANPMY 073007 120005014750000 | 11 | 31-Jul-07 | (4,877.62) | 5,000.00 | | |
| FB &T LOANPMY 083007 120005014750000 | 12 | 31-Aug-07 | (4,877.62) | 10,000.00 | | |
| FB &T LOANPMY 092807 120005014750000 | 13 | 1 Oct 07 | (4,877.62) | 10,250.00 | | |
| FB &T LOANPMY 103007 120005014750000 | 14 | 31-Oct-07 | (4,877.62) | 7,000.00 | | |
| FB &T LOANPMY 113007 120005014750000 | 15 | 3 Dec-07 | (4,877.62) | 9,000.00 | | |
| FB &T LOANPMY 123007 120005014750000 | 16 | 2-Jan-08 | (4,877.62) | 11,500.00 | | |
| FB &T LOANPMY 13008 120005014750000 | 17 | 31-Jan-08 | (4,877.62) | 9,000.00 | | |
| FB &T LOANPMY 022908 120005014750000 | 18 | 1-Mar-08 | (4,877.62) | 9,000.00 | | |
| OTHER WITHDRAWALS HOUSE REPAYMENT | 19 | 1-Apr-08 | (4,877.62) | 9,400.00 | | |
| Payments from Comerica a/c 7001142970 | | | (92,674.78) | 92,150.00 | | |
| Final House payment From FB&T check | 20 | | (4,859.20) | | | |
| Total house note paid | | | (97,533.98) | | | |

As per summary House Purchase see print out

RESPONDENT'S
EXHIBIT 19

| House loan payments | number of Payments | Date | Loan payment bank statement Comerica a/c 7001142970 | Income source Bank statements Comerica a/c 7001142996 | Other souces | |
|---|---|---|---|---|---|---|
| Pre Marriage before 31st January 2007 | | | | | | |
| FB &T LOAN PMY 12000501475000 | 1 | 2-Oct-06 | (4,877.62) | | 16,374.93 | opening balance |
| | | | | | 8,000.00 | deposit |
| FB &T LOAM PMY 103006 12000501475000 | 2 | 31-Oct-06 | (4,877.62) | | 7,128.58 | opening balance |
| | | | | | 3,000.00 | deposit |
| FB &T LOAN PMY 113006 12000501475000 | 3 | 1-Dec-06 | (4,877.62) | 6,000.00 | | |
| FB &T LOANPMY 122906 12000501475000 | 4 | 2-Jan-07 | (4,877.62) | 3,000.00 | 7,385.85 | |
| according to FB&T recods | 5 | 30-Jan-07 | (4,877.62) | | | |
| | | 30-Jan-07 | | | 5,000.00 | deposit |
| **per mnarriage 31st January 2007** | | | **(24,388.10)** | **9,000.00** | | |
| Post marriage Transaction | | | | | | |
| FB &T LOANPMY 022807 12000501475000 | 6 | 1-Mar-07 | (4,877.62) | 6,000.00 | | |
| TRANSFER FROM AC 00000700137897O | 7 | 3-Apr-07 | (4,877.62) | 6,000.00 | | |
| WEB TRANSFER FROM AC 7001142988 | 8 | 1-May-07 | (4,877.62) | | 5,000.00 | deposit 30th April |
| FB &T LOANPMY 043007 12000501475000 | 9 | 1-Jun-07 | (4,877.62) | | 5,000.00 | deposit 21st June |
| FB &T LOANPMY 043007 12000501475000 | 10 | 7-Jul-07 | (4,877.62) | | 6000.00 | depopsit 29th June |
| FB &T LOANPMY 073007 12000501475000 | 11 | 31-Jul-07 | (4,877.62) | 5,000.00 | | |
| FB &T LOANPMY 083007 12000501475000 | 12 | 31-Aug-07 | (4,877.62) | 10,000.00 | | |
| FB &T LOANPMY 092807 12000501475000 | 13 | 1-Oct-07 | (4,877.62) | 10,250.00 | | |
| FB &T LOANPMY 103007 12000501475000 | 14 | 31-Oct-07 | (4,877.62) | 7,000.00 | | |
| FB &T LOANPMY 113007 12000501475000 | 15 | 3-Dec-07 | (4,877.62) | 9,000.00 | | |
| FB &T LOANPMY 123007 12000501475000 | 16 | 2-Jan-08 | (4,877.62) | 11,500.00 | | |
| FB &T LOANPMY 13008 12000501475000 | 17 | 31-Jan-08 | (4,877.62) | 9,000.00 | | |
| FB &T LOANPMY 022908 12000501475000 | 18 | 1-Mar-08 | (4,877.62) | 9,000.00 | | |
| OTHER WITHDRAWALS HOUSE REPAYMENT | 19 | 1-Apr-08 | (4,877.62) | 9,400.00 | | |
| Payments from Comerica a/c 7001142970 | | | (92,674.78) | 92,150.00 | | |
| Final House payment from FB&T check | 20 | 30-Apr-07 | (4,859.20) | | | |
| Total house note paid | | | (97,533.98) | | | |

SOURCED FROM FB&T
FRED'S CHECKING ACCOUNT
As per summary House Purchase see print out

R-19
Received

C:\Documents and Settings\Administrator\My Documents\divorce hard drive\PROTECTED FILES\HOUSE PURCHASE\COMERICA ac 7001142970  HOUSE PURCHAS PROTECTED 1.xlsx



80767

Ilustlslslsludludlluulsludlsldslsludstsludllul
FREDERICK D GRAHAM
210 ELM ST
NACOGDOCHES TX 75965-2848

**Your _Money Market Investment_
statement**
August 25, 2006 to September 27, 2006
Account number 7001142896

## Your account summary

| | |
|---|---:|
| **Beginning balance** on August 25, 2006 | $186,070.31 |
| **_Plus deposits_** | |
| Interest | $406.24 |
| **_Less withdrawals_** | |
| Electronic (EFT) withdrawals | -$25,070.31 |
| Other withdrawals | -$4,000.00 |
| Fees and service charges | -$10.00 |
| **Ending balance** on September 27, 2006 | $157,396.24 |

**Summary of interest you've earned**
- Interest paid to you this statement period: $406.24
- Annual percentage yield earned this statement period: 2.55%
- Total interest paid to you this year: $3,935.48

**To contact us**

**Call**
(713) 888-3400
Hearing Impaired (TDD 214 589-4155)

**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
P.O. BOX 650282
DALLAS, TX 75265-282

**Important information**

The Comerica Visa Gift Card is the perfect gift for
everyone and every occasion - birthdays,
holidays, graduations, weddings and more. Pick
up your Visa Gift Card today at any Comerica
location or purchase online at comerica.com.
Some restrictions apply.

**Thank you**

Thank you for being a Comerica customer. We
value the trust and confidence that you continue
to place in us.

RESPONDENT'S
EXHIBIT 19a

**FUNDS TRANSFER TO CO A BANK A/c 7001142970      INVENTORY SUPPORT 4.3      REPORT 3**

| DATE | DETAILS | AMOUNT | BANK REF# |
|------|---------|--------|-----------|
| 30-Mar-06 | WEB TRANSFER FROM AC 7001142996 | 800.00 | WB88807324 |
| 17-Apr-06 | WEB TRANSFER FROM AC 7001142996 | 8,500.00 | WB88800292 |
| 26-Apr-06 | WEB TRANSFER FROM AC 7001142996 | 6,000.00 | WB88807604 |
| 7-Jun-06 | WEB TRANSFER FROM AC 7001142996 | 8,000.00 | WB88808096 |
| 7-Jun-06 | WEB TRANSFER FROM AC 7001142996 | 2,000.00 | WB88807612 |
| 7-Jun-06 | WEB TRANSFER FROM AC 7001142996 | 2,000.00 | WB88801374 |
| 6-Jul-06 | WEB TRANSFER FROM AC 7001142996 | 3,500.00 | WB88804059 |
| 13-Jul-06 | WEB TRANSFER FROM AC 7001142996 | 1,000.00 | WB88806871 |
| 24-Jul-06 | WEB TRANSFER FROM AC 7001142996 | 1,500.00 | WB88808548 |
| 10-Aug-06 | WEB TRANSFER FROM AC 7001142996 | 1,000.00 | WB88801800 |
| 21-Aug-06 | WEB TRANSFER FROM AC 7001142996 | 1,000.00 | WB88802796 |
| 29-Aug-06 | WEB TRANSFER FROM AC 7001142996 | 3,000.00 | OW50023399 |
| 5-Sep-06 | WEB TRANSFER FROM AC 7001142996 | 3,000.00 | OW50073167 |
| 14-Sep-06 | WEB TRANSFER FROM AC 7001142996 | 3,000.00 | OW50079976 |
| 21-Sep-06 | WEB TRANSFER FROM AC 7001142996 | 12,000.00 | OW50062130 |
| 20-Dec-06 | WEB TRANSFER FROM AC 7001142996 | 6,000.00 | OW50082172 |
| | Pre House purchase | **62,300.00** | |
| 1-Mar-07 | WEB TRANSFER FROM AC 7001142996 | 6,000.00 | OW50001709 |
| 28-Mar-07 | WEB TRANSFER FROM AC 7001142996 | 1,000.00 | OW50009599 |
| 3-Apr-07 | WEB TRANSFER FROM AC 7001142996 | 5,000.00 | OW50035618 |
| 30-Jul-07 | WEB TRANSFER FROM AC 7001142996 | 5,000.00 | OW50082796 |
| 30-Aug-07 | WEB TRANSFER FROM AC 7001142996 | 5,000.00 | OW50052155 |
| 10-Sep-07 | WEB TRANSFER FROM AC 7001142996 | 5,000.00 | OW50038121 |
| 27-Sep-07 | WEB TRANSFER FROM AC 7001142996 | 7,500.00 | OW50063723 |
| 1-Oct-07 | WEB TRANSFER FROM AC 7001142996 | 2,750.00 | OW50026027 |
| 30-Oct-07 | WEB TRANSFER FROM AC 7001142996 | 7,000.00 | OW50039801 |
| 30-Nov-07 | WEB TRANSFER FROM AC 7001142996 | 6,000.00 | OW50087670 |
| 14-Dec-07 | WEB TRANSFER FROM AC 7001142996 | 3,000.00 | OW50049096 |
| 24-Dec-07 | WEB TRANSFER FROM AC 7001142996 | 3,000.00 | OW500442247 |
| 2-Jan-08 | WEB TRANSFER FROM AC 7001142996 | 6,500.00 | OEW50002529 |
| 2-Jan-08 | WEB TRANSFER FROM AC 7001142996 | 2,000.00 | OW50006201 |
| 30-Jan-08 | WEB TRANSFER FROM AC 7001142996 | 5,000.00 | OW50076060 |
| 4-Feb-08 | WEB TRANSFER FROM AC 7001142996 | 1,000.00 | OW50037633 |
| 11-Feb-08 | WEB TRANSFER FROM AC 7001142996 | 3,000.00 | OW50010336 |
| 3-Mar-08 | WEB TRANSFER FROM AC 7001142996 | 6,000.00 | OW50094999 |
| 10-Mar-08 | WEB TRANSFER FROM AC 7001142996 | 3,000.00 | OW50058154 |
| 24-Mar-08 | WEB TRANSFER FROM AC 7001142996 | 2,000.00 | OW50076107 |
| 1-Apr-08 | WEB TRANSFER FROM AC 7001142996 | 5,000.00 | OW50075748 |
| 14-Apr-08 | WEB TRANSFER FROM AC 7001142996 | 1,400.00 | OW50029213 |
| 18-Apr-08 | WEB TRANSFER FROM AC 7001142996 | 1,000.00 | OW50014828 |
| | completion of house Purchase | **92,150.00** | |
| 28-Apr-08 | WEB TRANSFER FROM AC 7001142996 | 1,000.00 | OW50064000 |
| 6-May-08 | WEB TRANSFER FROM AC 7001142996 | 600.00 | OW50037453 |
| 23-May-08 | WEB TRANSFER FROM AC 7001142996 | 200.00 | OW50027822 |
| 27-May-08 | WEB TRANSFER FROM AC 7001142996 | 300.00 | OW50092365 |
| 27-May-08 | WEB TRANSFER FROM AC 7001142996 | 300.00 | OW50056130 |
| | | | |
| **Total** | | **156,850.00** | **march 06-may 08** |

**RESPONDENT'S
EXHIBIT 20**



Frederick Graham
704 Raguet
Nacogdoches TX 75965-



# First Bank & Trust EAST TEXAS

1009 N. University Drive
Nacogdoches, TX 75961
(936) 559-5100

```
--------- ------- ------------ ----- Transaction History Account Number 25014750 -------------
                                07-01-2006 to 05-17-2008
```

| Description | Eff Date | Post Date | Due Date | Balance Type | Amount | Running Bal |
|---|---|---|---|---|---|---|
| Regular Payment | 09-29-2006 | 09-29-2006 | | Note Interest(Excess) | -581.06 | |
| | | | | Note Balance(Excess) | -4296.56 | 86904.62 |
| | | | | Total | 4877.62 | |
| Regular Payment | 10-30-2006 | 10-30-2006 | | Note Interest(Excess) | -572.35 | |
| | | | | Note Balance(Excess) | -4305.27 | 82649.35 |
| | | | | Total | 4877.62 | |
| Regular Payment | 11-30-2006 | 11-30-2006 | | Note Interest(Excess) | -526.46 | |
| | | | | Note Balance(Excess) | -4351.16 | 78298.19 |
| | | | | Total | 4877.62 | |
| Regular Payment | 12-29-2006 | 12-29-2006 | | Note Interest(Excess) | -515.38 | |
| | | | | Note Balance(Excess) | -4362.24 | 73935.95 |
| | | | | Total | 4877.62 | |
| Regular Payment | 01-30-2007 | 01-30-2007 | | Note Interest(Excess) | -485.66 | |
| | | | | Note Balance(Excess) | -4391.96 | 69544.99 |
| | | | | Total | 4877.62 | |
| Regular Payment | 02-28-2007 | 02-28-2007 | | Note Interest(Excess) | -413.46 | |
| | | | | Note Balance(Excess) | -4464.16 | 65080.53 |
| | | | | Total | 4877.62 | |
| Regular Payment | 03-30-2007 | 03-30-2007 | | Note Interest(Excess) | 428.37 | |
| | | | | Note Balance(Excess) | 4449.25 | 60631.58 |
| | | | | Total | 4877.62 | |
| Regular Payment | 04-30-2007 | 04-30-2007 | | Note Interest(Excess) | -386.21 | |
| | | | | Note Balance(Excess) | 4491.41 | 56140.17 |
| | | | | Total | 4877.62 | |
| Regular Payment | 05-30-2007 | 05-30-2007 | | Note Interest(Excess) | 369.63 | |
| | | | | Note Balance(Excess) | -4508.09 | 51632.08 |
| | | | | Total | 4877.62 | |
| Regular Payment | 06-29-2007 | 06-29-2007 | | Note Interest(Excess) | -328.89 | |
| | | | | Note Balance(Excess) | -4548.73 | 47083.35 |
| | | | | Total | 4877.62 | |
| Regular Payment | 07-30-2007 | 07-30-2007 | | Note Interest(Excess) | 309.91 | |
| | | | | Note Balance(Excess) | -4567.71 | 42515.44 |
| | | | | Total | 4877.62 | |
| Regular Payment | 08-30-2007 | 08-30-2007 | | Note Interest(Excess) | -279.85 | |
| | | | | Note Balance(Excess) | -4597.77 | 37917.87 |

**RESPONDENT'S
EXHIBIT 21**



## HOUSE PAYMENTS

Frederick Graham
...
Nacogdoches, TX 75905



**First Bank & Trust** EAST TEXAS

1009 N. University Drive
Nacogdoches, TX 75961
(936) 559-5100

Transaction History Account Number 2561475C
07-01-2006 to 05-17-2008

| Description | Eff Date | Post Date | Due Date | Balance Type | Amount | Running Bal |
|---|---|---|---|---|---|---|
| | | | | Total | 4877.62 | |
| Regular Payment | 09-28-2007 | 09-28-2007 | | Note Interest(Excess) | -241.63 | |
| | | | | Note Balance(Excess) | -4636.09 | 33261.78 |
| | | | | Total | 4877.62 | |
| Regular Payment | 10-30-2007 | 10-30-2007 | | Note Interest(Excess) | -219.07 | |
| | | | | Note Balance(Excess) | -4658.55 | 28023.23 |
| | | | | Total | 4877.62 | |
| Regular Payment | 11-30-2007 | 11-30-2007 | | Note Interest(Excess) | -182.33 | |
| | | | | Note Balance(Excess) | -4695.29 | 23927.94 |
| | | | | Total | 4877.62 | |
| Regular Payment | 12-28-2007 | 12-28-2007 | | Note Interest(Excess) | -157.50 | |
| | | | | Note Balance(Excess) | -4720.12 | 19207.82 |
| | | | | Total | 4877.62 | |
| Regular Payment | 01-30-2008 | 01-30-2008 | | Note Interest(Excess) | -126.43 | |
| | | | | Note Balance(Excess) | -4751.19 | 14456.63 |
| | | | | Total | 4877.62 | |
| Regular Payment | 02-29-2008 | 02-29-2008 | | Note Interest(Excess) | -89.02 | |
| | | | | Note Balance(Excess) | -4788.60 | 9668.03 |
| | | | | Total | 4877.62 | |
| Regular Payment | 03-28-2008 | 03-28-2008 | | Note Interest(Excess) | -63.64 | |
| | | | | Note Balance(Excess) | -4813.98 | 4854.05 |
| | | | | Total | 4877.62 | |
| Account Payoff    PAYOFF | 04-30-2008 | 04-30-2008 | | Note Interest | -5.15 | |
| | | | | Note Balance | 4854.05 | 0.00 |
| | | | | Total | 4859.20 | |

## REPORT 2

## Statement summaryA/c 7001142996- Comerica money maker a/c (savings)

| | |
|---|---:|
| Balance as per statement 8/25/2006 pre marriage | 186,070.31 |
| intertset    interest | 1,619.39 |
| TRANSFERS TO 70011429970 freds checking account | (27,000.00) |
| TRANSFERS TO 70011429988 House hold account | (16,320.31) |
| over seas wire to K Macatty | |
| purchase Sians car for | |
| Rebecca | (13,045.00) |
| Other withdrawals | (4,010.00) |
| | (17,055.00) |
| Balance as per statement  pre marriage 26th Jan 07 | **127,314.39** |
| interest aand fees | 2,039.43 |
| TRANSFERS TO 70011429970 freds checking account | (96,550.00) |
| TRANSFERS TO 70011429988 House hold account | (20,380.00) |
| | |
| miscel net withdrawals | (12,200.00) |

| | |
|---|---:|
| Balance as per statement  on 27th May 08 | 223.82 |

C:\Documents and Settings\Administrator\My Documents\divorce hard drive\divorce 3 court infomation\HOUSE PURCHASE\comerica ac
7001142996 savings house purchase xlsx.xlsx

Page 1

RESPONDENT'S
EXHIBIT 22

# SUMMARY POST MARRIGE BEFORE 30TH Jan 2007 Comerica Savings Account 7001142996     Report 4

## SUMMARY

| | | Amount | |
|---|---|---|---|
| **Pre Marriage Balance as at per** | 31st January 07 | **127,314.39** | |
| transfers from Savings account all funded from savings account to payment a,c 700114297O from a/c | 7001142996 | (96,550.00) | this account used for House payments |
| transfers from Savings account all funded from savings account to payment a,c 700114298В from a/c | 7001142996 | (20,380.00) | this account beleved to be House hold a/c |
| interset earned on Account From January 2007 | | 2,039.43 | see statement analysis |
| miscel deposits and debits | | (12,200.00) | see statement analysis |
| Fees | | | see statement analysis |
| Closing Balance on 27th May 08 | | 223.82 | see Bank statement |

RESPONDENT'S
EXHIBIT 23

Source COMERICA bank A/c 7001142996-savings Money market a/c BANK STATEMENTS spreadsheet   Report 3

| Date | Income/ deposit | FUNDS TRANSFERS | sub totals LS | OTHER WITHDRAWAL/REFUNDS | OPENING BAL Deposits | TRANSFERS TO 7001142970 | TRANSFERS TO 7001142988 | TRANSFERS interest | Miscel deposits And Debits |
|---|---|---|---|---|---|---|---|---|---|
| Pre Marriage closing Balance on 26th Jan | | | | | 127,316.39 | | COMERIC balance on 26th Jan | | |
| interest | 280.42 | | | | 280.42 | | | 280.42 | |
| 1-Feb-07 to a/c 7001142988 | | -50 | | | | | | | |
| 2-Feb-07 to a/c 7001142988 | | -250 | | | | | | | |
| 9-Feb-07 to a/c 7001142988 | | -100 | | | | | | | |
| 16-Feb-07 to a/c 7001142988 | | -150 | | | | | | | |
| 20-Feb-07 to a/c 7001142988 | | -100 | | | | | | | |
| Eft summary to 7001142988 | | | -650 | | 126944.81 | | | | |
| closing Balance on 27th Feb | | | | 650 | 650 | | 650 | | |
| interest | 224.94 | | | | 224.94 | | | 224.94 | |
| 1-Mar-07 to a/c 7001142970 | | -6000 | | | | | | | |
| 28-Feb-07 to a/c 7001142988 | | -500 | | | | | | | |
| 26-Mar-07 to a/c 7001142988 | | -50 | | | | | | | |
| Eft summary to 7001142988 | | | -550 | -550 | | | | | |
| closing Balance on 26th Mar | | -6000 | | | 120619.75 | 6000 | 550 | | |
| interest | 234.61 | | | | 234.61 | | | 234.61 | |
| 27-Mar-07 to a/c 7001142988 B | | -50 | | | | | | | |
| 28-Mar-07 to a/c 7001142970 A | | -1000 | | | | | | | |
| 30-Mar-07 to a/c 7001142988 B | | -1200 | | | | | | | |
| 4-Apr-07 to a/c 7001142970 A | | -5000 | | | | | | | |
| 9-Apr-07 AOP to a/c 7001142988 B | | -150 | | | | | | | |
| 11-Apr-07 to a/c 7001142970 | | -2000 | MISSING FROM A/C 7001148970 | | | | | | |
| 11-Apr-07 to a/c 7001142988 B | | -1000 | -10400 | | | | | | |
| Eft summary to 7001142970 | | -8000 | | -8000 A totals 6000 | | 8000 | | | |
| Eft summary to 7001142988 | | -2400 | | -2400 B totals | | | 2400 | | |
| EXCESSIVE transation fee | | | | -10 | -10 | | | | |
| closing Balance on 25th April | | | | | 110444.36 | | | | |
| 24-May-07 interest | 221.13 | | | | 221.13 | | | 221.13 | |
| closing Balance on 24th May | | | | | | | | | |
| 25-May-07 interest | 187.85 | | | | 187.85 | | | 187.85 | |
| 1-Jun-07 to a/c 7001142988 | | -2000 | | -2000 | 110665.49 | | 2000 | | |
| withdrawal opening FB&T A/c | | | | -28500 | 80353.34 | | | | -28500 believed to be FB&T openning a/c |
| closing Balance on 26th June | 156.52 | | | | 156.52 | | | 156.52 | |
| interest | | | | | | | | | |
| closing Balance on 26th July | 143.17 | | | | 80509.86 | | | | |
| interest | | | | | 143.17 | | | 143.17 | |
| 30-Jul-07 Eft summary to 7001142970 | | -5000 | | -5000 | | 5000 | | | |
| closing Balance on 25th Augt | | | | | 75653.03 | | | | |
| 28-Aug-07 other deposits | | | | 22000 | 22000 | | | | 22000 |
| interest | 189.2 | | | | 189.2 | | | 189.2 | |
| 28-Aug-07 to a/c 7001142988 | | -500 | | | | | | | |
| 29-Aug-07 to a/c 7001142988 | | -200 | | | | | | | 22000 transfer back to earn interest |

see e mail note
from Comerica
funds missposted
by bank funds
posted to a/c
7001142988

RESPONDENT'S
EXHIBIT 24

Source COMERICA bank A/c 7001142996-savings Money market a/c BANK STATEMENTS spreadsheet

Report 3

| Date | income / deposit | FUNDS TRANSFERS | sub totals | LS | OTHER WITHDRAWA /REFUNDS | OPENING BAL Deposits | TRANSFERS TO 7001142970 | TRANSFERS TO 7001142988 | interest | Miscel deposits And Debits |
|---|---|---|---|---|---|---|---|---|---|---|
| 30-Aug-07 to a/c 7001142988 | | -100 | | | | | | | | |
| 4-Sep-07 to a/c 7001142988 | | -50 | | | | | | | | |
| 5-Sep-07 to a/c 7001142988 | | -50 | | | | | | | | |
| 21-Sep-07 to a/c 7001142988 | | -730 | | | | | | | | |
| 30-Aug-07 to a/c 7001142970 | | -5000 | | | | | | | | |
| 10-Sep-07 to a/c 7001142970 | | -5000 | | | | | | | | |
| 27-Sep-07 to a/c 7001142970 | | 7500 | | | | | | | | |
| Eft summary to 7001142970 | | | 17500 | | | 17500 | 17500 | | | |
| Eft summary to 7001142988 | | | 1680 | | | 1680 | | 1680 | | |
| withdrawal | | | | | 700 | 700 | | | | |
| EXCESSIVE transation fee | | | | | 30 | 30 | | | | -700 |
| closing Balance on 28th sept | | | | | | 77932.23 | | | | |
| interest | 135.95 | | | | | 135.95 | | | 135.95 | |
| miscelaneous debit | | | | | -5000 | -5000 | | | | 5000 |
| 1-Oct-07 to a/c 7001142970 | | -2750 | | | | | | | | |
| 28-Sep-07 AOP to a/c 7001142988 | | -100 | | | | | | | | |
| 3-Oct-07 AOP to a/c 7001142988 | | -50 | | | | | | | | |
| 10-Oct-07 AOP to a/c 7001142988 | | -100 | | | | | | | | |
| 12-Oct-07 AOP to a/c 7001142988 | | -250 | | | | | | | | |
| 15-Oct-07 AOP to a/c 7001142988 | | -50 | | | | | | | | |
| Eft summary to 7001142970 | | | -2750 | | | -2750 | 2750 | | | |
| closing Balance on 25th Oct | | | -550 | | | 550 | | 550 | | |
| interest | 140.39 | | | | | 140.39 | | | 140.39 | |
| to a/c 7001142970 | | -7000 | | | | 69768.18 | | | | |
| closing Balance on 28th Nov | | | | | | 62908.57 | | | | |
| interest | 104.04 | | | | | 104.04 | | | 104.04 | |
| 30-Nov-07 to a/c 7001142970 | | 6000 | | | | | | | | |
| 14-Dec-07 to a/c 7001142970 | | -3000 | | | | | 7000 | | | |
| 24-Dec-07 to a/c 7001142970 | | -3000 | | | | | | | | |
| Eft summary to 7001142970 | | | 12000 | | | 12000 | 12000 | | | |
| closing Balance on 27th Dec | | | | | | 51012.61 | | | | |
| interest | 72.66 | | | | | 72.66 | | | 72.66 | |
| 2-Jan-08 to a/c 7001142970 | | -6500 | | | | | | | | |
| 2-Jan-08 to a/c 7001142970 | | -2000 | | | | | | | | |
| 31-Dec-07 AOP to a/c 7001142988 | | -100 | | | | | | | | |
| 2-Jan-08 AOP to a/c 7001142970 | | -450 | | | | | | | | |
| 16-Jan-08 AOP to a/c 7001142988 | | 50 | | | | | | | | |
| 18-Jan-08 AOP to a/c 7001142988 | | -50 | | | | | | | | |
| 22-Jan-08 to a/c 7001142988 | | -1000 | | | | | | | | |
| Eft summary to 7001142970 | | | 8500 | | | 8500 | 8500 | | | |
| Eft summary to 7001142988 | | | -1650 | | | -1650 | | 1650 | | |
| fees & Services | | | | | -10 | 10 | | | | |
| closing Balance on 28th Jan interest | 13.76 | | | | | 40925.27 13.76 | | | 13.76 | |
| 30-Jan-08 to a/c 7001142970 | | -5000 | | | | | | | | |
| 11-Feb-08 to a/c 7001142970 | | -1000 | | | | | | | | |
| 19-Feb-08 to a/c 7001142970 | | -3000 | | | | | | | | |
| 1-Feb-08 to a/c 7001142988 | | -3000 | | | | | | | | |
| 19-Feb-08 to a/c 7001142988 | | -2000 | | | | | | | | |
| Eft summary to 7001142970 | | | -9000 | | | -9000 | 9000 | | | -19180 |
| | | | | | | | | | | -730 |

**Source COMERICA bank A/c 7001142996-savings Money market a/c BANK STATEMENTS spreadsheet**

Report 3

| Date | Income / deposit | FUNDS TRANSFERS | sub totals LS | OTHER WITHDRAWAL /REFUNDS | OPENING BAL Deposits | TRANSFERS TO 7001142970 | TRANSFERS TO 7001142988 | interest | Miscel deposits And Debits |
|---|---|---|---|---|---|---|---|---|---|
| closing Balance on 27th Feb | | | | | 26939.03 | | | | |
| interest | 3.72 | | | | 3.72 | | | 3.72 | |
| 3-Mar-08 to a/c 7001142970 | | -6000 | | | | | | | |
| 10-Mar-08 to a/c 7001142970 | | -3000 | | | | | | | |
| 24-Mar-08 to a/c 7001142970 | | -2000 | | | | | | | |
| 24-Mar-08 Eft summary to 7001142970 | | -1000 | -5000 | | | | | | |
| 14-Mar-08 AOP to a/c 7001142988 | | -50 | | | | | | | |
| 17-Mar-08 AOP to a/c 7001142988 | | -500 | | | | | | | |
| 18-Mar-08 AOP to a/c 7001142988 | | -50 | | | | | | | |
| 19-Mar-08 AOP to a/c 7001142988 | | -50 | | | | | | | |
| Eft summary to 7001142970 | | | | | | 11000 | | | |
| Eft summary to 7001142988 | | -11000 | | | -11000 | | | | |
| fees & Services | | | | -20 | -20 | | 1650 | | |
| closing Balance on 26th Mar | | 1650 | | | 14272.75 | | | | |
| interest | 1.07 | | | | 1.07 | | | 1.07 | |
| 1-Apr-08 to a/c 7001142970 | | -5000 | | | | | | | |
| 14-Apr-08 to a/c 7001142970 | | -1400 | | | | | | | |
| 18-Apr-08 to a/c 7001142970 | | -1000 | | | | | | | |
| 27-Apr-08 AOP to a/c 7001142970 | | -100 | | | | | | | |
| 28-Mar-08 AOP to a/c 7001142988 | | -500 | | | | | | | |
| 2-Apr-08 AOP to a/c 7001142988 | | -200 | | | | | | | |
| 14-Apr-08 to a/c 7001142988 | | -1000 | -7400 | | | | | | |
| Eft summary to 7001142970 | | | | | | 7400 | | | |
| Eft summary to 7001142988 | | -1800 | | | -1800 | | 1800 | | |
| closing Balance on 24th Apr | | | | | 5073.82 | | | | |
| interest | 0 | | | | 0 | | | | |
| 28-Apr-08 to a/c 7001142970 | | -1000 | | | | | | | |
| 6-May-08 to a/c 7001142970 | | -600 | | | | | | | |
| 23-May-08 to a/c 7001142970 | | -200 | | | | | | | |
| 27-May-08 to a/c 7001142970 | | -300 | | | | | | | |
| 27-May-08 to a/c 7001142970 | | -300 | | | | | | | |
| 28-Apr-08 to a/c 7001142988 | | -750 | | | | | | | |
| 6-May-08 to a/c 7001142988 | | -1000 | | | | | | | |
| 27-May-08 to a/c 7001142988 | | -700 | | | | | | | |
| Eft summary to 7001142970 | | -7400 | | | -2400 | 2400 | | | |
| Eft summary to 7001142988 | | -2450 | | | -2450 | | 2450 | | |
| closing Balance on 27th May 08 | | | | | 156,850.00 | | | | |

TRANSFERS Per REPORT-PRE MARRIAGE SEE 4.3 REPORTS

| | | |
|---|---|---|
| Balance as per statement report | | |
| bank missing posting 11 April | 223.82 post marriage | |
| | 158,850.00 | |
| | 62,300.00 | 96,550.00 |
| | -2000 | 2450 |
| Reconciled to Inventory 4.3 report 4 | | 20380 |
| | 156,850.00 | |

5000 | 1650 | 1.07 | ...

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## WARRANTY DEED WITH VENDOR'S LIEN

Date: December 16, 2008

Grantor: ROBERT MILLER and wife, ARDAN MILLER

Grantor's Mailing Address (including county):

610 Park St., Nacogdoches, Nacogdoches County, TX 75961

Grantee: FREDERICK D. GRAHAM

Grantee's Mailing Address (including county):

3704 Raguet St., Nacogdoches, Nacogdoches County, TX 75965

Consideration:

TEN AND NO/100 DOLLARS ($10.00) and other valuable consideration, and a note of even date that is in the principal amount of FORTY-FOUR THOUSAND and NO/100 DOLLARS ($44,000.00) and is executed by Grantee, payable to the order of FIRST BANK & TRUST EAST TEXAS. The note is secured by a vendor's lien retained in favor of FIRST BANK & TRUST EAST TEXAS in this deed and by a deed of trust of even date from Grantee to JOE C. DENMAN, III, Trustee.

Property (including improvements):

All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas, and being Lot No. 2 of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of the Plat Records of Nacogdoches County, Texas

Exceptions to Conveyance and Warranty:

Easements, rights-of-way, and prescriptive rights, whether of record or not; all presently recorded restrictions, reservations, covenants, conditions, zoning ordinances, oil and gas leases, rights of development, mineral severances, and other instruments, other than liens and conveyances, that affect the property; rights of adjoining owners in any walls and fences situated on a common boundary; any discrepancies, conflicts, or shortages in area or boundary lines; any encroachments or overlapping of improvements; any conditions that would be revealed by a physical inspection and survey of the property.

Ad valorem taxes for the year 2008 have been prorated and paid between Grantor and Grantee, and Grantee assumes payment of taxes for the year 2009 and subsequent years.

Reservations from Conveyance and Warranty:

NONE

Grantor, for the consideration and subject to the reservations from and exceptions to

1

RESPONDENT'S
EXHIBIT 33

conveyance and warranty, grants, sells, and conveys to Grantee the property, together with all and singular the rights and appurtenances thereto in any wise belonging, to have and hold it to Grantee, Grantee's heirs, executors, administrators, successors, or assigns forever. Grantor hereby binds Grantor and Grantor's heirs, executors, administrators, and successors to warrant and forever defend all and singular the property to Grantee and Grantee's heirs, executors, administrators, successors, and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the reservations from and exceptions to warranty.

The vendor's lien against and superior title to the property are retained until each note described is fully paid according to its terms, at which time this deed shall become absolute.

When the context requires, singular nouns and pronouns include the plural.

FIRST BANK & TRUST EAST TEXAS, at the instance and request of the Grantee herein, having advanced and paid in cash to the Grantor herein that portion of the purchase price of the herein described property as is evidenced by the hereinabove described note of $44,000.00, the vendor's lien together with superior title to said property is herein retained for the benefit of FIRST BANK & TRUST EAST TEXAS, and the same are hereby TRANSFERRED and ASSIGNED unto the said FIRST BANK & TRUST EAST TEXAS.

_____
ROBERT MILLER

_____
ARDAN MILLER


THE STATE OF TEXAS        *

COUNTY OF NACOGDOCHES    *

This instrument was acknowledged before me on the __16__ day of December, 2008, by Robert and wife, Ardan Miller.

_____
NOTARY PUBLIC, STATE OF TEXAS

DEANNA NICHOLS
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-06-2009

Filed for Record in:
Nacogdoches County
On: Dec 19,2008 at 03:51P
As a
Recording
Document Number:          131255
Amount                     20.00
Receipt Number - 68589
By,
Carol Wilson, County Clerk

2

# REAL ESTATE LIEN NOTE

**Date:** December 16, 2008

**Maker:** FREDERICK D. GRAHAM

**Maker's Mailing Address:**

3704 Raguet St., Nacogdoches, Nacogdoches County, TX 75965

**Payee:** FIRST BANK & TRUST EAST TEXAS

**Place for Payment (including county):**

P.O. Box 631111, Nacogdoches, Nacogdoches County, TX 75963

**Principal Amount:** $44,000.00

**Annual Interest Rate on Unpaid Principal from Date:**

SIX PERCENT (6.00%)

**Annual Interest Rate on Matured, Unpaid Amounts:**

All past due principal and interest shall bear interest from maturity until paid at an interest rate per annum which, from day to day, shall be equal to the lesser of either: (a) the greatest rate permitted by the laws of Texas or the United States applicable to this loan or (b) an interest rate of eighteen percent (18%) per annum.

**Terms of Payment (principal and interest):**

(1) Principal and interest are payable in monthly installments of EIGHT HUNDRED FIFTY and 60/100 DOLLARS ($850.60) or more each, on or before the 1ST day of every month, beginning JANUARY 1ST, 2009 and continuing regularly until the principal and interest have been paid. Interest will be calculated on the unpaid principal to the date of each payment. Payments will be credited first to the accrued interest and then to reduction of principal.

(2) All principal and interest not sooner paid shall be due and payable DECEMBER 1, 2013.

If the Payee has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, Maker will pay a late charge to Payee. The amount of the charge will be 5% of Maker's overdue payment of principal and interest. Maker will pay this late charge promptly but only once on each late payment.

**Security for Payment:**

This note is secured by a vendor's lien and superior title retained in deed dated DECEMBER 16, 2008, executed by ROBERT MILLER and wife, ARDAN MILLER to FREDERICK D. GRAHAM, and is additionally secured by a deed of trust of even date from Makers to JOE C. DENMAN, Trustee, covering the following real property:

All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas, and being Lot No. 2 of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of the Plat Records of Nacogdoches County, Texas



1

RESPONDENT'S
EXHIBIT 26

If Maker does not default under this note or any instrument securing the same, and if all accrued interest hereon be paid, Maker shall have the right to prepay, at any time prior to maturity, all or any part of the principal of this note without penalty. Any such prepayment shall be applied to the principal installment last maturing, in the inverse order of maturity, and without reducing the amount or delaying the time for payment of the remaining installments required hereunder.

Maker promises to pay to the order of Payee at the place for payment and according to the terms of payment the principal amount plus interest at the rates stated above. All unpaid amounts shall be due by the final scheduled payment date.

If Maker defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to it, and the default continues after Payee gives Maker notice of the default and the time within which it must be cured, as may be required by law or by written agreement, then Payee may declare the unpaid principal balance and earned interest on this note immediately due. Maker and each surety, endorser, and guarantor waive all demands for payment, presentations for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

Maker also promises to pay reasonable attorney's fees and court and other costs if this note is placed in the hands of an attorney to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured Unpaid Amounts. Maker will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

Interest on the debt evidenced by this note shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law; any interest in excess of that maximum amount shall be credited on the principal of the debt or, if that has been paid refunded. On any acceleration or required or permitted repayment, any such excess shall be cancelled automatically as of the acceleration or repayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides other provisions in this and all other instruments concerning the debt.

Each Maker is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

FREDERICK D. GRAHAM



**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## DEED OF TRUST

131256

Executed on the date of the acknowledgment below but having an Effective Date December ⎯16⎯, 2008

**Grantor:** FREDERICK D. GRAHAM, single man

**Grantor's Mailing Address (including county):**

    3704 Raguet St., Nacogdoches, Nacogdoches County, TX 75965

**Trustee:** JOE C. DENMAN, III

**Trustee's Mailing Address (including county):**

    P.O. Box 810, Diboll, Angelina County, TX 75941

**Beneficiary:** FIRST BANK & TRUST EAST TEXAS

**Beneficiary's Mailing Address (including county):**

    P.O. Box 631111, Nacogdoches, Nacogdoches County, TX 75963

**Note:**

    Date: December ⎯16⎯, 2008

    Amount: Forty-Four Thousand and No/100 Dollars ($44,000.00)

    Maker: Frederick D. Graham

    Payee: First Bank & Trust East Texas

    Final Maturity Date: December ⎯16⎯, 2013

    Terms of Payment: According to terms provided in the note.

**Property (including any improvements):**

    All that certain lot or parcel of land in the City of Nacogdoches, Nacogdoches County, Texas, and being Lot No. 2 of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of the Plat Records of Nacogdoches County, Texas

**Prior Lien(s) (including recording information):**

    NONE

For value received and to secure payment of the note, Grantor conveys the property to Trustee in trust. Grantor warrants and agrees to defend the title to the property. If Grantor performs all the covenants and pays the note according to its terms, this deed of trust shall have no further effect, and Beneficiary shall release it at Grantor's expense.

Grantor's Obligations

RESPONDENT'S
EXHIBIT 27

Grantor agrees to:

1. keep the Property in good repair and condition;
2. pay all taxes and assessments on the Property before delinquency;
3. defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;
4. maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender at least ten days before the expiration of the Required Insurance Coverages;
5. obey all laws, ordinances, and restrictive covenants applicable to the Property;
6. keep any buildings occupied as required by the Required Insurance Coverages;
7. if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments; and
8. notify Lender of any change of address.

## Beneficiary's Rights

1. Beneficiary may appoint in writing a substitute or successor trustee, succeeding to all rights and responsibilities of Trustee.
2. If the proceeds of the note are used to pay any debt secured by prior liens, Beneficiary is subrogated to all of the rights and liens of the holders of any debt so paid.
3. Beneficiary may apply any proceeds received under the insurance policy either to reduce the note or to repair or replace damaged or destroyed improvements covered by the policy.
4. If Grantor fails to perform any of Grantor's obligations, Beneficiary may perform those obligations and be reimbursed by Grantor on demand at the place where the note is payable for any sums so paid, including attorney's fees, plus interest on those sums from the dates of payment at the rate stated in the note for matured, unpaid amounts. The sum to be reimbursed shall be secured by this deed of trust.
5. If Grantor defaults on the note or fails to perform any of Grantor's obligations or if default occurs on a prior lien note or other instrument, and the default continues after Beneficiary gives Grantor notice of the default and the time within which it must be cured, as may be required by law or by written agreement, then Beneficiary may:
   a. declare the unpaid principal balance and earned interest on the note immediately due;
   b. request Trustee to foreclose this lien, in which case Beneficiary or Beneficiary's agent shall give notice of the foreclosure sale as provided by the Texas Property Code as then amended; and
   c. purchase the property at any foreclosure sale by offering the highest bid and then have the bid credited on the note.

## Trustee's Duties

If requested by Beneficiary to foreclose this lien, Trustee shall:

1. either personally or by agent give notice of foreclosure sale as required by the Texas Property Code as then amended;
2. sell and convey all or part of the property to the highest bidder for cash with a general warranty binding Grantor, subject to prior liens and to other exceptions to conveyance and warranty; and
3. from the proceeds of the sale, pay, in this order:
   a. expenses of foreclosure, including a commission to Trustee of 5% of the bid;
   b. to Beneficiary, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;
   c. any amounts required by law to be paid before payment to Grantor; and
   d. to Grantor, any balance.

## General Provisions

2

1. If any of the property is sold under this deed of trust, Grantor shall immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor shall become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2. Recitals in any Trustee's deed conveying the property will be presumed to be true.

3. Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4. This lien shall remain superior to liens later created even if the time of payment of all or part of the note is extended or part of the property is released.

5. If any portion of the note cannot be lawfully secured by this deed of trust, payments shall be applied first to discharge that portion.

6. Grantor assigns to Beneficiary all sums payable to or received by Grantor from condemnation of all or part of the property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the property. After deducting any expenses incurred, including attorney's fees, Beneficiary may release any remaining sums to Grantor or apply such sums to reduce the note. Beneficiary shall not be liable for failure to collect or to exercise diligence in collecting any such sums.

7. Grantor assigns to Beneficiary absolutely, not only as collateral, all present and future rent and other income and receipts from the property. Leases are not assigned. Grantor warrants the validity and enforceability of the assignment. Grantor may as Beneficiary's licensee collect rent and other income and receipts as long as Grantor is not in default under the note or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the note and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due under the note and deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the note or performance of this deed of trust, Beneficiary may terminate Grantor's license to collect and then as Grantor's agent may rent the property if it is vacant and collect all rent and other income and receipts. Beneficiary neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the property. Beneficiary may exercise Beneficiary's rights and remedies under this paragraph without taking possession of the property. Beneficiary shall apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Beneficiary's rights and remedies and then to Grantor's obligations under the note and this deed of trust in the order determined by Beneficiary. Beneficiary is not required to act under this paragraph, and acting under this paragraph does not waive any of Beneficiary's other rights or remedies. If Grantor becomes a voluntary or involuntary bankrupt, Beneficiary's filing a proof of claim in bankruptcy will be tantamount to the appointment of a receiver under Texas law.

8. Interest on the debt secured by this deed of trust shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law; any interest in excess of that maximum amount shall be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides other provisions in this and all other instruments concerning the debt.

9. When the context requires, singular nouns and pronouns include the plural.

10. The term "note" includes all sums secured by this deed of trust.

11. This deed of trust shall bind, inure to the benefit of, and be exercised by successors in interest of all parties.

12. If Grantor and Maker are not the same person, the term "Grantor" shall include Maker.

13. Grantor represents that this deed of trust and the note are given for the following purposes:

The debt evidenced by the note is in part payment of the purchase price of the property; the debt is secured by this deed of trust and by a vendor's lien on the property, which is expressly retained in a deed of even date given by ROBERT MILLER and wife, ARDAN MILLER to FREDERICK D. GRAHAM. This deed of trust does not waive the vendor's lien, and the two liens and the rights created by this instrument shall be cumulative. Beneficiary may elect to foreclose under either of the liens without waiving the other or may foreclose under both. The deed is incorporated into this deed of trust.

14. Beneficiary may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

15. If Grantor transfers any part of the property without Beneficiary's prior written consent, Beneficiary may declare the debt secured by this deed of trust immediately payable. In that event Beneficiary will notify Grantor that the debt is payable; if it is not paid within thirty (30) days after notice to Grantor, Beneficiary may without further notice or demand to Grantor invoke any remedies provided in this instrument for default. Exceptions to this provision for declaring the note due on sale or transfer are limited to the following: (a) creation of a lien or encumbrance subordinate to this deed of trust; (b) creation of a purchase-money security interest for household appliances; (c) transfer by devise, descent, or operation of law on the death of a joint tenant; (d) grant of a leasehold interest of three years or less without an option to purchase; and (e) a transfer from one spouse to the other.

16. This conveyance is also made in trust to secure and enforce the payment of all other indebtednesses of the Maker of said note to Beneficiary presently existing or which may in any manner or means hereafter be incurred by the Maker and evidenced in any manner whatsoever, either by notes, advances, overdrafts, bookkeeping entries or any other method or means, it being expressly agreed and understood that any and all sums now owed to or hereafter advanced by said Beneficiary to the Maker shall be payable at FIRST BANK AND TRUST EAST TEXAS in Nacogdoches County, Texas, and shall bear interest as may be provided in such notes or other evidences of indebtedness given by the Maker to said Beneficiary; and this instrument is also executed for the purpose of securing and enforcing the payment of any renewal and extension of any note or of any part of the said indebtedness of the Maker, and including any further loans and advancements made by said Beneficiary to the makers of said note under the provisions hereof. The fact of repayment of all indebtedness of the Maker to said Beneficiary shall not terminate this mortgage unless the same be so released by said Beneficiary at the request of the Maker; but otherwise it shall remain in full force and effect to secure all future advances and indebtednesses, regardless of any additional security that may be taken as to any past or future indebtedness, and shall be unaffected by any renewals, extensions or partial releases hereunder.

FREDERICK D. GRAHAM

REPUBLIC OF SINGAPORE      )
CITY OF SINGAPORE           )  S.S.
EMBASSY OF THE              )
UNITED STATES OF AMERICA)

SINGAPORE
EMBASSY OF THE UNITED STATES OF AMERICA

Before me, the undersigned authority, a Notarial Officer of the United States of America resident in Singapore, duly commissioned and qualified, on this day personally appeared FREDERICK D. GRAHAM, known to me or proven to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 5th day of December, 2008.



Type Name: Maria-Teresa Lopez
Title: Notarial Officer of the United States of America

Filed for Record in:
Nacogdoches County
On: Dec 19,2008 at 03:51P
As a
Recording
Document Number: 131256
Amount 28.00
Receipt Number - 68589
By,
Carol Wilson, County Clerk

4

14,120.98+
150.00+
336.22+
622.44+
15,229.64*+

0.*

06-26-2013

Frederick Graham
1009 N University Dr
Nacogdoches, TX  7596

Attn:    Frederick Graham:

Subject:    Acct Nbr:    7617330
            Borrower(s): Frederick Graham

Dear  Frederick Graham:

The amount needed to fully satisfy the above loan on __06-27-2013__ is __14,120.98__ .
The following table describes the payoff amount in detail:

| Balance Description | Due Bank | Due Customer | Per Diem After 06-27-2013 |
|---|---|---|---|
| Note Interest | 680.60 | | 2.18 |
| Note Balance | 13,057.61 | | |
| Late Charge Balance | 382.77 | | |
| **Totals** | 14,120.98 | 0.00 | |

Very truly yours,

First Bank & Trust East Texas
Nacogdoches
fbtet.com

Date Time: 06-28-2013 03:13:52
Teller Number: 68610
POFF  Seq.#: 2633
Acct#:********330
Amount: $14,120.98
              $14,120.98

All items credited subject to payment.

Thank you for banking with us.

**RESPONDENT'S**
**EXHIBIT 29**



DENA⬤ PAYMENTS OF HER PERSONAL34089201 LOAN WITHOUT ⬤NOWLEDGE OR APPROVAL

# Reimburement claim against Dena's mothers House now claimed to be
# her separate propertythrough Lady bird deed

LOAN payments
made to support
and repair
mothers home
NOW HER
SEPARATE
PROPERTY

LOAN PAYMENTS 34089201 OCT        (10,443.01) roof replacement
                                              SEE MONIES TAKEN
                                              BY DENA support

property taxes 801 laurel lane    (2,220.27) documentation

Sub total                        (12,663.28)

LOAN REPAYMENT!  8092940          (5,225.83) See 8092940 loan summary

lady bird deed lawyer fee check   (1,267.00) see copy of check

total reimburement from          (19,156.11)

C:\Documents and Settings\Administrator\My Documents\divorce hard drive\PROTECTED FILESI\BANK ACCOUNTS\DENAS LOAN REPAYMENTS ACCOUNT 510139288\deans loan settlementS with FB& 510139288 PROTECTED.xlsx

RESPONDENT'S
EXHIBIT 37

DENA TURNER
FREDERICK GRAHAM                                                    1036
3704 RAGUET
NACOGDOCHES, TX 76965                    936.652.1234

                                                                88-2280/1131

                                                    23 JULY 2012
                                                        Date

Pay to the
Order of        MICHAEL MOORE                          $ 1950 —

ONE THOUSAND NINE HUNDRED FIFTY & 00/100 Dollars     [Security Features Details on Back]

First Bank & Trust  EAST TEXAS
1009 N. UNIVERSITY
NACOGDOCHES, TX 75961

For FIT/DETAIL PAINTING                              MP

⑈113122804⑈ 1036⑈ 50⑈103758 9⑈"

http://osiapp/RetrieveImage.asp?BANK ID=113122804&ACCOUNT=50103758 9&CHECKNUM=1036&DATE=07-24-2012&...   6/24/2013

RESPONDENT'S
EXHIBIT 38-a

DENA TURNER
**FREDERICK GRAHAM**
3704 RAGUET
NACOGDOCHES, TX 75965

936.652.1234
105 87838

1034

98-2280/1131

Pay to the
Order of ___ EDWINA BROUSSARD _____ $1,000

ONE THOUSAND & _____ 00/100 _____ Dollars

**First Bank**
**& Trust** EAST TEXAS
1019 N. UNIVERSITY
NACOGDOCHES, TX 75961

Date
20 JULY 2012

Security
Features
Details on
Back

For ___ MTS ___

⑈113122804⑈ 1034 ⑈⑈ 50103 7589 ⑈⑈

RESPONDENT'S
EXHIBIT 38-b

FREDERICK GRAHAM
3704 RAGUET
NACOGDOCHES, TX 75965

936.652.1234
TDL 10587838

1031
88-2280/1131

20 JULY 2012
Date

Pay to the
Order of  PLUMBING PRO                    $ 1150—

ONE THOUSAND ONE HUNDRED FIFTY & 00/100 Dollars

First Bank
& Trust EAST TEXAS
1009 N UNIVERSITY
NACOGDOCHES, TX 75961

For #4 W COURT DR PLUMBING #4

⑆113122804⑆ 1031⑈ 50103758⑈

MP

Security
Features
Details on
Back

http://osiapp/RetrieveImage.asp?BANKID=113122804&ACCOUNT=50103758&CHECKNUM=1031&DATE=07-23-2012&...   6/24/2013

RESPONDENT'S
EXHIBIT 38-c

DENA TURNER
FREDERICK GRAHAM
3704 RAGUET
NACOGDOCHES, TX 75965

1038
88-22097121

Pay to the
Order of _____ SUSAN ODEN _____ $ 100 ——

ONE HUNDRED & _____ ND/100 —— Dollars

First Bank
& Trust EAST TEXAS
1009 N. UNIVERSITY
NACOGDOCHES, TX 75961

For COLLECTOR & PILLOW BIZ INVESTM(ENT)

⑆113122804⑆ 1038⑆ 501037589⑈

http://osiapp/RetrieveImage.asp?BANKID=113122804&ACCOUNT=501037589&CHECKNUM=1038&DATE=08-10-2012&...    6/24/2013

RESPONDENT'S
EXHIBIT 38-d

FREDERICK D. GRAHAM
DENA TURNER
HOUSEHOLD ACCOUNT
210 ELM STREET 3704 RAGUET ST.
NACOGDOCHES, TX 75965

TX 10587838

1150

88-2280/1131

Date 29 Aug 2012

Pay to the
Order of _Summer Reichardt_____ $ 575 —

FIVE HUNDRED SEVENTY — FIVE & —⁷⁰⁄₁₀₀ — Dollars

First Bank & Trust EAST TEXAS
1009 N UNIVERSITY
NACOGDOCHES, TX 75961

For 1/2 AUNTEVA'S KITCHEN FLOOR LOAN

⑆113122804⑆ 1150⑆ 50103758 9⑆

http://osiapp/RetrieveImage.asp?BANKID=113122804&ACCOUNT=50103758 9&CHECKNUM=1150&DATE=08-30-2012&...    6/24/2013

RESPONDENT'S
EXHIBIT 38-e

FREDERICK D. GRAHAM
DENJA TURNER
HOUSEHOLD ACCOUNT
210 ELM STREET
NACOGDOCHES, TX 75965

1148

88-2280/1131

936652.1234

Pay to the
Order of _J NATIVIDAD CHAVIRA_____ $ 950 —

NINE HUNDRED FIFTY & —100 —————— Dollars

Date 9 JULY 2012

First Bank
& Trust EAST TEXAS
1009 N UNIVERSITY
NACOGDOCHES, TX 75961

For _AE SHETTOCK_

⑈113122804⑈ 1148⑈ 50103758 9⑈

FINE SUPPORT DENIED FROM FBT BANK A/C FROM RECEIPT OF SETTLEMENT PAYMENTS

RESPONDENT'S
EXHIBIT 38-f

FREDERICK D. GRAHAM
DENA TURNER
HOUSEHOLD ACCOUNT
210 ELM STREET
NACOGDOCHES, TX 75965

936.652.1234
TDL 10507008

1147

88-2280/1131

Date 18 JULY 2012

Pay to the
Order of _DON BASS_ $405

FOUR HUNDRED FINE & ⁰⁹/₁₀₀ _____ Dollars

First Bank
& Trust EAST TEXAS
1009 N UNIVERSITY
NACOGDOCHES, TX 75961

For A.E. CONTRACTOR

�semana PanAmerican

⑆113122804⑆ 1147⑈ 50 10 37 589⑈

/osiapp/RetrieveImage.asp?BANKID=113122804&ACCOUNT=5010375S9&CHECKNUM=1147&DATE=07-19-2012&...   6/24/2013

RESPONDENT'S
EXHIBIT 38-g

DENA TURNER
FREDERICK GRAHAM
3704 RAGUET ST.
NACOGDOCHES, TX 75965

936 652.1234

1042

88-2280/1131

Date 26 APR 10

PAY to the order of ____ R.y. Mayo ____ $ 1267 —

ONE THOUSAND SIXTY-SEVEN & NO/100 ____ Dollars

First Bank & Trust EAST TEXAS
1009 N UNIVERSITY
NACOGDOCHES, TX 75961

For MR. MAYO FOR MOM

⑆113122804⑆ 1042⑈ 50 10 39 288⑆

CHECK DRAWN ON DALLAS A/C 510139288 (FILED WITH DENNA LOAN SETTLEMENT.)

RESPONDENT'S
EXHIBIT 38-h

936-658-1235

FREDERICK D. GRAHAM                                    1183
3704 RAGUET
NACOGDOCHES, TX 75965                    APR 30    10

Pay to the
Order of      S A M ' S   C L U B #6202              $ 108.07

ONE HUNDRED EIGHT AND 07/100                          Dollars

First Bank
& Trust
1009 N. UNIVERSITY
NACOGDOCHES, TX 75961

For   MEDS

⑈113122804⑈ 1183⑈ 501033745⑈   ⑈00000010807⑈

Branch 0    Date 05-04-2010    Account 501033745    Amount 108.07
Serial 1183    TR 113122804    InstID 0    EmpID 0    DbCr D    TranCode 0
DistributionCode 21    TransmitAccount 0    Sequence 9012868576
TransmitTR 113122804    ExceptionCode 0    PayNoPay
CorrectedAccount 0

---

FREDERICK D. GRAHAM                                    1187
3704 RAGUET
NACOGDOCHES, TX 75965                    27th MAY 2010

Pay to the
Order of   THE SECRETARY OF STATE              $ 75.00

SEVENTY FIVE DOLLARS                                  Dollars

First Bank
& Trust
1009 N. UNIVERSITY
NACOGDOCHES, TX 75961

For   REFILE RESUSTATE COMPANY

⑈113122804⑈ 1187⑈ 501033745⑈

Branch 0    Date 06-03-2010    Account 501033745    Amount 75.00
Serial 1187    TR 113122804    InstID 0    EmpID 0    DbCr D    TranCode 0
DistributionCode 21    TransmitAccount 0    Sequence 9013252840
TransmitTR 113122804    ExceptionCode 0    PayNoPay
CorrectedAccount 0

---

FREDERICK D. GRAHAM                                    1185
3704 RAGUET
NACOGDOCHES, TX 75965                    MAY 01    10

Pay to the
Order of      S A M ' S   C L U B #6202              $ 56.52

Dollars

First Bank
& Trust
1009 N. UNIVERSITY
NACOGDOCHES, TX 75961

For

⑈113122804⑈ 1185⑈ 501033745⑈   ⑈00000005652⑈

Branch 0    Date 05-05-2010    Account 501033745    Amount 56.52
Serial 1185    TR 113122804    InstID 0    EmpID 0    DbCr D    TranCode 0
DistributionCode 21    TransmitAccount 0    Sequence 9012884724
TransmitTR 113122804    ExceptionCode 0    PayNoPay
CorrectedAccount 0

---

CHECKING DEPOSIT

First Bank
& Trust
DIBOLL, TEXAS 75941

Fred Graham          6/10/10   Transfer

ACCOUNT NUMBER
501033745                              $   3,000.00

⑈71010103⑈

Branch 0    Date 06-11-2010    Account 501033745    Amount 3000.00
Serial 0    TR 71010103    InstID 0    EmpID 0    DbCr C    TranCode 103
DistributionCode 1    TransmitAccount 0    Sequence 4405591920
TransmitTR 0    ExceptionCode 0    PayNoPay    CorrectedAccount 0

---

FREDERICK D. GRAHAM                                    1184
3704 RAGUET
NACOGDOCHES, TX 75965                    30th April 2010

Pay to the
Order of   COUNTY CLERK                         $ 43.00

FORTY THREE                                          Dollars

First Bank
& Trust
1009 N. UNIVERSITY
NACOGDOCHES, TX 75961

For   DENA'S MINIS HOUSE D-C

⑈113122804⑈ 1184⑈ 501033745⑈

Branch 0    Date 05-05-2010    Account 501033745    Amount 43.00
Serial 1184    TR 113122804    InstID 0    EmpID 0    DbCr D    TranCode 0
DistributionCode 21    TransmitAccount 0    Sequence 9012867100
TransmitTR 113122804    ExceptionCode 0    PayNoPay
CorrectedAccount 0

---

FREDERICK D. GRAHAM                                    1189
3704 RAGUET
NACOGDOCHES, TX 75965                    14th JUNE 2010

Pay to the
Order of   John RANGEL                          $ 175.00

ONE HUNDRED AND SEVENTY FIVE                         Dollars

First Bank
& Trust
1009 N. UNIVERSITY
NACOGDOCHES, TX 75961

For   BUG SPRAY 14th JUNE

⑈113122804⑈ 1189⑈ 501033745⑈   ⑈00000017500⑈

Branch 0    Date 06-18-2010    Account 501033745    Amount 175.00
Serial 1189    TR 113122804    InstID 0    EmpID 0    DbCr D    TranCode 0
DistributionCode 21    TransmitAccount 0    Sequence 9013446656
TransmitTR 113122804    ExceptionCode 0    PayNoPay
CorrectedAccount 0

---

FREDERICK D. GRAHAM                                    1188
3704 RAGUET
NACOGDOCHES, TX 75965                    27th MAY 2010

Pay to the
Order of   MASTER TINT                          $ 180.00

ONE HUNDRED AND EIGHTY                               Dollars

First Bank
& Trust
1009 N. UNIVERSITY
NACOGDOCHES, TX 75961

For   SUBBASAU REPAIR

⑈113122804⑈ 1188⑈ 501033745⑈

Branch 0    Date 06-01-2010    Account 501033745    Amount 180.00
Serial 1188    TR 113122804    InstID 0    EmpID 0    DbCr D    TranCode 0
DistributionCode 21    TransmitAccount 0    Sequence 9013205682
TransmitTR 113122804    ExceptionCode 0    PayNoPay
CorrectedAccount 0

---

FREDERICK D. GRAHAM                                    1190
3704 RAGUET
NACOGDOCHES, TX 75965                    18th JUNE 2010

Pay to the
Order of   MEMORIAL HOSPITAL                    $ 1000.00

ONE THOUSAND                                         Dollars

First Bank
& Trust
1009 N. UNIVERSITY
NACOGDOCHES, TX 75961

For

⑈113122804⑈ 1190⑈ 501033745⑈

Branch 0    Date 06-23-2010    Account 501033745    Amount 1000.00
Serial 1190    TR 113122804    InstID 0    EmpID 0    DbCr D    TranCode 0
DistributionCode 21    TransmitAccount 0    Sequence 9013508610
TransmitTR 113122804    ExceptionCode 0    PayNoPay
CorrectedAccount 0

RESPONDENT'S
EXHIBIT 38-i

# DUPLICATE TAX RECEIPT

NACOGDOCHES CENTRAL APPR DIST
216 W HOSPITAL ST
NACOGDOCHES, TX 75961
936-560-3447

## This is a receipt. Do not pay.

**Owner ID:  R   18218**
TURNER MARJORIE JANE
801 LAUREL LANE
NACOGDOCHES, TX 75964-6513

| | | | | | | |
|---|---|---|---|---|---|---|
| Parcel Id/Owner Seq: | 28026 / 1 | Abst/Subdiv  CARTER | | | Suit:  N | |
| Account Number: | 18-110-5600-012000 | Block      Lot | LOT 12 | | Acres:  - | Cat Code  A1 |
| Owner Interest: | 1.000 | Legals:  LT 12 CARTER | | | | |
| Prop Address | 801 LAUREL LN | | | | | |
| Prop City/St/Zip: | NACOGDOCHES, TX-75964 | | | | | |

LIFE ESTATE

Homestead Code:  B

| Year | Jurisdiction | Tax Rate | Tax Value | Post Code | Tax | Dis/Pen/Other | Total Amount | Date Posted |
|---|---|---|---|---|---|---|---|---|
| 2009 | NACOGDOCHES COUNTY | 0.434300 | $34,690 | P | $104.97 | $0.00 | $104.97 | 01/29/2010 |
| 2009 | NACOGDOCHES ISD M&O | 1.170000 | $39,690 | P | $337.07 | $0.00 | $337.07 | |
| 2009 | NACOGDOCHES ISD I&S | 0.200000 | $39,690 | P | $79.38 | $0.00 | $79.38 | |
| 2009 | CITY OF NACOGDOCHES | 0.550000 | $54,690 | P | $300.80 | $0.00 | $300.80 | |
| | | 2009  Year Totals | | | $822.22 | $0.00 | $822.22 | |
| | | Parcel Totals: | | | $822.22 | $0.00 | $822.22 | |

DPI Year/Month:  201001     **Payment Ref Totals:**     $822.22     $0.00     $822.22

Clerk: nara          Paid By:  FREDERICK D GRAHAM          Payment Type:  Check          Payment Ref No:  1021

**Grand Totals:**     $822.22     $0.00     $822.22

**RESPONDENT'S
EXHIBIT 39-a**

# DUPLICATE TAX RECEIPT

NACOGDOCHES CENTRAL APPR DIST
216 W HOSPITAL ST
NACOGDOCHES, TX 75961
936-560-3447

## This is a receipt. Do not pay.

**Owner ID: R 18218**
TURNER MARJORIE JANE
801 LAUREL LANE
NACOGDOCHES, TX 75964-6513

| | | | | | | |
|---|---|---|---|---|---|---|
| Parcel Id/Owner Seq | 28026 / 1 | Abst/Subdiv CARTER | | | Suit: N | |
| Account Number: | 18-110-5600-012000 | Block Lot LOT 12 | | | Acres: - | Cat Code A1 |
| Owner Interest: | 1.000 | Legals: LT 12 CARTER | | | | |
| Prop Address | 801 LAUREL LN | | | | | |
| Prop City/St/Zip: | NACOGDOCHES,TX-75964 | | | | | |

LIFE ESTATE

Homestead Code: B

| Year | Jurisdiction | Tax Rate | Tax Value | Post Code | Tax | Dis/Pen/Other | Total Amount | Date Posted |
|---|---|---|---|---|---|---|---|---|
| 2010 | NACOGDOCHES ISD M&O | 1.170000 | $39,690 | A | $168.53 | $0.00 | $168.53 | 01/31/2011 |
| 2010 | NACOGDOCHES ISD I&S | 0.200000 | $39,690 | A | $39.68 | $0.00 | $39.68 | |
| 2010 | NACOGDOCHES COUNTY | 0.434300 | $34,690 | A | $52.49 | $0.00 | $52.49 | |
| 2010 | CITY OF NACOGDOCHES | 0.569367 | $54,690 | A | $155.70 | $0.00 | $155.70 | |
| | | **2010 Year Totals** | | | $416.40 | $0.00 | $416.40 | |
| | | **Parcel Totals:** | | | $416.40 | $0.00 | $416.40 | |

DPI Year/Month: 201101  **Payment Ref Totals:** $416.40  $0.00  $416.40

Clerk: Grace    Paid By: DENA TURNER    Payment Type: Check    Payment Ref No: 1112

**Grand Totals:** $416.40    $0.00    $416.40

RESPONDENT'S
EXHIBIT 39-b

# DUPLICATE TAX RECEIPT

NACOGDOCHES CENTRAL APPR DIST
216 W HOSPITAL ST
NACOGDOCHES, TX 75961
936-560-3447

## This is a receipt. Do not pay.

**Owner ID:  R   18218**
TURNER MARJORIE JANE
801 LAUREL LANE
NACOGDOCHES, TX 75964-6513

| Parcel Id/Owner Seq: | 28026 / 1 | Abst/Subdiv  CARTER | | | Suit:  N | |
|---|---|---|---|---|---|---|
| Account Number | 18-110-5600-012000 | Block       Lot | LOT 12 | | Acres:  - | Cat Code   A1 |
| Owner Interest: | 1.000 | Legals:  LT 12 CARTER | | | | |
| Prop Address: | 801  LAUREL LN | | | | | |
| Prop City/St/Zip: | NACOGDOCHES,TX-75964 | | | | | |

LIFE ESTATE

Homestead Code:   B

| Year | Jurisdiction | Tax Rate | Tax Value | Post Code | Tax | Dis/Pen/Other | Total Amount | Date Posted |
|---|---|---|---|---|---|---|---|---|
| 2010 | NACOGDOCHES COUNTY | 0.434300 | $34,690 | P | $52.48 | $7.87 | $60.35 | 06-07/2011 |
| 2010 | CITY OF NACOGDOCHES | 0.569367 | $54,690 | P | $155.69 | $23.35 | $179.04 | |
| 2010 | NACOGDOCHES ISD M&O | 1.170000 | $39,690 | P | $168.54 | $25.28 | $193.82 | |
| 2010 | NACOGDOCHES ISD I&S | 0.200000 | $39,690 | P | $39.70 | $5.96 | $45.66 | |
| | | | 2010  Year Totals | | $416.41 | $62.46 | $478.87 | |
| | | | Parcel Totals: | | $416.41 | $62.46 | $478.87 | |

**DPI Year/Month:  201106**           Payment Ref Totals:          $416.41        $62.46        $478.87

**Clerk:  meschelle1        Paid By:  DENA TURNER          Payment Type:  Check          Payment Ref No:  1120**

Grand Totals:          $416.41        $62.46        $478.87

**RESPONDENT'S
EXHIBIT 39-c**

# DUPLICATE TAX RECEIPT

NACOGDOCHES CENTRAL APPR DIST
216 W HOSPITAL ST
NACOGDOCHES, TX 75961
936-560-3447

## This is a receipt. Do not pay.

**Owner ID:  R   18218**
TURNER MARJORIE JANE
801 LAUREL LANE
NACOGDOCHES, TX 75964-6513

| | | | | |
|---|---|---|---|---|
| Parcel Id/Owner Seq: | 28026 / 1 | Abst/Subdiv  CARTER | Suit:  N | |
| Account Number | 18-110-5600-012000 | Block        Lot    LOT 12 | Acres   - | Cat Code:  A1 |
| Owner Interest: | 1.000 | Legals:   LT 12 CARTER | | |
| Prop Address | 801  LAUREL LN | | | |
| Prop City/St/Zip: | NACOGDOCHES,TX-75964 | | | |

LIFE ESTATE

Homestead Code     B

| Year | Jurisdiction | Tax Rate | Tax Value | Post Code | Tax | Dis/Pen/Other | Total Amount | Date Posted |
|---|---|---|---|---|---|---|---|---|
| 2011 | NACOGDOCHES COUNTY | 0.434300 | $34,690 | A | $75.36 | $0.00 | $75.36 | 01/31/2012 |
| 2011 | NACOGDOCHES ISD M&O | 1.170000 | $39,690 | A | $232.28 | $0.00 | $232.28 | |
| 2011 | CITY OF NACOGDOCHES | 0.569000 | $54,690 | A | $155.66 | $0.00 | $155.66 | |
| 2011 | NACOGDOCHES ISD I&S | 0.200000 | $39,690 | A | $39.70 | $0.00 | $39.70 | |
| | | 2011  Year Totals | | | $503.00 | $0.00 | $503.00 | |
| | | Parcel Totals: | | | $503.00 | $0.00 | $503.00 | |

**DPI Year/Month:  201201**     **Payment Ref Totals:**   $503.00   $0.00   $503.00

Clerk:  meschelle1     **Paid By:**  FREDERICK D GRAHAM     **Payment Type:**  Check     **Payment Ref No:**  1151

**Grand Totals:**          $503.00     $0.00     $503.00

**RESPONDENT'S
EXHIBIT 39-d**

# DUPLICATE TAX RECEIPT

NACOGDOCHES CENTRAL APPR DIST
216 W HOSPITAL ST
NACOGDOCHES, TX 75961
936-560-3447

## This is a receipt. Do not pay.

**Owner ID:  R   18218**
TURNER MARJORIE JANE
801 LAUREL LANE
NACOGDOCHES, TX 75964-6513

---

| Parcel Id/Owner Seq. | 28026 / 1 | | Abst/Subdiv | CARTER | | Suit | N | | |
| Account Number. | 18-110-5600-012000 | | Block | Lot | LOT 12 | Acres | - | Cat Code | A1 |
| Owner Interest. | 1.000 | | Legals | LT 12 CARTER | | | | | |
| Prop Address: | 801 LAUREL LN | | | | | | | | |
| Prop City/St/Zip. | NACOGDOCHES,TX-75964 | | | | | | | | |

LIFE ESTATE

Homestead Code   B

| Year | Jurisdiction | Tax Rate | Tax Value | Post Code | Tax | Dis/Pen/Other | Total Amount | Date Posted |
|------|-------------|----------|-----------|-----------|-----|---------------|--------------|-------------|
| 2012 | NACOGDOCHES ISD I&S | 0.200000 | $39,690 | A | $39.69 | $0.00 | $39.69 | 01/31/2013 |
| 2012 | NACOGDOCHES ISD M&O | 1.170000 | $39,690 | A | $232.19 | $0.00 | $232.19 | |
| 2012 | CITY OF NACOGDOCHES | 0.562000 | $54,690 | A | $153.68 | $0.00 | $153.68 | |
| 2012 | NACOGDOCHES COUNTY | 0.454300 | $34,690 | A | $75.33 | $0.00 | $75.33 | |
| | | 2012  Year Totals | | | $500.89 | $0.00 | $500.89 | |
| | | Parcel Totals: | | | $500.89 | $0.00 | $500.89 | |

DPI Year/Month:  201301          Payment Ref Totals:          $500.89          $0.00          $500.89

Clerk: meschellem      Paid By:   DENA M TURNER      Payment Type:  Check      Payment Ref No:  1001

Grand Totals:          $500.89          $0.00          $500.89

**RESPONDENT'S
EXHIBIT 39-e**

## DENAS SCHOOL LOAN REPAYMENTS EVIDENCED FROM BANK STATEMENTS

**Dena's shool loan payments since 2003**

| DATE | DETAIL | AMOUNT | BANK ACCOUNT | |
|---|---|---|---|---|
| 30-Jun-10 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 28-Jul-10 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 30-Aug-10 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 28-Sep-10 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 28-Oct-10 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| **DENA HAD TAKEN BANK STATEMENTS AND ALL OTHER DOCUMENTS FROM THE HOUSE** | | | | |
| 28-Nov-10 | NELNET LOAN SERV PAYMENT | 500.00 | | assumed Dena has statements Loan schedule wil support claim |
| 28-Dec-10 | NELNET LOAN SERV PAYMENT | 500.00 | | assumed Dena wa paid from this account |
| 28-Jan-11 | NELNET LOAN SERV PAYMENT | 500.00 | | assumed Dena has statements Loan schedule wil support claim |
| 28-Feb-11 | NELNET LOAN SERV PAYMENT | 500.00 | | assumed Dena has statements Loan schedule wil support claim |
| 28-Mar-11 | NELNET LOAN SERV PAYMENT | 500.00 | | assumed Dena wa paid from this account |
| 28-Apr-11 | NELNET LOAN SERV PAYMENT | 500.00 | | assumed Dena has statements Loan schedule wil support claim |
| 28-May-11 | NELNET LOAN SERV PAYMENT | 500.00 | | assumed Dena has statements Loan schedule wil support claim |
| 28-Jun-11 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | Loan wa paid from this account |
| 28-Jul-11 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 28-Aug-11 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 29-Aug-11 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 28-Oct-11 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 28-Nov-11 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 28-Dec-11 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 30-Jan-12 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 29-Jan-12 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 28-Feb-12 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 28-Mar-12 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 30-Apr-12 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | SEE BANK STATEMENT AS EVIDENCE |
| 29-May-12 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | WITHDRAWALS AFTER RECEIPT OF SETTLEMENT PAYMENTS SEE BANK STATEMENT AS EVIDENCE |
| 28-Jun-12 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | WITHDRAWALS AFTER RECEIPT OF SETTLEMENT PAYMENTS SEE BANK STATEMENT AS EVIDENCE |
| 30-Jul-12 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | WITHDRAWALS AFTER RECEIPT OF SETTLEMENT PAYMENTS SEE BANK STATEMENT AS EVIDENCE |
| 28-Aug-12 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | WITHDRAWALS AFTER RECEIPT OF SETTLEMENT PAYMENTS SEE BANK STATEMENT AS EVIDENCE |
| 1-Oct-12 | NELNET LOAN SERV PAYMENT | 500.00 | 501037589 | WITHDRAWALS AFTER RECEIPT OF SETTLEMENT PAYMENTS SEE BANK STATEMENT AS EVIDENCE Dena broke agreement and |
| school Loan payment post broken settlement | | 2,500.00 | 501037589 | kept money |

C:\Documents and Settings\Administrator\My Documents\divorce hard drive\PROTECTED FILES\SCHOOL LOAN\DENAS SCHOOL LOAN REPAYMENTS PROYRCYED xlsx xlsx

**RESPONDENT'S EXHIBIT 41**

DENA'S SCHOOL LOAN FUNDED AS A LOAN TO HER REPAYABLE WHEN SHE IS ON HER FEET

# DENAS SCHOOL LOAN REPAYMENTS EVIDENCED FROM BANK STATEMENTS

Dena's shool loan payments since 2003

| DATE | DETAIL | AMOUNT | BANK ACCOUNT | |
|------|--------|--------|--------------|---|
| | | | School Loan payments supported by bank Statements June | |
| | | | 2010 to april 2012 | |
| LOAN REPAYMENTS JUNE 2010 TO OCT 2012 | | 12,000.00 | | |

From 2001

| | | | |
|------|------|------|---|
| 2002 | | | assumed Dena paid her own school loan but I hjelped her with Cash |
| 2003 | | 6,000 | assumed Dena paid her own school loan but I hjelped her with Cash |
| 2004 | | 6,000 | ?? RESTRUCTURED LOAN WANTED TO PAY $500 |
| 2005 | | 6,000 | |
| 2006 | | 6,000 | |
| 2007 | | 6,000 | |
| 2008 | | 6,000 | |
| 2009 | | 6,000 | |
| 2010 half the year 5 months | | 6,000 | TOURED ASIS BUT STILL KEPT UP LOSN PSYMENT |
| | | 2,500 | |
| total payments | | 44,500.00 | |

28-Jun-05

DENA HAS HAD A SCHOOLLOAN OUTSTANDING SINCE SHE WENT TO SFA SHE RESTRUCTURE THE LOAN IN 2001 USING MONIES SHE EARNED WHILE WORKING SELF EMPLOYED FOR STEWART TITLE ASFTER WHICH I LOANED HER MONEY TO CORRECT HER BAD CRETT HISTORY WITH THE UNDERSTAQNDING SHE WOULD PAY BACK THE MONEY WHEN HER BUSINESSES WERE SUCCESSFUL AND SHE WAS ON HER FEET . TO DATE NONE OF THESE MONIES HAVE NEVER BEEN REPAID . THESE MONIES EXTEND FROM 2001 AND AMOUNT TO 56000 PER YEAR . DENA DISPUTES THIS AS SHE SAYS SHE PAID HER LOAN IN 2002 . NO PROFF TO DISPUTE THIS HOWEVER LOAN PAID REGARDLESS IF I WAS WORKING OT NOT I WAS NOT WORKING 1 YEAR (JUNE 2005-2006 12 MONTHS )ALSO 10 MONTHS (MAY 2007-FEB 2008) 7 MONTHS BETWEEN (MARCH 2008-Nov 2008) FINALLY 2 YEARS 9 ( MARCH 2009- DENA HAS MADE NO ATTEMPT TO REPAY ANYTHING .

living on pension income

Income source

Texaco / Chevron
NOTE PERSION PAYABLE AT THE 1ST OF EVERY MONTH INTO National westminister bank A/C 10084681 FROM THE START OF APRIL 2014
Monthly source Chevron letter dated 28th February 2014

| Basis | Basis | Year ended April 2014 | Annual Pension | Taxation Deducted at Source | Net pension received to be shared | Monthly net pension | 50% split as per UK divorce | Dollar |
|---|---|---|---|---|---|---|---|---|
| | | UK sterling | 31,776 | 4,465 | 27,311 | 2,275.95 | 13655.73 | |
| | My monthyly share in sterling pounds is | | | | | | 1137.977 | |
| | Dollar exchange rate annual average low | | | | | | | 1.4813 |
| | Dollar exchange rate annual average high | | | | | | | 1.6823 |
| | LATEST EXCHANGE RATE FROM FB&TuSING LATEST WIRE RATE | | | | | | | 1.63120157 |

| CONVERTED AT THE LATEST EXCHANGE RATE 1.6823 ( POUND TO DOLLAR) | 22220.6 |
|---|---|

| Average net monthly pension divide by 12 months | 1856.27 | As per May wire See 1.63120157 copy in file |
|---|---|---|

| out going expenses | monthly estimates |
|---|---|
| Cost of wire transfers from UK to FB&T which has no sort code only routing number 50 pounds sterling multiplied by dollare exchange rate | 74 |
| Electricty monthly living in 2 rooms without air conditioning. Can not manage this summer due to poor health | 150 |
| Gas heating not used just for heating water | 60 |
| City water and garbage collection | 50 |
| Property taxes currently delinquent | 500 |
| try to keep yard work reasonable monthly total | 100 |
| Medication see Doctors note for types UK free issue but only 90 days then required to see Uk doctor to replenish meds requires trip back to England to see a doctor cost of flight is fees and taxes $270 . Alturnative would be to consult with US doctor and pay monthly for medication . Assume us doctor would be more expensive than a 3 month return to the Uk average monthly cost do not expect daughters to pay for flights. | 90 |
| Phone bill estimated to be | 30 |
| Internet expenses currently using Java Jacks coffee house coffee per month Note no suddenlink usage for internet or Tv | 60 |
| Transportation currently cycling daily basis but trips to and from Houston airport reliaent on Rugby friend Irish to provide at a average cost of $150 each way ( fuel and time) . | 100 |
| Food ration to $12 per day | 360 |
| Normal outgoings | 1574 |
| Income from Pension | 1856 |
| Currently going letting propert taxes fall into arreas and coping without Air conditioning I can save short term $700 per moth | 282 |
| ignoring propert taxes and no air winter or summer can save but would not advise thinking about returning to England and live on welfare | 882 |

RESPONDENT'S
EXHIBIT 9

C:\Documents and Settings\Administrator\My Documents\divorce hard drive\divorce 3 court infomation\LIVING EXPENSES\Income Source .xlsx

Page 1



*Incoming Wire-Advice of Credit*

ACCOUNT #:   ***2070

Frederick Graham
1009 N University Dr
Nacogdoches  TX  75961

| | | | |
|---|---|---|---|
| **DATE:** | 05/15/2014 | **AMOUNT:** | 1,856.27 |
| **GFX REF #:** | 20141350003200 | | |
| **IMAD #:** | 20140515B1Q8021C017926 | **OMAD#:** | 20140515L1LFB47C000000705151020FT03 |

*Additional payment details are shown below:*

| | | |
|---|---|---|
| **SENDER FINANCIAL INSTITUTION** | *Name:* | CITIBANK NYC |
| | *ABA:* | 021000089 |
| **ORIGINATING PARTY (ORG)** | *Name:* | BRIDGET GRAHAM |
| | *Address:* | 34 AZALEA WAY, |
| | | GEORGE GREEN, |
| | | BUCKS, SL3 6RN |
| **BENEFICIARY PARTY (BNF)** | *Name:* | FREDERICK GRAHAM |
| | *Acct#:* | ***2070 |
| | *Address:* | |
| **BENEFICIARY'S FIN. INST. (BBK)** | *Name:* | |
| | *ABA:* | |

**REFERENCE FOR BENEFICIARY (RFB):**
**ORIGINATOR TO BENEFICIARY INFO (OBI):**
**BANK TO BANK INFORMATION (BBI):**

For questions regarding wires, please call 1-936-829-1041 or 1-936-829-1051.
All other questions can be directed to 1-936-829-4721 or toll free at 1-888-608-7787.

*This message is for the sole use of the intended recipient, and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by phone or fax and destroy all copies of the original message.*

**RESPONDENT'S
EXHIBIT 10**



Our ref: AON1751/CHV/A954445

**Chevron**

Mr FD Graham
34 Azalea Way
George Green
Slough
Berkshire
SL3 6RN



26 February 2014

**Chevron UK Pension Plan (The Plan)**

Dear Mr Graham

Thank you for your recent enquiry.

I can confirm that your Pension Commencement Lump Sum (PCLS) of £177,242.42 was paid when your pension commenced on 1 February 2008.

Please see the table below for details of your annual pension payments:

| Date | Gross Pension | Tax Deducted |
|------|---------------|--------------|
| 06/04/2009 | £35,327.74 | £12,201.40 |
| 06/04/2010 | £28,548.24 | £4,413.80 |
| 06/04/2011 | £28,808.13 | £4,465.80 |
| 06/04/2012 | £29,831.50 | £4,470.40 |
| 06/04/2013 | £30,934.41 | £4,565.00 |

If there's anything else you'd like to know, please get in touch (with your reference to hand) and we'll be happy to help

Yours sincerely

For and on behalf of the Trustee of the Chevron UK Pension Plan

Helpline Contact No: 0800 585 824 (or +44 800 585 824 from overseas)
Calls answered Monday to Friday 9:00am - 5:00pm
Email address: chevron.pensions@aonconsulting.co.uk
Website: www.chevronukpension.co.uk
Address for written correspondence:
Chevron UK Pension Plan
AON Hewitt Scanning Division
PO Box 196
Huddersfield
HD8 1EG

 Aon Hewitt Limited is authorised and regulated by the Financial Conduct Authority
Aon Hewitt Limited | Registered in England No. 4396310
Registered office: 8 Devonshire Square London EC2M 4PL

**RESPONDENT'S EXHIBIT 5**





Our ref: AON1751/CHV/A954445

Mr FD Graham
34 Azalea Way
George Green
Slough
Berkshire
SL3 6RN

30 July 2013

**Chevron UK Pension Plan (The Plan)**

Dear Mr Graham

Please find enclosed the information as requested in your recent phone call.

| | |
|---|---|
| Date Joined Company | 1 May 1979 |
| Date Joined Scheme | 1 August 1979 |
| Date of Leaving | 30 November 2001 |
| Start Date of Pension | 1 February 2008 |
| Type of Pension | Occupational Final Salary |
| Current Annual Payment | £31,476.24 (gross) |

More information can be found on the Chevron Pension website. Please find details below.

The website link is www.chevronukpension.co.uk

To ensure confidentiality the first time you visit the website, you will be required to enrol by entering personal information so that we can verify your identity. There are three steps to this process:

**Step 1** Begin by selecting 'Enrol' and entering your ▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮

**Step 2** The website will request you choose a password for accessing your benefits on subsequent visits. It can be a mix of letters and numbers and must be at least six characters long.

**RESPONDENT'S
EXHIBIT 6**

Chevron Pensions Administration is run by Aon Hewitt Limited.
Aon Hewitt Limited is authorised and regulated by the Financial Services Authority.
Aon Hewitt Limited. Registered in England No. 4396810. Registered office: 8 Devonshire Square London EC2M 4PL
GEN 10 (0513)



RESPONDENT'S
EXHIBIT 7

lip

On this page you will find up to your last 18 pension payslips that you can view and then print a copy for your records.

Select a payslip from the dropdown below.

Available Payslips:    01 Apr 2014 P

**Your Payslip**

Print

| If you have tax queries please telephone 0300 200 3300 or write to HM Revenue & Customs Regian House James Street Liverpool L75 1HW PAYE Ref: 428/C1070A | Please visit the "My Details" page on this website to make any changes to your address; and in addition you may visit the "Get In Touch" page to inform the Chevron UK Pension Plan administration team of any updated bank/building society account details. Alternatively you can contact the Chevron UK Pension Plan administration team on 0800 585824. Please also visit the "My Pension" page on this website to see the various elements that make up your current pension in payment. |

| **Payslip Additions** | | **Payslip Deductions** | |
|---|---|---|---|
| Pension | £2,695.87 | Tax | £381.70 |
| Total | £2,695.87 | Total | £381.70 |

| £2,695.87 | £381.70 | £0.00 | £0.00 | £31,776.45 | £4,465.40 | £2,314.17 | £27,311.05 |
|---|---|---|---|---|---|---|---|
| Gross | Tax | Gross | Tax | Gross | Tax | Current Period | Year to Date |
| **This Pension** | | **Pay/Pension Prev. Employment** | | **Pay/Pension Total For Year** | | **NET PENSION** | |

| Figures shown here should be used for your tax return if you receive one | Pay Date | 01/04/2014 | Tax Code/Tax | 944L |
|---|---|---|---|---|
| | Period Number | 12 | Basis | |
| | NI Number | YS329597C | Membership No. | A954445 |
| **Chevron UK Pension Plan** | | | Members Name | Mr FD Graham |

**RESPONDENT'S EXHIBIT 8**



Nacogdoches County
Carol Wilson
Nacogdoches County Clerk
Nacogdoches, Texas 75961

Instrument Number: 2012-8913

As

Recording

Recorded On: September 26, 2012

Parties: TURNER DENA MARIE

To  GRAHAM FREDERICK DAWSON

Billable Pages: 1

Number of Pages: 2

Comment: NOTICE OF LIS PENDENS

( Parties listed above are for Clerks reference only )

** Examined and Charged as Follows: **

Recording                  15.00

Total Recording:     15.00

*********** DO NOT REMOVE. THIS PAGE IS PART OF THE INSTRUMENT ***********

Any provision here n which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law

File Information:
  Document Number: 2012-8913
    Receipt Number: 92796
  Recorded Date/Time: September 26, 2012 12:55:30P
    Book-Vol/Pg: BK-OPR VL-3809 PG-155
  User / Station: J Allen - Cashier Station 01

Record and Return To:

  JEREMY WILLIS
  209 HUGHES
  NACOGDOCHES TX 75961



I hereby certify that this instrument was filed on the date
and time stamped heron and was duly recorded in the
Official Public Records in Nacogdoches County, Texas



Carol Wilson
Nacogdoches County Clerk

RESPONDENT'S
EXHIBIT 54

# NOTICE OF LIS PENDENS

## STATE OF TEXAS

## COUNTY OF NACOGDOCHES

NOTICE IS HEREBY GIVEN that Cause No. C1228635, styled In The Matter of The Marriage of Dena Marie Turner and Frederick Dawson Graham, was commenced in the 420th Judicial District Court of Nacogdoches County, Texas on September 21, 2012, and is now pending in such court.

The action involves the title and seeks to establish a lien interest or notice of encumbrance against real property situated in Nacogdoches County, Texas and described as follows:

All that certain lot or parcel of land in the city of Nacogdoches, Nacodoches County, Texas, and being Lot No.1 of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of the Plat Records, Nacogdoches County, Texas.

SIGNED this _____, 2012.

Jeremy S. Willis
209 Hughes Street
Nacogdoches, TX 75961
(936) 569-7944

## ACKNOWLEDGMENT

STATE OF TEXAS

COUNTY OF NACOGDOCHES

BEFORE ME, the undersigned Notary Public, on this day personally appeared Jeremy S. Willis, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that the same has been executed for the purposes and consideration therein expressed.

GIVEN under my hand and seal of office this September 25, 2012.

Notary Public, in and for
State of Texas

REBECCA MCCLELLAND
Notary Public, State of Texas
My Commission Expires
December 03, 2013



Instrument Number: 2012-8914

Recorded On: September 26, 2012

As

Recording

Parties: TURNER DENA MARIE

To    GRAHAM FREDERICK DAWSON

Billable Pages: 1

Number of Pages: 2

Comment: NOTICE OF LIS PENDENS

( Parties listed above are for Clerks reference only )

** Examined and Charged as Follows: **

Recording                    16.00

Total Recording:        16.00

************ DO NOT REMOVE. THIS PAGE IS PART OF THE INSTRUMENT ************

Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

File Information:

Document Number: 2012-8914
Receipt Number: 92797
Recorded Date/Time: September 26, 2012 12.58:03P
Book-Vol/Pg: BK-OPR VL-3809 PG-157
User / Station: J Allen - Cashier Station 01

Record and Return To:

JEREMY WILLIS
209 HUGHES
NACOGDOCHES TX 75961



I hereby certify that this instrument was filed on the date
and time stamped heron and was duly recorded in the
Official Public Records in Nacogdoches County, Texas

Carol Wilson

Carol Wilson
Nacogdoches County Clerk

RESPONDENT'S
EXHIBIT 55

# NOTICE OF LIS PENDENS

**STATE OF TEXAS**

**COUNTY OF NACOGDOCHES**

NOTICE IS HEREBY GIVEN that Cause No. C1228635, styled In The Matter of The Marriage of Dena Marie Turner and Frederick Dawson Graham, was commenced in the 420ᵗʰ Judicial District Court of Nacogdoches County, Texas on September 21, 2012, and is now pending in such court.

The action involves the title and seeks to establish a lien interest or notice of encumbrance against real property situated in Nacogdoches County, Texas and described as follows:

> All that certain lot or parcel of land in the city of Nacogdoches, Nacodoches County, Texas, and being Lot No. 2 of the Replat of Lot 25-C, City Block 67, as shown on Plat recorded in Volume 9, Page 25 of the Plat Records, Nacogdoches County, Texas.

SIGNED this _September 25_, 2012.

Jeremy S. Willis
209 Hughes Street
Nacogdoches, TX 75961
(936) 569-7944

## ACKNOWLEDGMENT

**STATE OF TEXAS**

**COUNTY OF NACOGDOCHES**

BEFORE ME, the undersigned Notary Public, on this day personally appeared Jeremy S. Willis, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that the same has been executed for the purposes and consideration therein expressed.

GIVEN under my hand and seal of office this September 25, 2012.

Rebecca McClelland
Notary Public, in and for
State of Texas

REBECCA MCCLELLAND
Notary Public, State of Texas
My Commission Expires
December 03, 2013

**Loan Agreement Between:**          Dated: 22nd June 2013

**Frederick D. Graham** purchaser of the following property in the City of Nacogdoches, Nacogdoches County, Texas and being Lot 25-C, CITY block 67, as shown on Plat recorded in volume 9, page 25 of the Records of Nacogdoches County, Texas.

Lending party being **Robert and Kathleen McCatty,** (U.K. citizens) residing at Halfacre, Ellington Road, Taplow, Buckinghamshire, SL6 0BA, England.

The purpose of the loan to enable Mr Frederick Graham to repay the outstanding arrears payment in full due to First Bank and Trust East Texas. The payment in full will result the relinquishment in the lien currently held by First Bank and Trust of East Texas and the lien being passed to Robert and Kathleen McCatty.

The amount of loan will be $15,000 principle. Repayable back to the lender within two years, 22nd June 2015, or when the property is sold which ever is the sooner.

The loan will carry interest of 10 percent (Annualized) once money has been paid to First Bank and Trust East Texas.

The loan is dependent on the legally executed transfer of the property lien and registered at the Nacogodoches County Court.

Duly signed by:

Robert McCatty:                         Kathleen McCatty:   K. McCatty
Dated:    22/6/2013                 Dated:    22nd June 2013.

Frederick D. Graham:
Dated   22/6/2013

RESPONDENT'S
EXHIBIT 31